UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAM RUBICON GLOBAL, LTD., a Delaware Corporation )<br><br>*Plaintiff,* )<br><br>v. )<br><br>TEAM RUBICON, INC., a Minnesota Corporation )<br><br>*Defendant,* )<br><br>TEAM RUBICON, INC., a Minnesota Corporation )<br><br>*Counterclaim Plaintiff,* )<br><br>v. )<br><br>TEAM RUBICON GLOBAL, LTD., a Delaware Corporation )<br><br>*Counterclaim Defendant.* ) | Civ. No. 20-cv-2537 (LTS) (KNF)<br><br>**TEAM RUBICON, INC.'S<br>ANSWER AND<br>COUNTERCLAIMS** |

**PRELIMINARY STATEMENT**

1.      Defendant and Counterclaim-Plaintiff Team Rubicon, Inc. ("Team Rubicon" or "Counterclaim-Plaintiff") is a charitable, non-profit organization that deploys U.S. Veterans to provide disaster relief in response to natural and humanitarian crises.  Since its founding in 2010, Team Rubicon has grown to include over 100,000 volunteers that provide support to communities affected by large scale disasters, including wildfires, tornadoes, hurricanes, floods, and even the ongoing COVID-19 pandemic.  In the process, Team Rubicon has developed a reputation as a preeminent disaster-relief organization, known for responding to emergency situations around the globe with speed and efficiency.

2.       Plaintiff and Counterclaim-Defendant Team Rubicon Global Ltd. ("TRG" or "Counterclaim-Defendant") was formed at the direction of Team Rubicon management in 2014 with the sole purpose of exporting and protecting the Team Rubicon brand outside of the United States.  Whereas Team Rubicon has grown substantially since its founding, TRG has languished. Since its inception, TRG has struggled to raise funds consistently and retain staff, directors, and officers.  At the time of this suit, TRG has only three employees and itself provides no disaster relief services.

3.       Pursuant to a Master Trademark License Agreement ( "MTLA") entered into in 2015, Team Rubicon licensed TRG the "Team Rubicon" trademarks (the "TR Marks") to use for certain enumerated purposes, including primarily the sublicensing of the marks outside of the United States to other regional organizations.  The TR Marks are well-known and valuable, having been registered with the U.S. Patent and Trademark Office in 2016.  The TR Marks are also registered in other jurisdictions, including the United Kingdom, Canada, Turkey, Australia, New Zealand and the Philippines.

4.       This dispute centers on Team Rubicon's termination of the MTLA, in accordance with its plain terms, following TRG's failure to cure its material breaches of the MTLA.  TRG's Complaint is nothing more than an attempt to divert attention and shift blame away from its breaches of its contractual obligations to Team Rubicon, its employees, volunteers, donors, and commercial partners.  The unfortunate reality is that TRG has for some time failed to protect the goodwill of the Team Rubicon brand, as required by the MTLA, and while Team Rubicon has attempted to work through these issues amicably, TRG's latest misconduct warranted termination of the MTLA and Team Rubicon's relationship with TRG.

5.      Specifically, in September 2019, TRG was made aware of credible allegations of sexual harassment by the CEOs of TR-United.Kingdom ("TR-UK") and TR-Australia ("TR-AUS"), these entities, as discussed further below, are sublicensees of TRG known as "TR-Xs." The harassment occurred at a particularly inappropriate time and place – during a Team Rubicon leadership conference and team-building retreat, designed to bring the volunteers and staff of the entire Team Rubicon network (including TRG and its TR-Xs) together to solidify their charitable goals, values, and mission.

6.      Promptly after the sexual misconduct allegations were reported, Team Rubicon conducted a thorough investigation, determined that the allegations were credible, and reached out to TRG to attempt to remedy the situation.  Team Rubicon requested that TRG undertake straightforward steps to address the inappropriate behavior and minimize the damage to Team Rubicon's reputation, goodwill, and morale among staff and volunteers.  TRG refused to do so. On the contrary, TRG attempted to exonerate the executives responsible for the sexual misconduct and harassment and protect their jobs.

7.      Through this conduct TRG has breached its contractual obligations in the MTLA. The MTLA empowered Team Rubicon with the authority to set and determine compliance with quality standards, not TRG, and empowered Team Rubicon with the right and authority to request action for curing such non-compliance.  TRG's breaches and failure to cure those breaches has damaged the reputation and goodwill of Team Rubicon the TR Marks.

8.      After these material breaches became clear, Team Rubicon sent TRG a notice of material breach, as required by the MTLA, setting forth those breaches and triggering a 60-day cure period in which TRG was required to cure them.  TRG failed to formally respond to Team Rubicon's notice letter or demonstrate any effort to cure its breach.

9.      Accordingly, in December 2019, following the 60-day period in which TRG'
failed to cure its breaches of the MTLA, Team Rubicon terminated the MTLA.

10.     Once the MTLA was terminated in December 2019, TRG lost *all* of its rights to
use or sublicense the TR Marks.  Nevertheless, TRG has unlawfully persisted in using those
marks and sublicensing them.  TRG's unauthorized use includes, but is not limited to, use of the
TR Marks on its social media posts and official communications, and in connection with its
fundraising efforts.  TRG has also falsely misrepresented to donors, sponsors, and volunteers that
it is still affiliated with Team Rubicon.

11.     In fact, even if the MTLA had not been terminated, TRG would be in violation of
it because TRG has used the TR Marks in the United States.  The MTLA only authorized such
use *outside* the United States.

12.     And, even if the MTLA had not been terminated, TRG has also sought to
capitalize improperly on its "global" moniker by intentionally confusing the public into thinking
that Team Rubicon is the regional U.S.-based arm of TRG.  Such representations are false and
misleading.

13.     TRG's campaign to sow confusion as detailed above has resulted in the siphoning
of critical aid, donations, and funding grants from donors and volunteers, which should have
gone directly to Team Rubicon to aid its charitable mission.

14.     Although TRG raced to the courthouse to initiate this lawsuit before Team
Rubicon sued it, there should be no misunderstanding about TRG's tactics.  TRG does not (and
cannot) assert any legitimate claims against Team Rubicon for breach of contract, tortious
interference, or interference with the TR Marks, because Team Rubicon owns those marks and
properly terminated its licensing relationship with TRG.  Moreover, as more fully explained

below, TRG's continued use of the TR Marks and its other representations regarding its relationship with Team Rubicon constitutes (a) trademark infringement, (b) unfair competition, (c) false advertising, and (d) tortious interference with Team Rubicon's prospective business advantages. Each of these counterclaims against TRG is pled below.

## ANSWER

Defendant Team Rubicon, by and through its undersigned counsel, hereby answers Plaintiff TRG's First Amended Complaint (the "Complaint"). Except to the extent expressly admitted herein, Team Rubicon denies each and every allegation in the Complaint, including any allegations contained in its headings or footnotes. With respect to any purported document cited to or quoted in the Complaint, Team Rubicon does not admit that the documents are accurate, relevant, or admissible in this action, and Team Rubicon reserves all objections regarding admissibility. Team Rubicon further reserves the right to change, supplement, and amend this Answer if and when new information is revealed to it. With respect to specific paragraphs of the Complaint, Team Rubicon responds as follows:

15.    Complaint Paragraph 1: Team Rubicon admits that Plaintiff purports to assert claims for breach of contract, tortious interference with contract, breach of the implied covenant of good faith and fair dealing, and/or tortious interference with prospective economic advantage. Team Rubicon denies that any such claims or the requested relief are proper or have merit. Team Rubicon otherwise denies the allegations in Paragraph 1.

16.    Complaint Paragraph 2: Team Rubicon admits that it is a non-profit organization that was founded in 2010 with the goal of using the skills and experience of volunteer U.S. Veterans to assist with disaster relief efforts around the globe, and further admits that TRG was

formed in 2014 as a legally separate non-profit.  Team Rubicon denies the remaining allegations in Paragraph 2.

17.    Complaint Paragraph 3:  Team Rubicon admits that it entered into a Master Trademark License Agreement (the "MTLA") with TRG in 2015.  To the extent Paragraph 3 purports to describe, characterize, or quote the MTLA, that document speaks for itself.  Team Rubicon denies the remaining allegations in Paragraph 3.

18.    Complaint Paragraph 4:  Team Rubicon admits that, since its inception, TRG has established relationships with its sublicensees, TR-Canada ("TR-CAN"), TR-AUS, TR-Norway ("TR-NORWAY") and TR-UK.  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 4 regarding Plaintiff's talks with potential organizations in the Netherlands, Germany and France.  Team Rubicon denies the remaining allegations in Paragraph 4.

19.    Complaint Paragraph 5:  Team Rubicon admits that it properly terminated the MTLA in December 2019.  To the extent Paragraph 5 purports to describe, characterize, or quote the MTLA, that document speaks for itself.  Team Rubicon denies the remaining allegations in Paragraph 5.

20.    Complaint Paragraph 6:  To the extent Paragraph 6 contains argument and legal conclusions, no response is required.  Team Rubicon denies the remaining allegations in Paragraph 6.

21.    Complaint Paragraph 7:  To the extent Paragraph 7 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon admits that, after the valid termination of the MTLA, it notified TRG and certain TR-Xs of their infringement on the TR Marks.  Team Rubicon denies the remaining allegations in Paragraph 6.

22.     Complaint Paragraph 8:  To the extent Paragraph 8 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 8 as to its actions.  Team Rubicon further denies that TRG has exclusive rights – or any rights for that matter – to license the TR Marks in light of the termination of the MTLA.  Team Rubicon lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 regarding TR-CAN's actions.

23.     Complaint Paragraph 9:  To the extent Paragraph 9 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 9 as to itself.  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 9, which relate to the Country Units.

24.     Complaint Paragraph 10:  To the extent Paragraph 10 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon admits that TRG purports to bring an action to obtain certain judicial declarations.  Team Rubicon denies that TRG is entitled to any of the judicial declarations that it seeks and denies any and all remaining factual allegations in Paragraph 10.

25.     Complaint Paragraph 11:  Team Rubicon admits the allegations in Paragraph 11 upon information and belief.

26.     Complaint Paragraph 12:  Team Rubicon admits the allegations in Paragraph 12.

27.     Complaint Paragraph 13:  Team Rubicon admits the allegations in Paragraph 13.

28.     Complaint Paragraph 14:  Team Rubicon admits the allegations in Paragraph 14.

29.     Complaint Paragraph 15:  Team Rubicon admits the allegations in Paragraph 15.

30.     Complaint Paragraph 16:  Team Rubicon admits that in January 2010, Team Rubicon was formed by Jacob Wood and William McNulty, and that it is a non-profit organization committed to providing disaster assistance to underserved communities.  Team Rubicon further admits that one of its core beliefs is that the organization can serve a dual purpose and help both people in need and the Veterans that respond to crisis.  Team Rubicon denies the remaining allegations in Paragraph 16.

31.     Complaint Paragraph 17:  Team Rubicon admits the allegations contained in Paragraph 17.

32.     Complaint Paragraph 18:  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 18, except that Team Rubicon admits that it established an International Expansion Committee for the purpose of helping expand its mission abroad.

33.     Complaint Paragraph 19:  Team Rubicon admits that in April 2013, Team Rubicon's International Expansion Committee recommended the expansion of Team Rubicon, and proposed that expansion be directed by a separate entity.  Team Rubicon denies the remaining allegations in Paragraph 19.

34.     Complaint Paragraph 20:  Team Rubicon admits the allegations in Paragraph 20.

35.     Complaint Paragraph 21:  Team Rubicon admits that IDEO was hired by Team Rubicon in or about February 2014 to assess potential mechanisms by which Team Rubicon could conduct international expansion, and that in or about June 2014, IDEO concluded that expansion should be carried out through a separate organization.  Team Rubicon denies the remaining allegations in Paragraph 21.

36.     Complaint Paragraph 22:  Team Rubicon admits the allegations in Paragraph 22.

37.     Complaint Paragraph 23:  Team Rubicon admits the allegations in Paragraph 23.

38.     Complaint Paragraph 24:  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 24, which relate to Plaintiff.  To the extent a response is required, Team Rubicon admits that TRG was required to ensure that its sublicensees followed Team Rubicon's philosophies, values and practices.  Team Rubicon denies the remaining allegations in Paragraph 24.

39.     Complaint Paragraph 25:  To the extent Paragraph 25 contains legal conclusions, no response is required.  Team Rubicon admits that it entered into the MTLA with TRG on or about October 9, 2015.  Team Rubicon refers to the MTLA for its contents and denies the allegations in Paragraph 25 to the extent those allegations are inconsistent with the MTLA. Team Rubicon denies the remaining allegations in Paragraph 25.

40.     Complaint Paragraph 26:  Team Rubicon admits the allegations in Paragraph 26.

41.     Complaint Paragraph 27:  Team Rubicon admits that in 2015, TRG entered into an agreement with an organization in the United Kingdom establishing Team Rubicon UK. Team Rubicon denies the remaining allegations in Paragraph 27.

42.     Complaint Paragraph 28:  Team Rubicon admits the allegations in Paragraph 28.

43.     Complaint Paragraph 29:  Team Rubicon admits the allegations in Paragraph 29.

44.     Complaint Paragraph 30:  Team Rubicon admits the allegations in Paragraph 30.

45.     Complaint Paragraph 31:  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 31, which relate to Plaintiff.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 31.

46.     Complaint Paragraph 32:  To the extent Paragraph 32 contains argument and legal conclusions, no response is required.  To the extent Paragraph 32 purports to describe, characterize, or quote the MTLA and individual TR-X sub-license agreements, those documents speak for themselves and TRG's characterization of those documents are denied.  Team Rubicon denies the remaining allegations in Paragraph 32.

47.     Complaint Paragraph 33:  To the extent Paragraph 33 contains argument and legal conclusions, no response is required.  To the extent Paragraph 33 purports to describe, characterize, or quote the MTLA, individual TR-X sub-license agreements, those documents speak for themselves and TRG's characterization of those documents are denied.  Team Rubicon denies the remaining allegations in Paragraph 33.

48.     Complaint Paragraph 34:  To the extent Paragraph 34 contains argument and legal conclusions, no response is required.  To the extent a response is required, Team Rubicon admits that TRG has repeatedly breached its contractual obligations under the MTLA since its execution in 2015, creating conflict between TRG and Team Rubicon, which Team Rubicon has—in good faith—attempted to resolve in order to further its charitable goals and mission.  Team Rubicon denies the remaining allegations in Paragraph 34.

49.     Complaint Paragraph 35:  To the extent Paragraph 35 contains argument and legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 35.

50.     Complaint Paragraph 36:  Team Rubicon admits that in August of 2019, the Team Rubicon Network was convened in Colorado.  Team Rubicon further admits that two executives from two of TRG's sublicensees were credibly accused of publicly engaging in gross sexual

misconduct and harassment of one or more female volunteers and staff who attended the meeting.  Team Rubicon denies the remaining allegations in Paragraph 36.

51.     Complaint Paragraph 37:  Team Rubicon denies the allegations in Paragraph 37.

52.     Complaint Paragraph 38:  Team Rubicon admits that in September 2019, after being informed of credible and disturbing accusations of gross sexual misconduct carried out by high-level executives of TRG's sublicensees, Team Rubicon informed TRG that, among other things, it expected TRG to implement certain quality control measures to preserve and protect the integrity of the Team Rubicon brand, and Team Rubicon's public image and reputation. Team Rubicon denies the remaining allegations in Paragraph 38.

53.     Complaint Paragraph 39:  To the extent Paragraph 39 contains argument and states legal conclusions, no response is required.  To the extent Paragraph 39 purports to describe, characterize, or quote the MTLA and individual TR-X sub-license agreements, those documents speak for themselves and TRG's characterization of those documents are denied. Team Rubicon denies the remaining allegations in Paragraph 39.

54.     Complaint Paragraph 40:  Team Rubicon admits that, given TRG's failure to take sufficient steps to safeguard, promote, and maintain the Team Rubicon brand, on October 9, 2019, Team Rubicon informed TRG that it was in material breach of the MTLA (the "October Letter").  To the extent Paragraph 40 purports to describe, characterize, or quote the October Letter, that document speaks for itself.  Team Rubicon denies the remaining allegations in Paragraph 40.

55.     Complaint Paragraph4 1:  Team Rubicon admits that, having received no response from TRG to the October Letter, and given TRG's failure to cure its material breaches within the cure period designated by the MTLA, on or about December 9, 2019, Team Rubicon notified

TRG that it was terminating the MTLA effective immediately. That notification speaks for itself. Team Rubicon denies the remaining allegations in Paragraph 41.

56.    Complaint Paragraph 42: To the extent Paragraph 42 contains argument and states legal conclusions, no response is required. To the extent a response is required, Team Rubicon denies the allegations in Paragraph 42.

57.    Complaint Paragraph 43: To the extent Paragraph 43 contains argument and states legal conclusions, no response is required. To the extent a response is required, Team Rubicon denies the allegations in Paragraph 43.

58.    Complaint Paragraph 44: Team Rubicon admits that it entered into a direct licensing agreement with TR-CAN on or about January 6, 2020, after Team Rubicon's licensing agreement with TRG was validly terminated in or about December 2019. Team Rubicon denies the remaining allegations in Paragraph 44.

59.    Complaint Paragraph 45: Team Rubicon admits that it entered into a direct licensing agreement with TR-CAN on or about January 6, 2020, after Team Rubicon's licensing agreement with TRG was validly terminated in or about December 2019, and after TR-CAN ended its relationship with TRG on or about December 16, 2019. Team Rubicon denies the remaining allegations in Paragraph 45.

60.    Complaint Paragraph 46: To the extent Paragraph 46 contains argument and states legal conclusions, no response is required. To the extent a response is required, Team Rubicon denies the allegations in Paragraph 46 as to itself. Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46, which relate to certain TR-X entities, and therefore denies those allegations.

61.     Complaint Paragraph 47:  To the extent Paragraph 47 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon admits that when contacted by Corporate Social Responsibility representatives from Activision and Moody's about Team Rubicon's response to the Australia Wildfires, Mr. Wood informed Activision and Moody's that TR-AUS no longer had a valid sublicense to use the Team Rubicon marks pursuant to the valid termination of the MTLA in or about December 2019. Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of certain allegations in Paragraph 47, which relate to certain TR-X entities, and therefore denies those allegations.  Team Rubicon denies the remaining allegations in Paragraph 47.

62.     Complaint Paragraph 48:  To the extent Paragraph 48 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 48 as to itself.  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48, which relate to TR-AUS, and therefore denies those allegations.

63.     Complaint Paragraph 49:  To the extent Paragraph 49 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 49 as to itself.  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49, which relate to Activision, and therefore denies those allegations.

64.     Complaint Paragraph 50:  To the extent Paragraph 50 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon admits that two TR-Xs purported to conduct investigations into the allegations of sexual and other misconduct following the August 2019 conference in Colorado.  Team Rubicon denies

that these investigations were thorough or, for that matter, designed to uncover the truth behind serious and credible allegations of the sexual harassment committed by the heads of these very same TR-Xs. Team Rubicon denies the remaining allegations in Paragraph 50.

65.     Complaint Paragraph 51:  In response to Paragraph 51, Team Rubicon incorporates by reference its responses to Paragraphs 1 through 50 of Plaintiff's Complaint.

66.     Complaint Paragraph 52:  Team Rubicon admits the allegations in Paragraph 52.

67.     Complaint Paragraph 53:  To the extent Paragraph 53 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon admits that it validly terminated the MTLA in or about December 2019.  Team Rubicon denies that TRG's contentions have any merit.  Team Rubicon denies the remaining allegations in Paragraph 53.

68.     Complaint Paragraph 54:  Team Rubicon admits that the Complaint purports to seek certain enumerated relief, but denies that TRG is entitled to any relief whatsoever.  Team Rubicon denies the remaining allegations in Paragraph 54.

69.     Complaint Paragraph 55:  Team Rubicon admits that TRG's use and sublicensing of the TR Marks and associated design elements following termination of the MTLA in or about December 2019 constitute trademark infringement.

70.     Complaint Paragraph 56:  Team Rubicon admits that TRG purports to seek a judicial determination, but denies that TRG is entitled to any such determination in its favor. TRG denies the remaining allegations in Paragraph 56.

71.     Complaint Paragraph 57:  Team Rubicon admits the allegations in Paragraph 57.

72.     Complaint Paragraph 58:  In response to Paragraph 58, Team Rubicon incorporates by reference its responses to Paragraphs 1 through 57 of Plaintiff's Complaint.

73.     Complaint Paragraph 59:  To the extent Paragraph 59 contains argument and states legal conclusions, no response is required.  To the extent Paragraph 59 purports to characterize the MTLA, that document speaks for itself and TRG's characterization of that document is denied.  Team Rubicon denies the remaining allegations in Paragraph 59.

74.     Complaint Paragraph 60:  To the extent Paragraph 60 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 60.

75.     Complaint Paragraph 61:  To the extent Paragraph 61 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 61.

76.     Complaint Paragraph 62:  To the extent Paragraph 62 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 62.

77.     Complaint Paragraph 63:  To the extent Paragraph 63 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 63.

78.     Complaint Paragraph 64:  In response to Paragraph 64, Team Rubicon incorporates by reference its responses to Paragraphs 1 through 63 of Plaintiff's Complaint.

79.     Complaint Paragraph 65:  To the extent Paragraph 65 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon admits that it validly terminated the MTLA on December 9, 2019.  To the extent Paragraph 65 purports to quote or characterize the MTLA, that document speaks for itself and

TRG's characterization of that document is denied.  Team Rubicon denies the remaining allegations in Paragraph 65.

80.    Complaint Paragraph 66:  To the extent Paragraph 66 contains argument and states legal conclusions, no response is required.  To the extent Paragraph 66 purports to characterize the MTLA, that document speaks for itself and TRG's characterization of that document is denied.  Team Rubicon denies the remaining allegations in Paragraph 66.

81.    Complaint Paragraph 67:  To the extent Paragraph 67 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 67.

82.    Complaint Paragraph 68:  To the extent Paragraph 68 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 68.

83.    Complaint Paragraph 69:  In response to Paragraph 69, Team Rubicon incorporates by reference its responses to Paragraphs 1 through 68 of Plaintiff's Complaint.

84.    Complaint Paragraph 70:  To the extent the allegations in Paragraph 70 state legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 70.

85.    Complaint Paragraph 71:  Team Rubicon denies the allegations in Paragraph 71.

86.    Complaint Paragraph 72:  To the extent Paragraph 72 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 72.

87.    Complaint Paragraph 73:  To the extent Paragraph 73 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in this Paragraph 73.

88.    Complaint Paragraph 74:  To the extent Paragraph 74 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in this Paragraph 74.

89.    Complaint Paragraph 75:  To the extent Paragraph 75 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in this Paragraph 75.

90.    Complaint Paragraph 76:  In response to Paragraph 76, Team Rubicon incorporates by reference its responses to Paragraphs 1 through 75 of Plaintiff's Complaint.

91.    Complaint Paragraph 77:  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 77, which relate to Activision, and therefore denies those allegations.

92.    Complaint Paragraph 78:  Team Rubicon denies the allegations in Paragraph 78.

93.    Complaint Paragraph 79:  To the extent Paragraph 79 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 79.

94.    Complaint Paragraph 80:  Team Rubicon denies the allegations in Paragraph 80 as to itself.  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 80, which relate to Activision and "others", and therefore denies those allegations.

95.    Complaint Paragraph 81:  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 81, which relate to TR-AUS and other TR-Xs and therefore denies those allegations.

96.    Complaint Paragraph 82:  Team Rubicon denies the allegations in Paragraph 82.

97.    Complaint Paragraph 83:  To the extent Paragraph 83 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 83.

98.    Complaint Paragraph 84:  Team Rubicon denies the allegations in Paragraph 84 as to itself.  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84, which relate to TR-AUS and other TR-Xs and therefore denies those allegations.

99.    Complaint Paragraph 85:  To the extent Paragraph 85 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 85 as to itself.  Team Rubicon lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph, which relate to TR-AUS and other TR-Xs, and therefore denies those allegations.  The remaining allegations in Paragraph are denied.

100.    Complaint Paragraph 86:  To the extent Paragraph 86 contains argument and states legal conclusions, no response is required.  To the extent a response is required, Team Rubicon denies the allegations in Paragraph 86.

## AFFIRMATIVE DEFENSES

Team Rubicon sets forth below its affirmative defenses.  By setting forth these affirmative defenses, Team Rubicon does not assume the burden of proving any fact, issue, or

element of a cause of action where such burden properly belongs to TRG.  Team Rubicon reserves the right to amend or add additional affirmative defenses as necessary.

### AS AND FOR A FIRST DEFENSE

TRG's claims are barred, in whole or in part, because the Complaint fails to state a claim for which relief can be granted.

### AS AND FOR A SECOND DEFENSE

TRG's claims are barred, in whole or in part, because the Complaint improperly seeks equitable remedies for alleged harm that is monetary in nature, and for which an adequate remedy at law exists.

### AS AND FOR A THIRD DEFENSE

TRG's claims are barred, in whole or in part, by TRG's failure to cure or mitigate its damages.

### AS AND FOR A FOURTH DEFENSE

TRG's claims are barred, in whole or in part, by the doctrine of unclean hands and/or *in pari delicto*.

### AS AND FOR A FIFTH DEFENSE

TRG's claims are barred, in whole or in part, because Team Rubicon has not breached any contract with TRG.

## AS AND FOR A SIXTH DEFENSE

TRG's claims are barred, in whole or in part, because Team Rubicon's conduct was lawful in all respects under the state and federal laws then applicable.

## AS AND FOR A SEVENTH DEFENSE

TRG's claims are barred, in whole or in part, because Team Rubicon's conduct was proper under the relevant agreement in place with TRG, and/or because TRG breached its obligations under one or more applicable agreements.

## AS AND FOR AN EIGHTH DEFENSE

TRG's claims are barred, in whole or in part, because they are duplicative of one another, and therefore barred under New York law.

## AS AND FOR A NINTH DEFENSE

TRG's Complaint does not describe the claims or events with sufficient particularity to permit Team Rubicon to ascertain what other defenses may exist, and Team Rubicon presently has insufficient knowledge or information to form a belief as to whether it has additional, as yet unstated, defenses available to it. Team Rubicon therefore reserves the right to assert all defenses that may pertain to the Complaint once the precise nature of the claims is ascertained and in the event discovery indicates that such claims would be appropriate.

## TEAM RUBICON'S COUNTERCLAIMS

Defendant-Counterclaim Plaintiff Team Rubicon, as and for its Counterclaims, under Rule 13 of the Federal Rules of Civil Procedure, asserts these Counterclaims against Plaintiff-Counterclaim Defendant TRG, and alleges upon knowledge as to facts of which it has knowledge and upon information and belief as to all other matters as follows:

## THE PARTIES

1.        Team Rubicon is a Minnesota corporation founded in 2010 with its principal place of business in Los Angeles, California.

2.        Upon information and belief, TRG is a Delaware corporation founded in 2014 with its principal place of business in Washington, District of Columbia.

## JURISDICTION AND VENUE

3.        Team Rubicon and TRG are citizens of different states, and the amount in controversy exceeds $75,000.  This Court thus has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  The Court also has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1331.

4.        Pursuant to Section 24 of the MTLA, the parties consented to litigation in the Southern District of New York and have waived any claim that this Court lacks jurisdiction or that venue is improper.  Accordingly, venue is proper pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

### A.        Team Rubicon and The TR Marks

5.        In 2010, Jacob Wood and William McNulty founded Team Rubicon, an international disaster-response nonprofit that unites the skills and experiences of U.S. Veterans with first responders to provide rapid relief to communities in need during large-scale disasters. Team Rubicon's mission is two-fold: not only does the organization's operation benefit the communities it serves, it also enriches the lives of its U.S. Veteran volunteers by helping them find purpose and community as they reintegrate into society after military service.

6.        Team Rubicon has grown quickly.  Since its first mission, Team Rubicon has launched over 500 additional operations across all 50 U.S. states.  These operations include responses to hurricanes Harvey, Sandy, Florence, Michael, and Dorian, as well as wildfires in

California and many other natural disasters.  Team Rubicon is often one of the first to respond to humanitarian crises.  Team Rubicon offers a variety of services to the affected communities it serves, including but not limited to, performing incident management, damage assessments, disaster mapping, debris management, hazard mitigation, expedient home repair, and emergency medicine provision.

7.      Team Rubicon currently maintains a roster of over 100,000 volunteers, all of whom are ready and able to deploy almost immediately throughout the United States.

8.      Team Rubicon is currently responding to the COVID-19 crisis.  In addition to traditional fundraising and disaster-awareness relief efforts, Team Rubicon has created a unique and technologically advanced drop-in COVID-19 testing center in Charlotte, North Carolina— the first of its kind in the state.  Team Rubicon expects to deploy multiple facilities like this throughout the United States in response to the coronavirus pandemic.

9.      Team Rubicon has developed various intellectual property assets known as the TR Marks.  For example, Team Rubicon registered with the U.S. Patent and Trademark Office and owns Registration No. 5,048,837 for its logo:



and Registration No. 5,048,836 for its standard character mark "TEAM RUBICON."  Team Rubicon has used both marks since 2010 in connection with its charitable missions and goals.

10.      Specifically, Team Rubicon employs the TR Marks in connection with its emergency medical and crises response services, including but not limited to its deployment of

medical, military, and other civil service experienced professional team into emergency medical and crisis situations, disaster relief, and rescue services such as risk assessment, mitigation services to victims of natural and manmade disasters, field triage, relief operations, first aid and supplies, food, shelter, and other critical materials. The TR Marks are also used in connection with Team Rubicon's provision of consultation services and other information in the field of emergency response and natural and manmade disaster aid services, among other things.

11.    Team Rubicon assists the world's most vulnerable populations at their most vulnerable hour. For that reason, the reputation of, and goodwill associated with, the TR Marks are crucial to the success of Team Rubicon's mission. Team Rubicon takes great care to preserve the strength of its intellectual property and its reputation. For instance, Team Rubicon conducts criminal background checks on its volunteers before deploying those individuals to serve in relief efforts; all volunteers and clients served are automatically provided with satisfaction surveys; anonymous feedback mechanisms are available via multiple forms; and all employees, instructors and incident managers take manager-level harassment prevention training.

12.    The strength of Team Rubicon's intellectual property is further demonstrated by widespread favorable media coverage of the organization's operations with extensive reference to the marks, as well as use of the marks in formal partnerships with institutional donors and other business affiliates. Indeed, within the past year alone, Team Rubicon and its TR Marks have been discussed and referenced in national news coverage discussing Team Rubicon's wildfire mitigation operations, flood cleanup operations, hurricane relief efforts, and response to the ongoing COVID-19 pandemic. For instance, on April 16, 2020, Team Rubicon, and its

volunteers were recognized for their rapid response to COVID-19 in a CNN article titled, "Team Rubicon Mobilizes Veterans to Serve their Neighbors During Covid-19 Pandemic."

13.    The TR Marks are critical to Team Rubicon's fundraising efforts.  The organization is able to solicit both individual and institutional donations and volunteers as a result of its goodwill and strong, favorable reputation.  As part of its mission and goals, it is critical that Team Rubicon hold itself to the highest standards of professionalism and organizational integrity.  Consistent with Team Rubicon's core tenets of conducting its operations with integrity, Team Rubicon is committed to creating a safe work environment, and imposes a strict code of conduct on its employees and executives, each of whom represents the Team Rubicon brand.

### B.    Team Rubicon's Licensing Agreement with TRG

14.    In 2012, Team Rubicon established an International Expansion Committee to explore ways in which the Team Rubicon mission could be grown to include a global reach. This Committee issued a report that recommended the formation of a distinct legal entity to spearhead global expansion.  The report also noted that any new entities formed as part of this global expansion should be required to protect the Team Rubicon brand, and that Team Rubicon and the new legal entity should be empowered to quickly and quietly disassociate themselves from any affiliated entities that did not meet the requirement to protect the Team Rubicon brand.

15.    Thus, in 2014, Team Rubicon approved the formation of TRG—a legally separate organization, led by Team Rubicon co-founder William McNulty—that was slated to export the Team Rubicon brand and mission internationally.  Part of this expansion contemplated TRG's issuance of sublicenses to new entities around the world that would model Team Rubicon's values and goals under the "Team Rubicon" name.  TRG's role in this mission was to help launch the new entities by providing guidance and resources that would help mirror Team

Rubicon's operations and incorporate Team Rubicon's core philosophies, values, and practices. Each new entity was known as a "TR-X," with the "X" indicating its geographic region (*i.e.*, TR-U.K. and TR- Canada).

16.     To formalize this objective, and to solidify the licensor-licensee relationship between Team Rubicon and TRG, the two entities negotiated and entered into a Master Trademark License Agreement (the "MTLA") in October 2015.  The MTLA governed the terms by which TRG could use the TR Marks outside the United States, including the "Team Rubicon" brand, logo, and related intellectual property, as well as how TRG could sublicense the TR Marks to respective sublicensees outside the United States.  A copy of the MTLA is attached as Exhibit A.

17.     The MTLA governed all aspects of TRG's use of the TR Marks, and imposed stringent requirements on TRG and its sublicensees.   This requirements are expressly stated throughout the MTLA.   For example, Section 2(a) of the MTLA established that "all use of the Licensed Marks by [TRG] and any accrued goodwill shall inure solely to the benefit of [Team Rubicon]."

18.     Similarly, Section 4(f) of the MTLA protected the brand and goodwell of Team Rubicon by requiring that "all uses of the Licensed Marks by [TRG] shall be in accordance with … the Brand Identity Guidelines" established by Team Rubicon.

19.     Section 4(h) went even further, mandating that TRG "shall not use the Licensed Marks in any way that would reasonably be expected to injure the value of the Licensed Marks or the goodwill associated therewith or with the Licensor" and establishing that TRG "hereby warrants that it shall not use the Licensed Marks in any manner that may, in *Licensor's reasonable judgment* [emphasis added], be inconsistent with Licensor's public image or that may

25

in any way disparage or adversely affect Licensor or its reputation."  Section 4(h) further barred TRG from allowing any TR-X to use the licensed marks in any manner that reflected poorly on Team Rubicon.

20.    Under Section 4(c) of the MTLA, TRG received a limited license to register and use a domain name using the TR Marks, provided that such registrations be made in the name of, on behalf of, and for the benefit of Team Rubicon.  TRG registered the domain name *teamrubiconglobal.org* pursuant to that license.  In the event that the MTLA was terminated, TRG was required to assign that domain name to Team Rubicon pursuant to Section 15(iv) of the MTLA.

21.    The MTLA set forth clearly the importance of the preservation of the value of and goodwill associated with the TR Marks.  In Section 5(a) of the MTLA, TRG acknowledged that "the Licensed Marks are very valuable and must continue to be associated only with high quality goods and services in order to maintain their value" and that it "further agree[d] to cooperate and comply with all quality control measures undertaken by or at the request of Licensor in order to preserve and protect the integrity of the Licensed Marks."

22.    The MTLA also provided broad protections against the misuse and degradation of the TR Marks by TRG or any of its sublicensees.  For instance, under Section 5(b) of the MTLA, TRG was obligated to "maintain quality standards for all . . . services offered by it in connection with the Licensed Marks *that are substantially equivalent to or stricter than the standard required . . . by the Licensor* [emphasis added]."

23.    The MTLA empowered Team Rubicon with the sole authority to determine whether TRG, or any TR-X, was not materially in compliance with Team Rubicon's quality standards.  Under Section 5(c) of the MTLA, if Team Rubicon determined, in its sole discretion,

26

that TRG "or any sublicensee" was materially not in compliance with its quality standards, Team Rubicon had the right and authority to request action for curing su\ch non-compliance. Failure to cure non-compliance necessitated TRG and its sublicensees to cease offering goods and services *immediately*.

24.     Along similar lines, in the event TRG failed to comply with other material provisions of the MTLA, Team Rubicon possessed the exclusive and sole right to terminate the MTLA with notice. Specifically, pursuant to Section 13(b) of the MTLA, Team Rubicon had the right to terminate TRG's sublicense in the event of an uncured "material breach" by TRG; the MTLA defined such breach as "Licensee's misconduct which materially and adversely impacts the [Team Rubicon] License Marks or the associated goodwill."

25.     In Section 9 of the MTLA, TRG agreed to indemnify Team Rubicon for any losses, damages, settlements, fees, expenses, or costs (including reasonable attorneys' fees) incurred by them based upon any claim arising from Licensee's or any sublicensee's performance of obligations under the MTLA or sublicense agreement, or for any breach of the agreement by TRG or its sublicensees.

26.     In addition to TRG's commitments under the MTLA, TRG also entered into similar agreements with each of its TR-Xs. Pursuant to these sublicense agreements, TRG was empowered to terminate any TR-Xs rights for failure to comply with the strict standards set forth in either the MTLA, the sublicensing agreements between TRG and the TR-Xs, Team Rubicon's Brand Identity Guidelines, or any other standards set forth by Team Rubicon.

27.     The MTLA only authorized TRG's use of the marks within a strictly defined "Territory," which was defined as any jurisdiction worldwide *other than the United States* (MTLA § 1(k)), and only for the following defined "Permitted Purpose": (i) charitable services,

27

and resource allocation to, organizations concerned with disaster relief, crisis response, emergency response, emergency rescue, and veteran support; (ii) indicating membership in and/or affiliation with the Team Rubicon brand; (iii) advertising and/or promoting such organizations' services and mission; and (iv) providing, manufacturing, promoting and distributing products bearing the Team Rubicon marks.  The MTLA did not include fundraising in the definition of TRG's Permitted Purpose.

### C.    TRG And Its TR-X Sublicensees

28.    Pursuant to the MTLA and TRG's respective sublicense agreements, several TR-X organizations were formed.  By 2019, TRG had helped in the formation of TR-Canada ("TR-CAN"), TR-Australia ("TR-AUS"), TR-United Kingdom ("TR-UK), and TR-Norway ("TR-NO").

29.    While TRG does not own any of the TR-X entities, it does have certain rights to control each TR-X entity through its sublicense agreements, which require oversight of the TR-Xs.  In particular, under Section 5 of the MTLA, TRG is required to monitor each TR-X's use of the TR Marks and ensure that each TR-X is in compliance with the standards set forth by Team Rubicon for use of the TR Marks so as to preserve the value of Team Rubicon's reputation, brand, and goodwill.  In the event a TR-X is not in compliance with Team Rubicon's standards or has engaged in conduct that would damage the goodwill associated with the TR Marks, TRG has the power to demand corrective action be taken.  Failing that, TRG has the ability to terminate a TR-X's right to continued use of the TR Marks pursuant to its sublicense agreements with the TR-X's.  In that way, TRG has substantial control over the conduct and management of the TR-X entities and specifically their use of the TR Marks.  However, TRG must take its lead in this regard from Team Rubicon.  Notably, Section 5 of the MTLA vested Team Rubicon, and

not TRG, with the authority to determine whether a TR-X was in non-compliance with the Team
Rubicon brand standards.

### D.    Team Rubicon's August 2019 Leadership Retreat

30.    Although in contractual privity with TRG rather than the TR-Xs, Team Rubicon
has also formed close professional relationships with each of the TR-Xs, and has helped each
TR-X grow and undertake rescue and other disaster relief efforts in countries across the globe.
In fact, many TR-Xs have expressed their view that they have received more support and
guidance from Team Rubicon than from TRG.  To foster these bonds and build stronger
relationships across Team Rubicon, TRG, and each of the TR-Xs (the "Team Rubicon
Network"), Team Rubicon holds an annual multi-day Leadership Conference each August.  The
conference is intended to spread Team Rubicon's culture and core values, and determine strategy
and set goals for the upcoming year.

31.    The 2019 Team Rubicon Leadership Conference took place in Colorado and
began on or about August 13, 2019 and continued through August 18, 2019.  High-level
executives from Team Rubicon and TRG were in attendance at the leadership conference, as
well as Team Rubicon sponsors, donors, and senior executives of corporate partners.  Attendees
also included the representatives of TRG's sublicensees, including TR-AUS, TR-CAN, and TR-
UK.

32.    As an organization dedicated to service, the safety of Team Rubicon's volunteers
and employees is of utmost importance.  Thus, in preparation for the event, Team Rubicon
created welcome packets that were distributed to all attendees upon arrival at the conference.
The welcome packets included a copy of Team Rubicon's official Code of Conduct.

33.    Team Rubicon's Code of Conduct set forth several of the core values and
principles on which Team Rubicon was founded, including Team Rubicon's commitment to

professionalism and humanitarianism.  Importantly, the Code of Conduct set forth that all

attendees at the Leadership Conference have the right to "operate in a safe, inclusive

environment" and "be treated with respect."

34.    The Team Rubicon Code of Conduct is consistent with Team Rubicon's own

Employee Handbook, which states in relevant part:

> [Team Rubicon] is committed to providing a work environment that is free from all
> forms of discrimination and conduct that can be considered harassing, coercive, or
> disruptive, including sexual harassment.  Actions, words, jokes, or comments based
> on an individual's sex, race, color, national origin, age, religion, disability, sexual
> orientation, gender identity, pregnancy, military status, or any other legally
> protected characteristics will not be tolerated.  Harassment is unwelcome verbal,
> visual or physical conduct creating an intimidating, offensive, or hostile work
> environment that interferes with work performance. Examples of harassment
> include verbal (including slurs, jokes, insults, epithets, gestures or teasing), graphic
> (including offensive posters, symbols, cartoons, drawings, computer displays, or e-
> mails) or physical conduct (including physically threatening another, blocking
> someone's way, etc.) that denigrates or shows hostility or aversion towards an
> individual because of any protected characteristic. Such conduct constitutes
> harassment when: 1) it has the purpose or effect of creating an intimidating, hostile,
> or offensive working environment; or 2) it has the purpose or effect of unreasonably
> interfering with an individual's work performance; or 3) it otherwise adversely
> affects an individual's employment opportunities.

35.    Team Rubicon's Employee Handbook also strictly prohibits sexual harassment.

Such harassment is considered as unwanted sexual advances, or visual, verbal, or physical

conduct of a sexual nature.  Pursuant to Team Rubicon's policies, any allegations of sexual

harassment must be quickly and discreetly investigated.  Team Rubicon requires that *all* of its

employees and external instructors and incident managers undergo harassment prevention

training.

36.    Notwithstanding these guidelines and protocols, on August 18, 2019, at the

conclusion of the Leadership Conference, credible accusations of sexual misconduct were

presented to executives at Team Rubicon regarding sexual misconduct committed by high-level

male executives of two TR-Xs, against a female conference attendee from another TR-X.  The allegations included, among other things, sexual advances, comments of a sexual nature, and the propositioning for sex, along with other unprofessional and lewd comments unbecoming of a member of senior leadership within the Team Rubicon Network.  Both the alleged victim of the misconduct and executives at the victim's TR-X voiced their disappointment with the behavior of the senior-level executives to Team Rubicon leadership, and further articulated that the target of the comments was clearly and understandably distraught.

37.     The allegations leveled against the high-level executives, if true, would constitute clear violations not only of the Equal Employment Opportunity Commission standards and laws against workplace discrimination, but would also violate the strict standards outlined in Team Rubicon's own Employee Handbook and Code of Conduct.  While secondary to the safety and well-being of the victim of such treatment, such allegations, if true, would also cast the Team Rubicon brand in a poor light, as the Leadership Conference was attended not only by staff and volunteers of Team Rubicon and the Team Rubicon network, but also Team Rubicon's sponsors and business partners.

38.     In consideration for the safety of its own employees and those of the TR-Xs and out of concern for its reputation and goodwill, Team Rubicon determined that an immediate and thorough investigation was warranted.  The victim's TR-X requested that Team Rubicon investigate the allegations because Team Rubicon had no relationship to the accuser or the two individuals accused of sexual misconduct independent of their indirect licensing relationship with their employers, and because Team Rubicon had a professional human resources team that could adequately conduct such an investigation.  In other words, Team Rubicon was best positioned to undertake a swift and unbiased investigation, rather than have the investigation

carried out by TRG or a TRG sublicensee with a personal interest in the outcome of the investigation.

39.    On August 19, 2019, the day after the allegations surfaced, Team Rubicon initiated its investigation.  Team Rubicon assigned its President and Chief Operating Officer, a former Commanding Officer in the U.S. Navy with a background in conducting military investigations, to oversee the investigation.  The investigation was aided by two other personnel, including one woman, within Team Rubicon's People Operations team that had experience in human resource investigations and training.  Over the course of a week, the investigation team reviewed email correspondence and conducted over a dozen interviews of witnesses to the alleged conduct at issue, including the accuser, the two individuals accused of sexual misconduct, a volunteer affiliated with one of the TR-Xs, and a senior executive from TRG, who was also the roommate of one of the accused individuals for the duration of the conference.

40.    Through its investigation, Team Rubicon learned of additional inappropriate behavior inconsistent with Team Rubicon's mission and brand from one of the male senior executives, including additional unwanted sexual advances toward a female Team Rubicon staff member and the public humiliation of another junior female staff member.  Both episodes placed Team Rubicon in a highly negative light, harming its reputation and goodwill.

41.    On August 23, 2019, Team Rubicon's investigatory team presented its findings to Team Rubicon's Board of Directors.  The investigatory team weighed its findings against the standards set forth by the United States Department of Labor, as well as Team Rubicon's own Code of Conduct and internal standards, and determined that, had either executive been employed directly by Team Rubicon, they would have been fired for cause.

E.   **TRG's Failure To Protect And Maintain Team Rubicon's Goodwill**

42.     On or about September 5, 2019, Team Rubicon sent TRG a letter notifying TRG

of the conclusions from its investigation.  A copy of this letter is attached hereto as Exhibit B.

Team Rubicon's letter stated, in part, that the investigation resulted in "a determination that such

accusations were credible" and that such conduct was "inconsistent with, and may disparage,

adversely affect, or injure the value or goodwill associated with the [Team Rubicon brand]

(including trademarks and logos), and Team Rubicon's public image and reputation."  Indeed, at

that point in time, such damage had already been done, as several witnesses to the offending

conduct noted they were embarrassed and/or ashamed to be associated with the Team Rubicon

brand.  Team Rubicon further reiterated that it has "zero tolerance" for such conduct.  Indeed,

Team Rubicon's code of professionalism and its commitment to ensuring a safe working

environment remain paramount priorities across the Team Rubicon network to this day.

43.     In the same letter, Team Rubicon noted that the conduct of the senior executives

breached both the MTLA as well as the sublicensing agreements between TRG and each at-issue

TR-X, i.e., TR-AUS and TR-UK.  Indeed, such conduct tarnished both Team Rubicon and the

TR Marks.

44.     To ensure the safety of employees within the Team Rubicon Network, and to

mitigate further damage to the integrity of the Team Rubicon brand and reputation, Team

Rubicon set forth measures for TRG to implement in order to rectify the situation with respect to

each of the offending sublicensees.  Specifically, Team Rubicon insisted that TRG (i)

immediately prohibit the at-issue executives from participating in all ongoing and future Team

Rubicon activities; (ii) timely terminate the at-issue executives for cause and in compliance with

local law; (iii) forbid TRG, TR-AUS, and TR-UK from contacting the victim, or any witnesses to

the harassment for the protection of such individuals, and (iv) require that TR-AUS and TR-UK retrain their paid staff and regular volunteers on harassment prevention.

45.    Finally, Team Rubicon also requested inspection of each of TRG's and its sublicensees' employee handbooks and any other policies related to prohibitions on harassment and the protection of whistleblowers, as well as a description of each entity's processes for investigating harassment, sexual harassment training policies, and proposed training policies for the upcoming year.

46.    Team Rubicon's letter provided TRG the opportunity to cure its material breaches of the MTLA and set forth the straightforward steps TRG could take to do so.  Inexplicably, however, TRG showed no interest in implementing any of these remedial measures.  Nor, for that matter, did TRG provide any of the information Team Rubicon requested in the September 5 letter to ensure that each of TRG and its sublicensees maintained proper policies and trainings that would help ensure that staff and volunteers were treated with proper respect and provided a safe environment in the future.  Specifically, TRG did not procure, as it was contractually required to do, (i) any employee handbooks, (ii) any policies on sexual harassment prevention, or (iii) any code of conduct from either itself or any of its sublicensees.  Indeed, TRG chose not to respond to Team Rubicon's September 5 letter.

47.    Team Rubicon also alerted TR-AUS and TR-UK, whose  senior executives were the subject of investigation, of the allegations and Team Rubicon's investigative conclusions. TR-UK initially placed its CEO on suspension, and then immediately initiated its own investigation.  Prior to the conclusion of that investigation, however, TR-UK's board of directors reinstated the CEO.  However, the decision to reinstate was not based on an indication that the allegations made against him were not credible; rather, such action was taken because, according

to the Chairman of TR-UK's Board, the investigation process was simply "taking significantly longer than . . . anticipated" and it was "necessary to consider the immediate needs of [TR-UK]." Ultimately, TR-UK's investigation concluded that five of the six allegations against the CEO—including gross misconduct, verbal abuse, and the berating of a junior female staff member to the point of tears—were well-founded. Notwithstanding these findings, TR-UK continued to employ the CEO.

48.     TR-AUS also conducted an investigation into the allegations. TR-AUS did not place its CEO on leave or suspension during the course of the investigation, and—even more troublingly—he attempted to contact the victim of the harassment through an intermediary, despite Team Rubicon's insistence that her identity be protected. Team Rubicon was never provided with a copy of TR-AUS' investigative report or a summary of its conclusions. To this day, TR-AUS's CEO continues to be employed by TR-AUS.

49.     TRG's lack of engagement in remediating the conduct of its sublicensees, which it was contractually empowered and obligated to do (including through, if necessary, terminating its licensing arrangements with the offending TR-Xs), violated the terms of the MTLA. Indeed, TRG had an obligation to ensure the safety of the individuals associated with its sublicensees, as well as all employees and volunteers within the Team Rubicon Network. In breaching its responsibilities, TRG caused significant harm to Team Rubicon, the TR Marks, and negatively impacted morale among the entire Team Rubicon Network. These failures also highlighted a misalignment of TRG's prioritization of its relationships with certain TR-Xs over the protection of the Team Rubicon brand and TR Marks, and constituted serious misconduct on the part of TRG that jeopardized Team Rubicon's reputation and ability to conduct effective charitable work and fundraising.

50.     On October 9, 2019, Team Rubicon sent another letter to TRG, a copy of which is attached hereto as Exhibit C.  This letter again noted that Team Rubicon has "zero tolerance for [the] alleged grave misconduct."  Team Rubicon's letter also stated, "separate and apart from our obvious concern for the well-being of Team Rubicon's volunteers and staff, we are committed to safeguarding, promoting and maintaining the valuable [Team Rubicon brand]."  Team Rubicon set out, in clear and unequivocal terms, "[Y]our failure to timely and fully resolve this grave misconduct has and will continue to materially and adversely impact the [Team Rubicon brand] and associated goodwill."

51.     Within the letter, Team Rubicon also notified TRG, pursuant to the terms of the MTLA, that the letter "constitutes notice of your material breach of the Agreement."  The October 9, 2019 letter demanded that TRG cure its breach within 60 days of the notice, as required by Section 13(b) of the MTLA.

52.     Again, TRG failed to demonstrate that it had taken the requested remedial action over the next 60 days.  It did not force the termination of the offending executives or forbid anyone from contacting the victims of their sexual harassment.  To Team Rubicon's knowledge, TRG also did not require that TR-AUS and TR-UK retrain their paid and volunteer staff in harassment prevention.  And it took no action to protect the Team Rubicon brand, TR Marks, and reputation as required by the MTLA and sublicense agreements.  TRG also failed to provide the requested information regarding TRG and its sublicensees' harassment and training policies. In addition to ignoring the MTLA's 60 day cure period, TRG's failure to take remedial steps to protect the Team Rubicon brand and the TR Marks not only violated Section 13(b)(iv) of the MTLA, but several other sections of the MTLA, including but not limited to Section 4(c), 4(h),

and 5(a)-(c), dealing with TRG's obligations to maintain the quality and good will of the Team Rubicon brand.

53.    Not only did TRG never demonstrate any attempt to remediate the misconduct at its sublicensees to protect Team Rubicon from further harm, but in fact it did the opposite.  On December 4, TRG's board of directors convened and voted on whether to accept the TR-UK's decision to retain its CEO in spite of conclusions by both the Team Rubicon and TR-UK investigation teams that the CEO had engaged in misconduct, and whether that decision was an appropriate cure for the breach noted in Team Rubicon's October 9, 2019 letter.  The TRG board, which consisted of seven individuals, was initially split 3-to-3 as to whether TR-UK's conduct was acceptable: TRG's Chairman, TRG's CEO (then Dr. Steve Hunt), and a TR-CAN representative expressed disapproval with TR-UK's decision, while TR-NO's representative, TR-AUS' representative, and William McNulty stated TR-UK's conduct was appropriate.  TR-UK's representative on the Board abstained.  Mr. McNulty, TRG's current CEO, therefore declined to condemn the actions of TR-UK and its CEO.  Again, such a result was reached in spite of (i) TR-UK's own investigation concluding that its CEO was guilty of conduct unbecoming of an executive as well as verbal abuse of a female employee, and (ii) Team Rubicon's independent investigation concluding that TR-UK's CEO was guilty of sexual harassment.  Mr. McNulty's decision on the vote also ran contrary to TRG's obligations under the MTLA, which vested Team Rubicon, and not TRG, with the authority to determine whether any of the TR-X's were in noncompliance with the standards.

54.    To be clear, TRG has the ability, both contractually and operationally, to censure its sublicensees and insist on the termination of the at-issue executives.  Further, pursuant to Section 4(b) of the MTLA, TRG has the ability to terminate the sublicense agreements for the

TR-Xs' failure to comply with the strict standards set forth in either the MTLA, the sublicensing agreements between TRG and the TR-Xs, Team Rubicon's Brand Identity Guidelines, or any other standards set forth by Team Rubicon.  TRG chose, however, not to take such action, and instead condoned its sublicensees' efforts to sweep such conduct "under the rug."  TRG in fact admitted to Team Rubicon that its decision was motivated by a desire to avoid exposing TRG to any employment liability or wrongful termination claims.  Citing this unacceptable outcome and an unwillingness by TRG to require appropriate action from its sublicensees, both TRG's chairman and its CEO at the time resigned from TRG in protest.

55.     TRG's conscious decision not to take action in the face of such misconduct, and to permit its sublicensees to knowingly employ individuals who engaged in the misconduct in leadership positions, constituted several ongoing and clear breaches of the MTLA.

56.     Following TRG's failure to cure its breaches, and having received no satisfactory response from TRG regarding Team Rubicon's September and October letters, Team Rubicon was left with no choice but to terminate the MTLA.  On December 9, 2019, Team Rubicon sent TRG a letter terminating the MTLA.  A copy of this letter is attached hereto as Exhibit D.  At some point after the MTLA was terminated, and after the contractual 60-day cure period had expired, TRG claimed—without offering any evidence—that it had taken some remedial steps, but even then it did not represent that it had taken all of the steps Team Rubicon had requested and never provided evidence regarding the steps it purportedly did take.

57.     Pursuant to Section 15(i) of the MTLA, in the event of termination, TRG was obligated to immediately cease using all of Team Rubicon's registered marks.  As noted above, pursuant to Section 15(iv), TRG was also obligated to assign to Team Rubicon any domain names that it registered using any of the TR Marks.  Notwithstanding these obligations, TRG has

continued to use the TR Marks, maintain domain names using the TR Marks, and engaged in
various other actions in violation of the termination provision of the MTLA.

<strong>F.    TRG's Infringing Activities</strong>

58.    On January 8, 2020, Team Rubicon notified TRG that TRG's use of the TR
Marks was unauthorized and "highly likely to mislead and confuse consumers of both TRG's
services and those of [Team Rubicon] into believing, wrongly, that TRG is affiliated with or
sponsored by, [Team Rubicon] notwithstanding the December 9, 2019, termination of the
[MTLA]."  Team Rubicon further demanded that TRG "immediately cease[] and discontinue[]
its infringing use of [Team Rubicon's] trademarks."  A copy of this letter is attached as
Exhibit E.

59.    Furthermore, upon the termination of the MTLA and the reversion of TRG's
temporary license back to Team Rubicon, TRG was required to transfer its domain name,
*www.teamrubiconglobal.org*, to Team Rubicon within thirty days, pursuant to Section 15(iv) of
the MTLA.  TRG did not do so and continues to operate a website under the
*www.teamrubiconglobal.org* domain name and continues to trade on the use of a TR Mark in
that domain name and the use of all the TR Marks on the website found at that domain name.

60.    TRG has continued to illegally use Team Rubicon's trademarks, intending to sow
confusion among donors, sponsors, and volunteers.  TRG's conduct is particularly harmful and
damaging to Team Rubicon in light of the fact that, as a non-profit organization, Team Rubicon
relies on funding from donors and corporate partners to carry out its mission.  TRG's continued
and unauthorized use of the TR Marks, and TRG's efforts to mislead the public about the
relationship between TRG and Team Rubicon, confuse Team Rubicon's donors and business
partners and deprive Team Rubicon of donations sponsorships, grants, and other business
opportunities.  This infringing conduct includes, without limitation (i) TRG's maintenance of an

39

active website located at *www.teamrubiconglobal.org* that displays the TRG name and logo, which marks and domain name all incorporate the TR Marks, (ii) TRG's maintenance of pages on various social media mediums, including but not limited to its Facebook, Twitter, Instagram, and LinkedIn accounts, bearing the TR Marks and logo; and (iii) TRG's use of the TR Marks and logo in conversations with a joint donor to both TRG and Team Rubicon, and with other existing and potential donors.

61. Further, TRG has continued to use TR Marks in a manner that interferes with Team Rubicon's business relations. In its social media and other communications, TRG misrepresents the nature of the relationship between TRG and Team Rubicon by referring to Team Rubicon as "Team Rubicon USA,"—despite the fact that Team Rubicon, Inc. has no geographic delineator in its name—in an effort convince potential donors that Team Rubicon is merely a country-specific affiliate of TRG, with TRG being the organizational parent at the head of the global Team Rubicon network. Indeed, TRG's website prominently displays the TR Marks with the word "GLOBAL" inserted below the marks, suggesting that it is the corporate parent of Team Rubicon.

62. TRG actively uses its website to improperly profit from the TR Marks. Next to the prominently displayed TR Marks, TRG requests visitors to "Give" and "Donate" to TRG. Furthermore, TRG uses the TR Marks to manipulate internet searches so that its domain appears more prominently, often before Team Rubicon's domain. Indeed, users of the popular internet search engine, Google, are sometimes directed to TRG's website even before they are directed to Team Rubicon's website, *teamrubiconusa.org*, notwithstanding that Team Rubicon, and not TRG, is the organization actually undertaking substantive disaster relief efforts and that TRG is no longer authorized to use the TR Marks.

63. TRG's infringement is also widespread across social media and networking platforms. For example, TRG uses the TR Marks on its Twitter, Instagram, Facebook and other social media pages, and often "re-tweets" and "re-posts" Team Rubicon's own content, enhancing the likelihood of consumer confusion by insinuating that the two entities are affiliated and operating in tandem. Some examples, though not exhaustive, include a March 28, 2020 Twitter post from TRG, whereby TRG "re-tweeted" (re-posted) one of Team Rubicon's posts that called for the signing of a petition to ask Congress to begin credentialing U.S. Veterans from medical fields to aid in the fight against COVID-19. TRG shared the post, along with a message stating that it was a "worthy initiative from Team Rubicon USA," implying to TRG's followers that the entities are affiliated and working together on the initiative. A copy of the March 28 tweet is attached hereto as Exhibit F. On January 13, 2020, TRG tweeted a photo with a grayscale version of Team Rubicon's well-known and registered logo next to an image of "10 YEARS." The caption of the tweet read: "Ten years ago a small group sprang into action, and a mission was born. Over 100K strong, in five countries, serving around the world." The tweet—obviously referring to the inception of Team Rubicon but not explicitly saying so—does not clarify to its readers that TRG is a separate entity, with only a handful of employees and volunteers, formed only in 2014. It also ignores that TRG's rights to use the TR Marks have been terminated. The only implication a member of the public can glean from reading the tweet is that TRG was founded ten years ago and operates as the "real" Team Rubicon. A copy of the January 13 tweet is attached hereto as Exhibit G.

64. TRG's improper conduct has created actual confusion amongst supporters of Team Rubicon and its cause. For example, on April 15, 2020, an individual launched a fundraiser on Facebook, asking others to donate to *TRG* in support of efforts undertaken by *Team Rubicon*.

The Facebook user's post exclusively referred to charitable activities performed by Team Rubicon as the reason for donating to the Team Rubicon network, but mistakenly linked to TRG's donation page instead of Team Rubicon's donation page. A copy of the Facebook user's post is attached hereto as Exhibit H.

65.    In another, particularly troubling example of TRG's tactics, on April 15, 2020, TRG distributed an email newsletter to potential donors seeking donations to support the "Team Rubicon Network's response to the coronavirus." TRG prominently displayed the Team Rubicon logo and TR Marks in this newsletter, months after the termination of the license authorizing it to do so. TRG also listed efforts undertaken by Team Rubicon as part of a bullet-point list of efforts undertaken by various TR-X's, in yet another effort to falsely insinuate that Team Rubicon is merely a regional affiliate of TRG. TRG also indicated in this newsletter that any donations made to TRG would go towards supporting relief efforts in response to the coronavirus, despite the fact that TRG does not conduct any on-the-ground relief efforts of its own and is not authorized to use the TR Marks for any purpose. A copy of this newsletter is attached as Exhibit I.

### G.    **TRG's Additional Breaches**

66.    In addition to TRG's breach of Section 13 of the MTLA and its ongoing breaches of Section 15's post-termination requirements, TRG has and continues to be in breach of several other provisions of the MTLA. These breaches include, but are not limited to:

- TRG's breach of Section 4(a) of the MTLA by using the TR Marks within the United States without authorization, given that Section 4(a) authorizes TRG to use the Marks only within the "Territory" defined in the MTLA and Section 1(k) defines such "Territory" as "any jurisdiction worldwide, *other than* the United States." (Emphasis added.)

- TRG's breach of Section 4(b) of the MTLA by entering into a sublicensing agreement with TR-NO without following the procedures for establishing such a relationship, including its failure to request and obtain prior written consent of Team Rubicon or an affirmative vote by a majority of existing TR-Xs and Team Rubicon on the now-defunct "Country Council."

- TRG's breach of Section 4(c) of the MTLA by failing to register the domain name for its website, *teamrubiconglobal.org*, in the name of, on behalf of, and for the benefit of Team Rubicon.

- TRG's breach of Section 4(h) of the MTLA, including by using, and continuing to allow the TR Marks to be used in ways that (i) injure their value and Team Rubicon's goodwill, (ii) is inconsistent with Team Rubicon's public image, and (iii) adversely affects Team Rubicon and its reputation.

- TRG's breach of Sections 5(a)-(c) of the MTLA, by (i) failing to cooperate and comply with all quality control measures undertaken by or at the request of Team Rubicon to protect and preserve the integrity of the TR Marks, including implementing each of the requests set forth in Team Rubicon's September and October 2019 letters; (ii) failing to maintain quality standards that are "substantially equivalent to or stricter than the standard required" by Team Rubicon; and (iii) "failing to act promptly to correct the issues identified" by Team Rubicon.

67.     In addition, as noted above, the MTLA did not include fundraising as a Permitted Purpose, subject to the license.  TRG's sole authority to raise funds using the Team Rubicon brand arose from the Fundraising Protocol issued by Team Rubicon's Board of Directors.  Yet, upon information and belief, TRG has sourced 100% of its funds from U.S.-based donors, in violation of the Fundraising Protocol's requirement that TRG use its best efforts to limit its share of funds from U.S-based donors to 50% in the second year of operation, and to 33% beginning in the third of operation.  TRG's CEO, Mr. McNulty also stopped attending the QDRs required by the Fundraising Protocol.  Further, TRG did not obtain prior approval of written asks before reaching out to potential donors, as also required by the Fundraising Protocol.

68.     Team Rubicon has exhausted all options to protect its intellectual property, its business relationships, and its reputation and goodwill, in light of TRG's improper conduct.

**COUNTER-CLAIMS**

**FIRST COUNTERCLAIM**
**(SEEKING DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF)**

69.     Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

70.     Section 4(h) of the MTLA authorizes Team Rubicon to use its own reasonable judgment to determine whether TRG's conduct is inconsistent with Team Rubicon's public image or brand, and whether TRG's conduct may disparage Team Rubicon's reputation. Additionally, Section 13(b)(iv) of the MTLA provides in relevant part that "a material breach shall include Licensee's misconduct which materially and adversely impacts the License[d] Marks or the associated goodwill" of the Team Rubicon brand.

71.     Section 5(a) requires TRG to "cooperate and comply with all quality control measures undertaken by or at the request of [Team Rubicon] in order to preserve and protect the integrity of the Licensed Marks", while Section 5(b) of the MTLA sets forth that TRG was obligated to "maintain quality standards for all . . . services offered by it in connection with the Licensed Marks *that are substantially equivalent to or stricter than the standard required . . . by the Licensor* [emphasis added]."  Section 13(b)(ii) authorizes termination in case of TRG's failure to comply with Section 5.

72.     Team Rubicon's thorough investigation of the harassment allegations leveled against the at-issue executives determined that those allegations were credible.  Team Rubicon accordingly exercised its reasonable judgment to determine that TRG's inaction in the face of such credible and serious allegations irreparably damaged Team Rubicon's public image and reputation and materially and adversely impacted the TR Marks and associated goodwill of the Team Rubicon brand.  Indeed, such damage had already occurred upon the misconduct of the at-

issue executives, since several witnesses to the offending conduct, including a senior executive from a partner company, noted that they were embarrassed and/or ashamed to be associated with the Team Rubicon brand, and TRG's subsequent inaction has intensified such damage.

73.    Such conduct constitutes a breach of several material provisions of the MTLA, including but not limited to Section 4(h), Section 5(a), Section 5(b) and Sections 13 (b)(ii) and (b)(iv).

74.    Team Rubicon promptly notified TRG of the findings of its investigation and, consistent with its obligations under the MTLA, identified specific remedial measures to be taken that were necessary to mitigate the damage to the Team Rubicon brand and to protect Team Rubicon's public image and reputation from additional harm.  The measures included: (i) immediately prohibiting the at-issue executives from all ongoing and future Team Rubicon activities and locations; (ii) timely terminating the at-issue executives for cause and in compliance with local law; (iii) forbidding TRG, TR-AUS, and TR-UK from contacting the victim, or any witnesses to the subject conduct for the protection of such individuals, and (iv) requiring that TR-AUS and TR-UK retrain their paid staff and regular volunteers on harassment prevention.  TRG refused to institute the requested remedial measures, or to hold its sublicensees to account.  In fact, TRG went so far as to endorse a sham investigation conducted by TR-UK, an interested party.

75.    Given TRG's refusal to take corrective measures, Team Rubicon promptly sent TRG a notice of breach consistent with its obligations under the MTLA, and properly terminated the MTLA *only after* TRG failed to cure its breach within the 60 day cure period allowed by the MTLA.

76.     TRG's failure to implement the measures provided by Team Rubicon materially and adversely damaged the goodwill associated with the Team Rubicon brand and the TR Marks. Such inaction served as an additional basis for Team Rubicon to terminate the MTLA.

77.     Team Rubicon accordingly validly terminated the MTLA by following the procedure for termination outlined therein.

78.     In light of Team Rubicon's termination of the MTLA, TRG's continued use of the TR Marks is in direct violation of various provisions of the MTLA, specifically Section 15, which requires TRG to immediately cease its use of the TR Marks upon the MTLA's termination, and mandates assignment of any domain names using the TR Marks to Team Rubicon.

79.     Further, such continuing or future use of the TR Marks after the valid termination of the MTLA is likely to continue to cause confusion, mistake, and/or deception as to the source, origin, affiliation, or sponsorship of TRG and will thereby irreparably damage Team Rubicon.

80.     TRG's activities have caused and will continue to cause irreparable harm to Team Rubicon, for which it has no adequate remedy at law, in that: (i) the TR Marks comprise unique and valuable property rights that have no readily determinable market value; (ii) TRG's infringement interferes with Team Rubicon's goodwill and customer relationships and will substantially harm Team Rubicon's reputation; and (iii) TRG's wrongful conduct, and the damages resulting to Team Rubicon, are continuing.

81.     Team Rubicon has sustained and will continue to incur substantial, immediate, and significant damages and irreparable injury due to TRG's continued use of the TR Marks, which has damaged the Team Rubicon brand and TR Marks.

82.    TRG's unauthorized use of the marks is injurious to Team Rubicon's rights as owner of the TR Marks and is in an amount not capable of determination.

83.    Unless restrained, TRG's continued use will cause further irreparable injury for which Team Rubicon has no adequate remedy at law.  Team Rubicon therefore seeks a judicial declaration that (i) the MTLA was validly terminated on December 9, 2019 and (ii) that under the MTLA's provisions, TRG is no longer licensed to use the TR marks.  Team Rubicon further seeks a declaration that TRG's continued use of the TR Marks after the MTLA was terminated constitutes trademark infringement.

84.    A declaratory judgment to that effect is necessary and appropriate at this time given that TRG has initiated the instant suit challenging Team Rubicon's termination of the MTLA and that TRG continues to use the TR Marks without a license.

85.    Team Rubicon additionally seeks injunctive relief, both during the pendency of this action and immediate and permanent injunctions thereafter, against TRG and its sublicensees, agents, servants, employees, and all others in active concert or participation with it with notice thereof, enjoining and restraining all of them from further use of the TR Marks.

## SECOND COUNTERCLAIM
### (TORTIOUS INTERFERENCE WITH TEAM RUBICON'S BUSINESS RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE)

86.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

87.    As a non-profit organization, Team Rubicon relies on donations in order to carry out its mission.  Team Rubicon trades on the substantial goodwill and reputable public image associated with its valuable TR Marks to maintain its relationships with existing donors, sponsors, business affiliates and volunteers, and to solicit new donors, business affiliates,

sponsors, and volunteers.  As Team Rubicon's former licensee, and in its role in helping new

Team Rubicon-affiliated entities launch around the world, TRG is aware, or should be aware, of

the importance of the TR Marks to those relationships, fundraising efforts, and other

communications.

88.    TRG has, and continues to, interfere with Team Rubicon's relationships with its

donors, sponsors, business affiliates, and volunteers by publicly misrepresenting the nature of the

relationship between TRG and Team Rubicon and by using the valuable TR Marks without a

license to do so.

89.    TRG has no right, contractually or otherwise, to use the TR Marks.  Yet, TRG

continues to falsely represent in both its public and private communications with donors,

sponsors, volunteers, and the general public that TRG is affiliated with Team Rubicon.  TRG

also intentionally confuses the public by making statements implying that TRG, rather than

Team Rubicon, is the parent organization of the global Team Rubicon network.

90.    TRG knows, or should know, that its false and misleading use of the TR Marks

would cause potential donors, sponsors, and volunteers to mistakenly believe that Team Rubicon

continues to be affiliated with TRG.  TRG's misleading communications also wrongly indicate

to potential donors and business affiliates that TRG, rather than Team Rubicon, is the parent

organization of the global Team Rubicon network.  TRG has misrepresented its position within

the Team Rubicon Network in this manner since at least 2017.  For instance, in a 2017 email to a

partner NGO, TRG referred to Team Rubicon as "one of the TR country units, TR-USA."  Team

Rubicon immediately sent TRG a cease-and-desist letter asking TRG to stop referring to Team

Rubicon as merely a regional affiliate, like it did in that email.

91.     In January 2020, Team Rubicon once again notified TRG that TRG's use of the TR Marks was "highly likely to mislead and confuse consumers of both TRG's services and those of [Team Rubicon] into believing, wrongly, that TRG is affiliated with or sponsored by, [Team Rubicon] notwithstanding the December 9, 2019, termination of the [MTLA]."

92.     Accordingly, TRG's use of the TR Marks and attempts to capitalize on the Team Rubicon brand are wrongful because TRG is no longer licensed to use the TR Marks following the termination of the MTLA on December 9, 2019.  TRG's continued use of the marks is in clear breach of the MTLA is therefore improper.  Further, TRG's representations to potential donors, sponsors, business affiliates, and volunteers that TRG continues to be affiliated with Team Rubicon are also wrongful because they are false and deceptive misrepresentations given that Team Rubicon has properly terminated the MTLA.

93.     TRG's false and misleading communications using the TR Marks have injured Team Rubicon, including through the loss and diversion of donations, grants, and corporate partnerships.

94.     In the past two months alone, TRG's conduct has jeopardized a $100,000 donation and potential grants in excess of $10,000,000.

95.     Accordingly, Team Rubicon seeks a judgment that TRG has tortiously interfered with Team Rubicon's business relations with potential donors and corporate partners.  Team Rubicon further seeks monetary damages in an amount to be determined at trial, and other appropriate relief the court deems just and proper.

## THIRD COUNTERCLAIM
### (TRADEMARK INFRINGEMENT IN VIOLATION OF 15 U.S.C. § 1114)

96.     Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

97.     Team Rubicon is the sole owner of the TR Marks.  The TR Marks have been continuously used in commerce by Team Rubicon since February 2010.  On September 27, 2016, the TR Marks were registered with the United States Patent and Trademark Office ("USPTO") and continue to be registered on the USPTO principal register.

98.     Since at least October of 2015, TRG has had actual knowledge of the existence of the TR Marks, having entered into the MTLA to license the TR Marks from Team Rubicon subject to the terms of the MTLA.

99.     From the time the MTLA was contemplated, TRG had notice that it was unauthorized to use the TR Marks if the MTLA was terminated, and Section 15(i) of the MTLA mandates that TRG cease using TR Marks, any portion of the marks, or any term, phrase or design that is confusingly similar to the marks immediately upon termination of the MTLA and reversion of the license.

100.    On December 9, 2019, after TRG's various breaches of the MTLA went uncured, Team Rubicon validly terminated the MTLA.  In the same correspondence, Team Rubicon demanded that TRG "immediately cease[] and discontinu[e] its infringing use of [Team Rubicon's] trademarks" as required by the MTLA.  On January 8, 2020, Team Rubicon reiterated this demand through a cease and desist letter to TRG.

101.    Notwithstanding these demands and the termination of the MTLA, TRG continues to improperly use the TR Marks without Team Rubicon's authorization or consent. TRG's continued, unauthorized use of TR Marks is confusing and misleading to Team Rubicon's consumers, volunteers, sponsors, donors, and/or corporate partners.

102.    TRG's unauthorized use of the TR Marks is knowing, intentional, and willful, as demonstrated by TRG's disregard of Team Rubicon's correspondence, notices, and cease and

desist letter, sent between September of 2019 and January of 2020.  Further, TRG has not only

failed to comply with the termination requirements in the MTLA and Team Rubicon's cease and

desist letter, TRG has expanded its advertising and promotional efforts using the TR Marks,

including on its social media and other public platforms, since its breach, sowing further

confusion and demonstrating a reckless disregard for the terms of the MTLA and the law.

103.    As a direct and proximate result of TRG's wrongful conduct, Team Rubicon has

been and will continue to be irreparably damaged.

104.    TRG's actions thus constitute trademark infringement under 15 U.S.C. § 1114.

105.    TRG's activities have caused, and will continue to cause, irreparable harm to

Team Rubicon, for which there is no adequate remedy at law, in that, for among other reasons,

(i) the TR Marks comprise unique and valuable property rights that have no readily determinable

market value; (ii) TRG's infringement constitutes interference with Team Rubicon's goodwill

and customer relationships and will divert precious resources away from Team Rubicon; and

(iii) TRG's wrongful conduct, and the damages resulting to Team Rubicon, are continuing and

amplifying.  Accordingly, Team Rubicon is entitled to injunctive relief pursuant to 15 U.S.C. §

1116(a).

106.    Pursuant to 15 U.S.C. § 1117(a), Team Rubicon is entitled to an order

(i) requiring TRG to account to Team Rubicon for any and all profits derived from TRG's use of

the TR Marks and Team Rubicon brand's goodwill in accordance with the applicable provision

of the law; and (ii) award all damages sustained by Team Rubicon that were caused by TRG's

unlawful conduct.

107.    TRG's willful, malicious, and deliberate acts of infringement make this an exceptional case under 15 U.S.C. § 1117(a), and, accordingly, Team Rubicon is entitled to an award of attorneys' fees and costs.

## FOURTH COUNTERCLAIM
### (UNFAIR COMPETITION IN VIOLATION OF 15 U.S.C. § 1125(a))

108.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

109.    The TR Marks are strong and distinctive and designate Team Rubicon as the source of all services advertised, marketed, sold or used in connection with those marks.  By virtue of Team Rubicon's ten years of use of the TR Marks in connection with its services and philanthropic mission, along with its extensive marketing, advertising, promotion, and sale of its services under the TR Marks, those marks have become strong and the consuming public associates the TR Marks with a single source of services: Team Rubicon.

110.    Through its contemplation, negotiation, and execution of the MTLA, TRG has obtained actual knowledge of Team Rubicon's ownership of the valuable TR Marks as well as the "goodwill and excellent reputation associated" with the TR Marks.

111.    In a bad faith attempt to confuse and mislead Team Rubicon's consumers, volunteers, sponsors, donors, and corporate partners, TRG used and continues to use the TR Marks on its social media platforms, through its search engine advertising practices, and in its website design and use, to mislead the public into falsely believing TRG is affiliated with Team Rubicon.  Specifically, TRG misrepresents its affiliation to Team Rubicon in order to obtain donations and other sponsorships that would otherwise be provided directly to Team Rubicon or entities properly affiliated with Team Rubicon.

112.    TRG's conduct is willful, intentional, and malicious.  On December 9, 2019 and again on January 8, 2020, Team Rubicon made clear that TRG was to immediately cease using the TR Marks.  TRG refused and continues to infringe upon Team Rubicon's rights in the present day.

113.    Through its wrongful conduct, TRG has misappropriated Team Rubicon's efforts and is exploiting the TR Marks and Team Rubicon's reputation to solicit consumers, volunteers, sponsors, donors, and corporate partners that TRG otherwise would not have had.

114.    As a direct and proximate result of TRG's ongoing false and intentionally misleading representations about the nature, source, and affiliation between TRG and Team Rubicon, Team Rubicon has been injured and is likely to be further injured in the future. .

115.    TRG's ongoing actions constitute false designation of origin and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).

116.    TRG's activities have caused, and will continue to cause, irreparable harm to Team Rubicon, for which there is no adequate remedy at law, in that (i) the TR Marks comprise unique and valuable property rights that have no readily determinable market value; (ii) TRG's infringement constitutes interference with Team Rubicon's goodwill and customer relationships and will divert precious resources away from Team Rubicon; and (iii) TRG's wrongful conduct, and the damages resulting to Team Rubicon are continuing and amplifying.  Accordingly, Team Rubicon is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

117.    Pursuant to 15 U.S.C. § 1117(a), Team Rubicon is entitled to an order (i) requiring TRG to account to Team Rubicon for any and all revenues derived by TRG's wrongful use of the TR Marks and the Team Rubicon brand's goodwill, to be increased in accordance with

the applicable provision of law; and (ii) awarding damages to Team Rubicon for the harm caused by TRG's conduct.

118.    TRG's willful, malicious, and deliberate acts of infringement make this an exceptional case under 15 U.S.C. § 1117(a), and, accordingly, Team Rubicon is entitled to an award of attorneys' fees and costs.

### FIFTH COUNTERCLAIM
### (COMMON LAW TRADEMARK INFRINGEMENT)

119.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

120.    Team Rubicon has valid and protectable common law rights in the TR Marks.

121.    Team Rubicon is the owner of the TR Marks.  Through the MTLA, TRG is aware of Team Rubicon's ownership of the TR Marks as well as the value of the marks in identifying Team Rubicon and its services.

122.    In a bad faith attempt to confuse and mislead Team Rubicon's consumers, volunteers, sponsors, donors, business affiliates, and corporate partners, TRG uses the TR Marks in its search engine advertising practices, website design, and on various social media platforms, to infer a false and misleading relationship between Team Rubicon and TRG.  Specifically, TRG misrepresents its affiliation to Team Rubicon in order to obtain donations, grants, sponsorships, and other business opportunities that would have otherwise flowed directly to Team Rubicon or entities properly affiliated with Team Rubicon.

123.    TRG's conduct is willful, intentional, and malicious.  On December 9, 2019 and January 8, 2020, Team Rubicon made clear that TRG is to immediately cease using the TR Marks.  TRG did not respond and continues to infringe upon Team Rubicon's rights.

124.    As a direct and proximate result of TRG's ongoing false and intentionally misleading representations about the nature, source, and affiliation of TRG with Team Rubicon., Team Rubicon has been injured and is likely to be further injured in the future.

125.    Unless an injunction is issued enjoining TRG's infringing conduct, Team Rubicon will continue to be irreparably damaged.  Team Rubicon has no adequate remedy at law. Accordingly, Team Rubicon is entitled to both preliminary and permanent injunctive relief.

**SIXTH COUNTERCLAIM**
**(COMMON LAW UNFAIR COMPETITION)**

126.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

127.    Team Rubicon has valid and protectable common law rights in the TR Marks, having expended significant time and expense in developing the TR Marks and promoting the TR Marks in association with the services and products it provides.  As a result, the TR Marks have been very successful and have developed a strong reputation and significant goodwill.

128.    Through its wrongful conduct, TRG has misappropriated Team Rubicon's intellectual property and is exploiting the TR Marks and Team Rubicon's reputation in order to market and promote TRG's competing products and services using the same TR Marks.  These actions constitute unfair competition.

129.    As a direct and proximate cause of TRG's wrongful conduct, Team Rubicon has been and will continue to be injured.

130.    Unless an injunction is issued enjoining TRG's unfairly competitive conduct, Team Rubicon will continue to be irreparably damaged for which Team Rubicon has no adequate remedy at law.  Accordingly, Team Rubicon is entitled to both preliminary and injunctive relief.

131.    TRG has acted willfully, intentionally, and maliciously; therefore Team Rubicon is entitled to an award of punitive damages.

## SEVENTH COUNTERCLAIM
### (BREACH OF THE MTLA)

132.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

133.    Team Rubicon and TRG entered into the MTLA on October 9th, 2015.

134.    Team Rubicon fully performed its obligations under the MTLA.

135.    TRG breached Section 4(a) of the MTLA through its unauthorized use of the TR Marks within the United States, *i.e.*, outside the "Territory" within with TRG was permitted to use the marks.

136.    TRG breached Section 4(b) of the MTLA by entering into a sublicensing agreement with TR-NO without following the procedures for approval of a new TR-X outlined in that provision.

137.    TRG breached Section 4(c) of the MTLA by failing to register the domain name for its website *teamrubiconglobal.org* in the name of, on behalf of, and for the benefit of Team Rubicon.

138.    TRG also breached Sections 4 and 5 of the MTLA by failing to safeguard, promote, and maintain the quality standards and goodwill associated with Team Rubicon and the TR Marks.  Specifically, TRG failed to (i) maintain quality standards substantially equivalent to or stricter than that of Team Rubicon, in violation of MTLA Section 5(b), and (ii) failed to take remedial actions deemed necessary by Team Rubicon to correct actions by TRG and certain of its sublicensees that were, in Team Rubicon's reasonable judgment, inconsistent with Team

56

Rubicon's public image and have adversely affected Team Rubicon and its reputation in violation of MTLA Section 4(h).

139.    TRG continues to breach the MTLA by failing to honor the termination requirements set forth in Section 15 of the MTLA, including through its ongoing use of the TR Marks in communications with the public through newsletters, private conversations, and social media posts

140.    TRG also breached its agreement to fundraise using the TR Marks according to the Fundraising Protocol approved by the Team Rubicon Board of Directors by failing to follow the procedures for fundraising using the Team Rubicon brand set forth in that Protocol.

141.    As a direct result of TRG's breach, Team Rubicon has suffered and will continue to suffer substantial, immediate, and significant monetary damages in an amount to be proven at trial.  Team Rubicon is entitled to recover such damages from TRG.

## EIGHTH COUNTERCLAIM
## (FALSE ADVERTISING IN VIOLATION OF 15 U.S.C. § 1125(a)(1)(B))

142.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

143.    TRG has made, and continues to make, false and misleading statements to the general public, including volunteers, donors, corporate sponsors, and business affiliates.  TRG continues to use the TR Marks in its social media posts and fundraising efforts, and continues to misrepresent that TRG is affiliated with Team Rubicon, despite the termination of the MTLA and the reversion of TRG's temporary license to Team Rubicon.

144.    TRG's false and misleading statements confuse the public, including donors, corporate sponsors, corporate partners, and volunteers.  TRG's former association with Team Rubicon causes donors and potential donors to incorrectly believe that TRG continues to be

affiliated with Team Rubicon. Further, TRG's use of the term "Team Rubicon-USA" to refer to Team Rubicon misleads donors into thinking that Team Rubicon is merely a country-specific affiliate of TRG and that TRG is the parent organization at the head of the global Team Rubicon network.

145.    TRG's false and misleading statements are material because they trade on the substantial goodwill and strong reputation of the TR Marks, which are powerful instruments for fundraising thanks to Team Rubicon's extensive history of high-impact charitable activities and positive coverage in the press.

146.    TRG's false and misleading statements are made in the course of interstate commerce because TRG publishes its statements through its publicly accessible website and social media accounts, which are available to donors, volunteers, and business affiliates throughout the United States who may decide to contribute to TRG, instead of Team Rubicon, based on those statements.

147.    TRG's false and misleading statements have injured Team Rubicon, including without limitation by diverting potential donations that may have otherwise flowed to Team Rubicon.

148.    Based on the foregoing, TRG has engaged in false advertising in violation of 15 U.S.C. § 1125(a)(1)(B), and Team Rubicon is entitled to damages from TRG.

149.    TRG's acts make this an exceptional case under 15 U.S.C. § 1117(a), so Team Rubicon is entitled to an award of reasonable attorneys' fees and costs.

## NINTH COUNTERCLAIM
### (FALSE ADVERTISING IN VIOLATION OF N.Y. GENERAL BUSINESS LAW § 350)

150.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully set forth herein.

151.    TRG has made, and continues to make, false and misleading statements capitalizing on the TR Marks and the goodwill associated with the marks to attract donors, which could generate donations to TRG that would not have been made absent TRG's use of the TR Marks and the goodwill associated therewith.

152.    TRG's statements are unfair and deceptive because TRG continues to use the TR Marks and make representations in its social media and fundraising communications that indicate TRG is affiliated with Team Rubicon, when in reality, TRG no longer has a license to use the TR Marks.

153.    TRG's false and misleading statements using the TR Marks, and capitalizing on the substantial goodwill and strong Team Rubicon brand, are material misrepresentations because they trade on the substantial goodwill and strong reputation of Team Rubicon, which are powerful instruments for fundraising as a result of Team Rubicon's extensive history of high-impact charitable activities and wide-spread favorable media coverage.

154.    Reasonable potential donors, sponsors, partners, business affiliates, and volunteers acting reasonably under the circumstances are likely to rely on TRG's false and misleading statements and believe that TRG continues to be affiliated with Team Rubicon.

155.    TRG's false and misleading statements have injured Team Rubicon, including by diverting donors that would have donated to Team Rubicon if not for TRG's misrepresentations and sowing of confusion among the public about the relationship between TRG and Team Rubicon.

156.    Based on the foregoing, TRG has engaged in consumer-oriented conduct that is deceptive or misleading in a material way and which constitutes false advertising in violation of § 350 of the New York General Business Law.  Team Rubicon is therefore entitled to recover

damages and reasonable attorneys' fees from TRG.  Further, unless an injunction is issued

enjoining TRG's infringing conduct, Team Rubicon will continue to be irreparably damaged.

Team Rubicon has no adequate remedy at law.  Accordingly, Team Rubicon is entitled to a both

preliminary and permanent injunctive relief.

<u>**TENTH COUNTERCLAIM**</u>
**(INDEMNIFICATION FOR ATTORNEYS' FEES)**

157.    Team Rubicon repeats and re-alleges all prior pleaded paragraphs, as though fully

set forth herein.

158.    The MTLA contains an indemnification provision in Section 9, which states, in

relevant part:

> "Licensee … shall pay all losses, damages, settlements, fees, expenses or
> costs (including reasonable attorneys' fees) incurred by them based upon
> any claim, demand, suit, or proceeding arising from (a) Licensee's or any
> sublicensee's performance of obligations under this Agreement … or (b)
> Licensee's or any sublicensee's breach of any covenant, representation,
> obligation, or warranty…"

159.    Section 9(a) refers to suits arising from TRG's performance of its obligations

under the MTLA.  Section 9(b) refers to suits arising from TRG's breach of any covenant,

representation, obligation, or warranty under the MTLA.  The language in those two provisions,

which both refer to suits arising under the MTLA itself, impose an obligation on TRG to

indemnify Team Rubicon for fees, expenses, and costs (including reasonable attorneys' fees) for

suits between Team Rubicon and TRG concerning TRG's obligations under the MTLA.

160.    The instant suit relates to TRG's performance and/or breach of its obligations

pursuant to various provisions of the MTLA including, but not limited to, Section 4(h)—

prohibiting use of the TR Marks or the conduct of TRG's business operations in a manner that, in

Team Rubicon's reasonable judgment, may be inconsistent with Team Rubicon's public image

or which may disparage Team Rubicon's reputation—and Section 15—governing TRG's obligations upon termination of the MTLA, such as immediately ceasing use of the TR Marks.

161.    The instant suit is therefore of the type contemplated by Sections 9(a) and 9(b) of the MTLA, which require TRG to indemnify Team Rubicon for fees, expenses, and costs, associated with the suits identified in Section 9.

162.    Accordingly, Team Rubicon seeks a judgment that TRG is required to indemnify Team Rubicon for all costs, expenses, and reasonable attorneys' fees associated with the instant lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Team Rubicon respectfully requests judgment in its favor and against TRG, and that the Court order and/or award the following relief:

1.    A preliminary and permanent injunction enjoining TRG, and its officers, directors, members, agents, servants, employees, and attorneys, and all other persons acting in concert or participating with them (collectively, the "Enjoined Parties"), from doing the following:

      A.    Publishing, using, displaying, distributing or sublicensing Team Rubicon's trademarks, including the TR Marks and any confusingly similar variations thereof, in, on or with any products or services or in connection with the advertising, marketing or other promotion, distribution, offering for sale, or sale of any products or services, including on any social media accounts;

      B.    Using any false designation of origin, false representation, or any false or misleading description of fact, that can, or is likely to, lead the consuming public or individual members thereof, to believe that any products or services produced, offered, promoted, marketed, advertised, provided, sold

or otherwise distributed by the Enjoined Parties is in any manner associated or connected with Team Rubicon, or are licensed, approved, or authorized in any way by Team Rubicon;

C.    Representing, suggesting in any fashion to any third party, or performing any act that may give rise to the belief, that the Enjoined Parties, or any of their products or services, are related to, authorized, or sponsored by Team Rubicon;

D.    Registering any domain name that contains the TR Marks or any misspelling or variation of those marks, or any domain name confusingly similar to those marks;

E.    Operating or authorizing the operation of any website using any domain name incorporating any of the TR Marks or any misspelling or variation of those marks, or any domain name confusingly similar to the TR Marks;

F.    Using social media accounts and any similar accounts or social media websites, and registering any social media account that uses any of the TR Marks, any misspelling or variation of those marks or any other social media account confusingly similar to those marks;

G.    Unfairly competing with Team Rubicon in any manner whatsoever, or engaging in any unfair, fraudulent, or deceptive business practices that relate in any way to the production, distribution, marketing and/or sale of products and services bearing the TR Marks or any other mark likely to cause confusion with the TR Marks, including any misspelling or variation of those marks; and

62

H.    Assisting, aiding or abetting any other person or entity in engaging in or performing any such activities.

2.    An order requiring the Enjoined Parties to:

A.    Transfer to Team Rubicon all domain names in the Enjoined Parties' possession, custody, or control that include the TR Marks or any misspelling or confusingly similar variation thereof; and

B.    Transfer to Team Rubicon any social media accounts, and all other account used to promote the TR Marks, including all accounts in the Enjoined Parties' possession, custody or control that are identified by the TR Marks or any misspelling or confusingly similar variation thereof;

3.    To give practical effect to any judgment entered by this Court, an order requiring the social networking service or entity (*e.g.*, Facebook) related to any of the social media accounts subject to the judgment shall, within fourteen (14) days of receipt of the judgment, transfer, disable, or otherwise cancel those subject accounts at Team Rubicon's request if the Enjoined Parties have not already done so.

4.    To give practical effect to any judgment entered by this Court, an order requiring the Registry or Registrar for any of the domain names subject to the judgment transfer or otherwise assign those subject domain names to Team Rubicon if the Enjoined Parties have not already done so within fourteen (14) days of receipt of any such judgment.

5.    A finding that, by the acts complained of above, TRG has breached the MTLA and Team Rubicon has properly terminated the MTLA as a result.

6.    A finding that, by the acts complained of above, TRG has tortiously interfered with Team Rubicon's economic advantages.

63

7.      A finding that, by the acts complained of above, TRG has infringed Team Rubicon's federally-registered trademarks in violation of 15 U.S.C. § 1114.

8.      A finding that, by the acts complained of above, TRG has created a false designation of origin and false representation of association in violation of 15 U.S.C. § 1125(a).

9.      A finding that, by the acts complained of above, TRG has engaged in common law trademark infringement.

10.     A finding that, by the acts complained of above, Defendants have engaged in common law unfair competition.

11.     An award of the following relief to Team Rubicon and against TRG:

      A.      Any and all damages arising from TRG's breaches of the MTLA and toritious interference with Team Rubicon's prospective economic advantages;

      B.      Team Rubicon's attorneys' fees and costs pursuant to the indemnification provision of the MTLA and applicable law, including but not limited to 15 U.S.C. § 1117(a) because this is an exceptional case;

      C.      Pursuant to 15 U.S.C. § 1117(a), Team Rubicon's actual damages, as well as all of TRG's profits or gains of any kind from its acts of trademark infringement, false designation of origin, and unfair competition, including a trebling of those damages; and

      D.      Punitive damages pursuant to applicable common law.

      E.      Pursuant to 15 U.S.C. § 1117(a), all of Team Rubicon's costs, disbursements, and other expenses incurred due to TRG's unlawful conduct.

F.    Pre-judgment interest.

12.    Such other relief as the Court deems appropriate.

### <u>JURY DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Team Rubicon hereby

demands a trial by jury.

Dated: April 24, 2020

/s/ Jeff G. Hammel

Jeff G. Hammel
Matthew S. Salerno
Elizabeth A. Parvis
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4834
+1.212.906.1200

Matthew W. Walch (*pro hac vice pending*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Ste. 2800
Chicago, IL 60611-3607
+1.312.876.7700

*Attorneys for Team Rubicon, Inc.*