UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAM RUBICON GLOBAL, LTD., a Delaware Corporation<br><br>*Plaintiff,*<br><br>v.<br><br>TEAM RUBICON, INC., a Minnesota Corporation<br><br>*Defendant,*<br><br>TEAM RUBICON, INC., a Minnesota Corporation<br><br>*Counterclaim Plaintiff,*<br><br>v.<br><br>TEAM RUBICON GLOBAL, LTD., a Delaware Corporation<br><br>*Counterclaim Defendant.* | Civ. No. 20-cv-2537 (LTS) (KNF) |

**DECLARATION OF JACOB WOOD**

JACOB WOOD, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1. I am over the age of 18 years old, and reside in Redondo Beach, CA. I am the co-founder and CEO of Team Rubicon, Inc. ("Team Rubicon"), the defendant and counterclaim plaintiff in this action. Prior to founding Team Rubicon, I was a Sergeant in the United States Marine Corps. and was deployed in both Afghanistan and Iraq. I submit this declaration in connection with Team Rubicon's Motion for Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and am competent to testify to such facts if called as a witness.

A.  **The Founding of Team Rubicon and The TR Marks**

2.  In January 2010, William McNulty and I, both U.S. Marines, led a team of U.S. Veterans, first responders, and volunteers into Haiti to provide supplies and assistance in the aftermath of a 7.0 magnitude earthquake that devastated Port-au-Prince and the surrounding areas. We named that mission team "Team Rubicon," which was a nod to the story of Julius Ceasar's crossing of the Rubicon River in Rome. "Crossing the Rubicon" today is used to refer to committing to a course of action. In our case, Team Rubicon represented making a commitment to helping those in need. Based on our experience in Haiti, on January 19, 2010, we founded the nonprofit organization, Team Rubicon, Inc.

3.  Team Rubicon's mission is two-fold. First, Team Rubicon provides emergency relief to communities impacted by natural and humanitarian crises, such as hurricanes and wildfires. Second, Team Rubicon enriches the lives of U.S. Veteran volunteers by utilizing their skills developed in combat and helping volunteers find purpose and regain a sense of confidence as they transition from military to civilian life. To further its charitable mission, Team Rubicon began developing intellectual property rights in the trademark, "TEAM RUBICON" as well as a related design mark (together, the "TR Marks"). These marks have been used in connection with Team Rubicon's mission since at least September 2010. On September 27, 2016, Team Rubicon registered its TR Marks with the United States Patent and Trademark Office. Specifically, Team Rubicon owns Registration No. 5,048,837 for its logo:



2

and Registration No. 5,048,836 for its standard character mark "TEAM RUBICON." A true and correct copy of Team Rubicon's certificate of registration of Trademark Registration No. 5,048,837 is attached hereto as Exhibit A. A true and correct copy of Team Rubicon's certificate of registration of Trademark Registration No. 5,048, 836 is attached hereto as Exhibit B.

4. Team Rubicon also owns registrations for the TEAM RUBICON word mark in various other jurisdictions around the globe, including Australia (Registration No. 1551282; Registration Date: April 7, 2014); the European Community (Registration No. 011728417; Registration Date: October 11, 2013); Norway (Registration No. 272771; Registration Date: October 23, 2013); the Philippines (Registration No. 99996938; Registration Date: February 11, 2016); Turkey (Registration No. 2016/08252; Registration Date: February 1, 2016) and New Zealand (Registration No. 1036178; Registration Date: January 28, 2016).

5. Because Team Rubicon has earned a reputation as one of the most effective and highly regarded non-profits in the country, the TR Marks have come to represent Team Rubicon's commitment to honor and service. Under the TR Marks, Team Rubicon has developed a network of over 100,000 volunteers. Team Rubicon and its TR Marks have been featured prominently and positively in wide-spread national news coverage in connection with Team Rubicon's wildfire mitigation operations, flood cleanup operations, hurricane relief efforts, and response to the ongoing COVID-19 pandemic. Some examples include: a November 11, 2012 NPR article, titled "Veterans Deploy to Northeast After Superstorm Sandy," a true and correct copy of which is attached hereto as Exhibit C; a July 5, 2019 Patch article, titled "Team Rubicon Helps Mom Rebuild Home Nearly Lost To Harvey," a true and correct copy of which is attached hereto as Exhibit D; a September 10, 2015 piece titled "Vets Who Still Serve: After Disasters, Team Rubicon Picks Up the Pieces," a true and correct copy of which is attached

hereto as Exhibit E; a February 22, 2019 Forbes article titled, "NASCAR's Dale Earnhardt Jr., Team Rubicon and Mountain Dew Partner in Disaster Relief," a true and correct copy of which is attached hereto as Exhibit F.  In the past week alone, CNN featured Team Rubicon's COVID-19 relief efforts on its well-known "CNN Heroes" segment.  A true and correct copy of the CNN Heroes article, titled "Team Rubicon mobilizes veterans to serve neighbors during Covid-19 pandemic" and dated April 16, 2020 is attached hereto as Exhibit G.

6. To preserve the valuable reputation and goodwill of the TR Marks, Team Rubicon takes numerous affirmative steps to ensure that its staff and volunteers protect the marks.  For example, Team Rubicon conducts thorough background checks on every individual deployed to serve in relief efforts.  Further, Team Rubicon maintains a strict code of employee conduct and requires all employees, instructors, and incident managers engage in management-level harassment prevention training.

### B.   The Formation of TRG and the MTLA

7. In 2012, my team and I began discussions regarding the expansion of the Team Rubicon mission and model to other countries.  It was decided that a distinct legal entity should be created to assist Team Rubicon's global expansion, and that entity's main purpose should be to ensure that any international expansion was consistent with Team Rubicon's mission and values and protected the reputation of the brand.

8. In 2014, TRG was formed as separate entity for the purpose of aiding in Team Rubicon's international expansion.  The idea behind TRG was that it would help organize new charitable organizations worldwide with values consistent with those of Team Rubicon, and organize those entities under the Team Rubicon brand.  TRG would be charged with fostering the development of these entities and ensuring that each organization was instilled with Team Rubicon's core philosophies, values, and practices.  Each new international entity created was

4

referred to as a "TR-X," with the "X" referring, in shorthand, to the country in which that entity was established (for instance, TR-Canada ("TR-CAN"), TR-United Kingdom ("TR-UK"), and TR-Australia ("TR-AUS")).

9. Because TRG does not itself engage in direct charitable missions, but instead organizes and coordinates TR-X entities, its footprint is decidedly smaller than that of both Team Rubicon or any of the TR-Xs. For instance, while Team Rubicon has over 100,000 full time staff and volunteers, TRG employed less than fifteen people at its peak, and I understand it currently employs fewer than five people.

10. In October 2015, Team Rubicon and TRG entered into a Master Trademark License Agreement ("MTLA"), whereby Team Rubicon licensed its TR Marks to TRG for use *outside* the United States. Attached hereto as Exhibit H is a true and correct copy of the MTLA, dated October 9, 2015. Again, the idea behind the MTLA was that TRG, as a "hub," would identify charitable organizations for inclusion in the Team Rubicon network, and then sublicense Team Rubicon's TR Marks to each of these TR-Xs for legal use outside of the United States. Again, TRG's role was not to engage in on-the-ground volunteer work, but rather serve as a hub to organize each of the TR-Xs and monitor and protect the TR Marks. TRG, in turn, imposed guidelines for the protection of Team Rubicon's intellectual property in each of its sublicense agreements with each individual TR-X. To be clear, despite TRG's "Global" name and perspective, TRG was never the "parent" organization for Team Rubicon, the original Team Rubicon entity, nor did TRG ever have any authority over Team Rubicon.

11. Consistent with the role of TRG as a protector of the Team Rubicon brand outside the United States, the MTLA obligated TRG to require its sublicenses to "be made subject to the terms, conditions and limitations" of the MTLA. Additionally, Section 13(b) of the MTLA

5

granted Team Rubicon the right to terminate the MTLA with notice upon TRG's failure to comply with any material provisions of the agreement, which included "Licensee's misconduct which materially and adversely impacts the [Team Rubicon] License Marks or the associated goodwill."

12. The MTLA also contained rights and duties that would exist among the parties even after termination of the MTLA. For example, pursuant to Section 4(c) of the MTLA, TRG received a limited license to register a domain name using the TR Marks. Section 15(iv) of the MTLA provides that, upon termination, TRG is required to assign that domain name to Team Rubicon.

13. From 2015, when TRG was founded, until 2019, TRG aided in the development of four TR-Xs: TR-AUS, TR-UK, TR-NOR, and TR-CAN.

C. **TRG's Failure To Protect The Team Rubicon Brand**

14. From August 13-18, 2019, Team Rubicon hosted an annual conference in Estes Park, Colorado (the "Conference"). The purpose of the Conference is to foster strong relationships across the collective Team Rubicon Network (including Team Rubicon, TRG, and the TR-X entities), spread Team Rubicon's core values of inclusivity and respect, and set charitable goals for the coming year.

15. Approximately 500 individuals attended the Conference, including Team Rubicon's paid staff members, volunteer leaders, and representatives from TRG and each of the TR-Xs. Further, some of Team Rubicon's sponsors, donors, and corporate partners were also in attendance.

16. In advance of the conference, Team Rubicon distributed welcome packets that included a copy of Team Rubicon's official Code of Conduct. This Code of Conduct was also circulated electronically to registrants that signed up for the conference online. The Code of

Conduct provided that all attendees had the right to "operate in a safe, inclusive environment" and "be treated with respect." Attached hereto as Exhibit I is a true and correct copy of the Code of Conduct circulated at the Conference.

17.    On August 17th, 2019, I received a note from the Chief Executive Officer ("CEO") of TR-CAN. The note informed me that a TR-CAN volunteer had raised allegations that the CEOs of TR-UK and TR-AUS had engaged in improper conduct during the Conference. The allegations of misconduct included sexual advances, comments of a sexual nature, propositions for sex, and other lewd and unprofessional comments unbecoming of a member of senior leadership within Team Rubicon. This conduct was directed at the TR-CAN volunteer.

18.    I understand that the victim of the harassment reported shame and embarrassment over the incident, which occurred in front of other volunteers and staff. I am aware that other volunteers and staff to have witnessed the incident voiced disappointment over the conduct and the fact that it reflected poorly on Team Rubicon's brand and values.

19.    I was very concerned when I heard of these allegations. Team Rubicon has a "Zero Tolerance" policy for harassment and sexual misconduct, and we take our obligation to provide a safe and inclusive environment to our staff and volunteers very seriously. In discussions with leadership at TR-CAN, I understood they, too, were very concerned about the allegations. As part of these discussions, executives of TR-CAN requested that Team Rubicon conduct an investigation, particularly in light of the fact that Team Rubicon had no relationship with the accuser or the two individuals accused of sexual misconduct, and because Team Rubicon had a professional human resources team that could adequately conduct such an investigation. Team Rubicon determined it was best positioned to undertake an unbiased and disinterested investigation.

20.     On August 19, 2019, Team Rubicon launched its investigation. The Board of Team Rubicon, on which I sit, assigned its President and Chief Operating Officer, a former Commanding Officer in the U.S. Navy with a background in conducting military investigations, to oversee the investigation. The investigation was aided by other two employees from the Team Rubicon People Operations team, including one woman, that possessed experience in human resource investigations and training. Over the next week, the investigation team reviewed email correspondence and conducted several interviews of witnesses to the alleged conduct, including the individuals accused of sexual misconduct, a volunteer affiliated with one of the TR-X entities, and a senior executive from TRG, who was the roommate of one of the accused individuals for the duration of the Conference.

21.     I and others on the Team Rubicon board were briefed on the investigation periodically. Shortly after the investigation concluded, the investigation team presented its findings to the Board of Directors. Specifically, the investigation team reported that it had determined that the accusations made against the two CEOs were credible. In addition, the investigators reported that they uncovered additional inappropriate behavior by one of the CEOs during the course of their investigation. The team's findings noted that if either of the CEOs had been employed by Team Rubicon, they would have been fired for cause in light of the standards set forth by the United States Department of Labor relating to their misconduct, and Team Rubicon's own standards and expectations.

**D.     Team Rubicon's Termination of the MTLA**

22.     In light of the findings, the Team Rubicon Board determined that the conduct warranted immediate termination of the accused CEOs and that TRG and the TR-Xs would need to take certain other remedial steps to protect the TR Marks and the Team Rubicon brand.

23. On September 5, 2019, the Team Rubicon Board sent a letter to TRG, notifying TRG of the findings of the Team Rubicon investigation (the "September 2019 Letter"). In the letter, Team Rubicon reiterated that it has "zero tolerance" for such conduct. Team Rubicon also explained that the conduct was "inconsistent with, and may disparage, adversely affect, or injure, the value or goodwill associated with the TR Marks and brand." The letter also requested that TRG implement common sense remedial measures to ensure the safety of employees and volunteers within the Team Rubicon Network as well as protect the goodwill and reputation of the TR Marks. Attached hereto as Exhibit I is a true and correct copy of the September 2019 Letter.

24. In the September letter, Team Rubicon requested that TRG implement five common sense remedial measures to ensure the safety of employees and volunteers within the Team Rubicon Network as well as protect the goodwill and reputation of the TR Marks: (1) immediately prohibit the at-issue executives from participating in all ongoing and future Team Rubicon activities; (2) timely censure and terminate the at-issue executives for cause and in compliance with local law; (3) forbid TRG, TR-UK, and TR-AUS from contacting the victim, or any witnesses to the subject conduct for the protection of such individuals, and (4) require that TR-UK and TR-AUS retrain their paid staff and regular volunteers on harassment prevention, and (5) allow Team Rubicon to inspect and propose revisions to the harassment and whistleblower policies of TRG and each TR-X. Team Rubicon felt these actions were necessary to protect the safety and well-being of the staff, employees, volunteers, and reputation of the TR Marks.

25. TRG did not formally respond to the September 2019 Letter and, to my knowledge, none of the remedial steps requested were implemented by TRG.

26. In light of TRG's refusal to address the misconduct uncovered by Team Rubicon's investigators, Team Rubicon sent another letter to TRG on October 9, 2019 (the "October 2019 Letter"). In that letter, Team Rubicon formally explained its position that TRG was in breach of the MTLA for failing to take the requested corrective measures and otherwise failing to protect the TR Marks and reputation of Team Rubicon. Team Rubicon notified TRG of the MTLA's 60-day cure period, and reiterated its request for the implementation of the straightforward remedial measures listed above. Attached hereto as Exhibit J is a true and correct copy of the October 2019 Letter.

27. TRG also did not respond to Team Rubicon's October 2019 Letter. Further, as I understand from my role as CEO of Team Rubicon, TRG took no remedial action over the next 60 days. Specifically, it did not, to my knowledge, censure or force the termination of the CEOs of TR-UK or TR-AUS. It did not forbid TRG, TR-UK, or TR-AUS from contacting the victims of the sexual harassment (and indeed, to the contrary, TR-AUS did attempt to contact the victim at TR-CAN against explicit directions). It did not require that TR-UK or TR-AUS retrain its paid and volunteer staff in harassment prevent. Nor did TRG provide Team Rubicon with any information regarding the harassment and whistleblower policies of TRG or any of the TR-Xs.

28. Around this time, I learned that TRG was conducting its own investigations into the allegations and initially suspended its CEO. However, I learned that the TR-UK CEO was reinstated simply because the investigation was taking "significantly longer than … anticipated." The Board and executives of Team Rubicon were extremely frustrated and disappointed in this result, as it showed an abject lack of regard for both the victims and Team Rubicon's values and policies. Eventually, the TR-UK investigation concluded, and found its CEO to have engaged in five of the six allegations made against him, including verbal harassment and misconduct. The

main conclusion of the Board was that the CEO of TR-UK had engaged in "conduct that fell far below the standards expected by [TRG] and that dismissal could be justified under the circumstances." Despite this, the Board did not terminate its CEO.

29. At this point—learning of the results of the investigation and TR-UK's refusal to act, and having received no response from TRG to either of Team Rubicon's September or October letters—it became clear to me and other executives at Team Rubicon that TRG had no intention of implementing the remedial policies required to cure its breach of the MTLA. So, on December 9, 2019, Team Rubicon notified TRG that Team Rubicon was terminating the MTLA (the "December 2019 Letter") for cause. Attached hereto as Exhibit K is a true and correct copy of the December 2019 Letter. On December 17, 2019, after Team Rubicon had already sent its valid termination notice and the 60-day contractual cure period had expired, TRG sent Team Rubicon a letter, claiming—without evidence—that they took certain of the steps requested in Team Rubicon's September 2019 letter and believed the MTLA to be in full force and effect. TRG has not rectified its breaches in any way that would be apparent to me as the CEO of Team Rubicon, and TRG has still not provided any evidence to support its claims regarding the select steps it allegedly took after the MTLA's termination.

30. I understand that TRG currently takes the position that it did not breach the MTLA because the harassment allegations were not made "public" and thus could not harm the Team Rubicon brand, and because TRG alleges it has no power to terminate the at-issue executives. I disagree with these contentions because the entire purpose of TRG's creation was to ensure that any international sublicensees would comply with the values and mission set forth by Team Rubicon. TRG's claim that these allegations do not harm the TR Marks and brand are simply wrong, and it shows a blatant disregard for the safety, welfare, and morale of our

11

employees and volunteers.  Further, they ignore that a significant number of our staff, volunteers, and *guest sponsors* bore witness to the events that unfolded at the conference. Further, TRG's contention that it did not have power to terminate the CEO's similarly has no merit because I understand the MTLA to require them to enforce the MTLA's standards as set forth in the TRG sublicense agreements and terminate those agreements as necessary.

### E. TRG's Additional Breaches Of the License

31. Despite the termination of the MTLA, TRG has continued to use the TR Marks in marketing materials, soliciting donations, social media posts, and a website hosted at the domain name *teamrubiconglobal.org*.  On January 8, 2020, Team Rubicon sent TRG a cease and desist letter, demanding TRG cease infringing on the TR Marks (the "January 2020 Letter").  Attached hereto as Exhibit L is a true and correct copy of the January 2020 letter.  TRG again ignored this letter.

32. For example, TRG continues to prominently display the TR Marks in connection with soliciting donations, marketing, social media posts, and the *www.teamrubiconglobal.org* website.  Attached hereto as Exhibit M is a true and correct copy of the landing page of *www.teamrubiconglobal.org*.  Attached hereto as Exhibit N is a true and correct copy of TRG's Facebook page downloaded on April 15, 2020.  Attached hereto as Exhibit O is a true and correct copy of TRG's Twitter page downloaded on April 15, 2020.

33. In one of its most notable offenses to date, TRG circulated a misleading newsletter, prominently displaying the TR Marks, on April 15, 2020.  A true and correct copy of this newsletter is attached hereto as Exhibit P.  The newsletter, sent over four months after the termination of TRG's license under the MTLA, lists efforts taken by Team Rubicon as part of a bullet-point list of efforts undertaken by various TR-X's, insinuating that Team Rubicon is merely a regional affiliate of TRG.  The TRG newsletter also indicated that any donations made

to TRG would go towards supporting relief efforts in response to the coronavirus, despite the fact that TRG does not conduct any on-the-ground relief efforts of its own and is not authorized to use the TR Marks for any purpose. Even more problematic, the newsletter announced a "matching" partnership with a defense contractor—risking Team Rubicon's relationship with certain government organizations, including the World Health Organization, which cannot support organizations otherwise sponsored by such contractors. This action could potentially preclude Team Rubicon from receiving tens of millions of dollars in donations and funding grants.

34. As a result of the foregoing, it has become difficult to solicit donations and adequately fundraise. Indeed, many donors have suggested to me that they do not feel comfortable donating while there is an ongoing dispute regarding TRG's rights to use the TR Marks. Donations are critical to our large-scale relief efforts, and TRG's conduct has caused Team Rubicon serious and irreparable harm.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24 day of April 2020 in Redondo Beach, CA

JACOB WOOD
Team Rubicon, Inc.