UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAM RUBICON GLOBAL, LTD., a Delaware Corporation<br><br>*Plaintiff,*<br><br>v.<br><br>TEAM RUBICON, INC., a Minnesota Corporation<br><br>*Defendant,*<br><br>TEAM RUBICON, INC., a Minnesota Corporation<br><br>*Counterclaim Plaintiff,*<br><br>v.<br><br>TEAM RUBICON GLOBAL, LTD., a Delaware Corporation<br><br>*Counterclaim Defendant.* | Civ. No. 20-cv-2537 (LTS) (KNF) |

**SECOND DECLARATION OF JACOB WOOD**

JACOB WOOD, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1. I am over the age of 18 years old, and reside in Redondo Beach, CA. I am the co-founder and CEO of Team Rubicon, Inc. ("Team Rubicon"), the defendant and counterclaim plaintiff in this action. I also sit on the Board of Directors for Team Rubicon (the "Board"). Prior to founding Team Rubicon, I was a Sergeant in the United States Marine Corps. and was deployed in both Afghanistan and Iraq. I submit this second declaration in connection with Team Rubicon's Opposition to Plaintiff and Counterclaim Defendant Team Rubicon Global, Ltd.'s ("TRG") Motion for Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and am competent to testify to such facts if called as a witness.

A.     **The Formation, Operations, and Responsibilities of TRG**

2.     In January 2010, I co-founded Team Rubicon with William McNulty. Team Rubicon's charitable mission is unique in that it serves both communities in need *and* its volunteers, primarily U.S. Veterans, by utilizing their unique skills and experience to respond to large scale natural and humanitarian crises.

3.     In approximately 2013, Team Rubicon began to evaluate whether to expand the Team Rubicon mission and model to other countries. Eventually, the Board of Team Rubicon—after a number of heavily debated meetings—voted in 2014 to create TRG to serve as Team Rubicon's global expansion vehicle. TRG is incorporated in Delaware and is headquartered in Washington D.C. To my knowledge, most (with the exception of one) of TRG's staff are American citizens. Though TRG carries the moniker "Global" in its name, TRG has no parental or hierarchical status over Team Rubicon.

4.     TRG's singular purpose was to establish new charitable organizations abroad under the Team Rubicon brand with values consistent with those of Team Rubicon and protect the integrity and goodwill associated with Team Rubicon's trademarks (the "TR Marks") and the Team Rubicon brand during the international expansion. As a result, TRG is significantly smaller than Team Rubicon and most of the TR-Xs. For instance, while Team Rubicon has over 165 full time staff and over 100,000 volunteers, TRG employed less than fifteen people at its peak, and currently employs only three individuals.

5.     As part of establishing the terms and scope of TRG's role in Team Rubicon's expansion, Team Rubicon and TRG negotiated and agreed upon the confines of TRG's allowed activities, territories of operation, and level of involvement in the growth of international sublicensees. At all times, Team Rubicon maintained ownership and control of the TR Marks, certain rights to which were licensed to TRG for the purpose of sublicensing those marks to new

international organizations.  These terms were formalized in a Master Trademark License Agreement ("MTLA"), entered into by the parties on October 9, 2015.

6. The MTLA established TRG as the "hub" that would identify charitable organizations for inclusion in the Team Rubicon network, and then sublicense Team Rubicon's TR Marks to each of these TR-Xs for legal use outside of the United States.  Again, TRG's role was not to engage in on-the-ground volunteer work, but rather to serve as an administrative organization to establish and monitor each TR-X.  TRG, in turn, was required by the MTLA to impose guidelines for the protection of Team Rubicon's intellectual property in each of its sublicense agreements with each individual TR-X, including the TR Marks.

7. TRG, as the protector of the TR Marks and the Team Rubicon brand outside the United States, was obligated to require its sublicenses to "be made subject to the terms, conditions and limitations" of the MTLA.  Additionally, Section 13(b) of the MTLA granted Team Rubicon the right to terminate the MTLA with notice upon TRG's failure to comply with any material provisions of the agreement, which included "Licensee's misconduct which materially and adversely impacts the [Team Rubicon] License Marks or the associated goodwill."

8. Team Rubicon and TRG also settled and agreed upon the scope of TRG's ability to fundraise and conduct other charitable activities, so that TRG's actions and provision of services would sync with, and not duplicate, Team Rubicon's own fundraising and provision of charitable services.  As part of this agreement, TRG agreed to obtain Team Rubicon's express permission before soliciting donations so as to not conflict with Team Rubicon's own funding efforts with particular donors.  TRG failed to obtain this permission on several occasions, causing friction between Team Rubicon and TRG.

9. For example, in 2016, TRG obtained multiple donations of funds from existing Team Rubicon donors earmarked for relief in Haiti as a result of Hurricane Matthew. TRG did not tell Team Rubicon it solicited these donations, nor did it coordinate its disaster relief efforts in Haiti, which it was not permitted to undertake. When Hurricane Matthew later hit the United States, I reached out to our donors and requested funding for Team Rubicon's domestic response, only to be informed by multiple donors that they had contributed to TRG's efforts, and were under the impression that they were donating to Team Rubicon, or that the organizations were one and the same. One such donor even made a pledge to TRG of $25,000 but tried to send the contribution to Team Rubicon. I was embarrassed and had to apologize to the donors, and then immediately raised the issue with TRG, who refused to acknowledge that the actions were harmful or confusing and refused to disclose what additional donors had been approached – despite our rights as licensor to receive this information.

10. Issues like this occurred frequently between Team Rubicon and TRG, which sometimes led me and other board members at Team Rubicon to discuss options to address this discord, and one such option included potential absorption of TRG to improve coordination. I had one such discussion in 2016, via email with Charles Macintosh and Adam Yarnold, both Team Rubicon Board members. I understand that in his April 22, 2020 declaration to the Court, Mr. McNulty provided an incomplete version of this 2016 communication and characterized it as a "secret" email. He further claimed this email demonstrates that Team Rubicon's proffered reasons for terminating the MTLA in December 2019 were pretextual. This is a deliberate mischaracterization of a business email sent three years before the events giving rise to the termination of the MTLA. This email instead relates to a specific set of concerns raised by TRG's operations at the time. The option to absorb TRG was never pursued and Team Rubicon

4

and TRG continued to work together notwithstanding these operational issues for another three years.

### B. TRG's Failure To Protect The Brand

11. Unlike the operational issues noted above, TRG's refusal to police its sublicensees and protect the TR Marks is a failure of one of TRG's most fundamental obligations to Team Rubicon and warranted terminations of TRG's rights to the TR Marks. This is particularly the case given the nature of the allegations raised against two of TRG's sublicensees (*i.e.*, senior executives in positions of power behaving inappropriately with younger female staff and volunteers). The recent "#MeToo" movement has also affirmed Team Rubicon's belief that it is critical for both individuals and organizations alike to take a stand against inappropriate workplace behavior in order to create safe, collaborative, and inclusive work environments. As a result, Team Rubicon refuses to associate with entities or organizations that do not take harassment and sexual misconduct seriously. Such a failure also risks permanently damaging the Team Rubicon brand.

12. I understand TRG's position to be that it did not breach the MTLA because the harassment allegations were not made "public" and thus could not harm the Team Rubicon brand. This is incorrect for several reasons. Even if the events were purely between the harasser and his victim, classifying the events as a "private matter" ignores TRG's corporate responsibility to address the events and protect the staff and volunteers within the Team Rubicon Network, as well as the negative effects that even non-publicized harassment have on workplace culture, recruitment, retention, and reputation within the marketplace. But moreover, the conduct in question, which occurred during a Team Rubicon conference attended by over 500 individuals, was witnessed by several staff and volunteers. Having witnesses to such harassment, by definition, disqualifies the event from being a mere "private" matter.

5

Additionally, the detailed and voluminous reports put together by the investigatory team were sent to at least five Board members who spent hundreds of hours reviewing and discussing them. Failure to swiftly and effectively address such allegations, when raised, have a toxic effect on corporate culture and an organization's "tone from the top."

13. In any event, as discussed below, Team Rubicon has an obligation of transparency to its corporate funders and partners, each of which places its trust in Team Rubicon to act in accordance with their core values. Team Rubicon's partners trust Team Rubicon to take harassment in the workplace seriously, deal with accusations in an appropriate manner, and disclose issues of sexual harassment when they may ultimately affect Team Rubicon's reputation and, in turn, the reputation of Team Rubicon's business partners. Therefore, keeping these events wholly "private" was both unrealistic and improper given our obligations to our corporate partners.

14. I also understand that TRG claims it has no power to terminate the at-issue executives because TRG does not have a parent-subsidiary relationship with its sublicensees. This contention is puzzling to me because the MTLA requires TRG to enter into agreements with its sublicensees pursuant to which TRG is permitted to enforce Team Rubicon's brand standards, including by terminating any sublicense agreement as necessary should the sublicensee not be in full compliance with the agreement. In fact, the primary function of TRG, per its own board briefings, is to develop and protect the TR Marks and Team Rubicon brand as it is sublicensed to other entities abroad. Listed as a responsibility under this function is an obligation to fulfill the duties of the license agreement.

15. I am further confused by TRG's claim that it took a "series of actions" in response to Team Rubicon's September 2019 letter. Team Rubicon did not receive formal responses from

TRG to either of its September or October 2019 letters.  Only after Team Rubicon sent its December 9, 2019 letter—which confirmed termination of the MTLA following TRG's failure to cure within the 60-day cure period—did TRG make Team Rubicon aware of its purported "actions."  On December 17, 2019, I received a letter from Stephen Hunt, the former CEO of TRG, that confirmed TRG's receipt of the October 9, 2019 letter and said "TRG can exercise no corporate control [over TR-UK and TR-AUS] . . . [and] therefore cannot terminate the Chief Executive Officers of either entity . . . however, [TRG] completed the remaining requests immediately after receiving" the September letter.  To date, TRG has not provided any evidence of the steps it supposedly took, has not produced any of the records or documents Team Rubicon requested to inspect in its September and October 2019 letters, and has not explained why it did not make Team Rubicon aware of its purported "action" within the 60-day cure period and before the MTLA was validly terminated.  To my knowledge, this is because none of the requested actions have actually been taken.  A true and correct copy of the December 17, 2019 letter I received from TRG is attached hereto as Exhibit A.

        **C.**        **Protection of the Team Rubicon Brand**

        16.        Since the December 9, 2019 termination of the MTLA, Team Rubicon has had to do the job TRG failed to do – police the TR Marks and protect the Team Rubicon brand.  For instance, in January 2020, Team Rubicon focused on the specific TR-X entities whose employees had taken actions that threatened the TR Marks and otherwise refused to take the necessary steps to protect the TR Marks by addressing such actions, namely TR-AUS and TR-UK.  Team Rubicon demanded that they cease using the TR Marks, including on their respective websites, LinkedIn pages, or on any social media accounts.  Team Rubicon notified TR-UK and TR-AUS that their unauthorized use of the TR Marks suggested sponsorship or affiliation with Team Rubicon, when their sublicensing relationship with Team Rubicon had terminated in

7

December of 2019 by virtue of the termination of the MTLA license between Team Rubicon and TRG.

17. Moreover, consistent with the mandate from and expectation of our funders, Team Rubicon affirmatively reached out across its Network to disclose the misconduct it investigated to its donors and corporate sponsors. I am aware that many of Team Rubicon's corporate donors and sponsors do not tolerate sexual misconduct or harassment, and would immediately terminate their relationships with Team Rubicon if such conduct had not been disclosed and Team Rubicon had otherwise failed to take appropriate steps to address such conduct.

18. Corporate reputation, business integrity, and community trust are all crucial factors in many of Team Rubicon's donors' operations. If and when the harassment became public, TRG's failure to disassociate the Team Rubicon Network from the at-issue CEOs would risk serious and irreparable damage to Team Rubicon's donors' brand and goodwill. As a result, we understand that each of our donors and corporate sponsors holds us accountable for such risk and expects Team Rubicon to implement and uphold policies and procedures that will protect their brands and reinforce the alignment of their organization with Team Rubicon's core values of integrity, trust, and mutual respect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of May 2020 in Redondo Beach, CA.

JACOB WOOD
Team Rubicon, Inc.