# EXHIBIT D



LOS ANGELES HEADQUARTERS
6171 W. CENTURY BLVD. SUITE 310
LOS ANGELES, CA 90045

23 August 2019

From:    Art delaCruz, President and Chief Operating Officer, Team Rubicon

To:      Adam Miller, Chairman of the Board, Team Rubicon
         Chris Perkins, Vice Chairman of the Board, Team Rubicon
         Geordie Young, Chairman of the Board, Team Rubicon Canada
         Jake Wood, Chief Executive Officer and Co-Founder, Team Rubicon
         Bryan Riddell, Chief Executive Officer, Team Rubicon Canada

CC:      John Pitts, Kirkland and Ellis LLP

Subj.:   INTERVIEWS RELATED TO ALLEGATIONS OF INAPPROPRIATE CONDUCT BY GEOFF EVANS,
         CEO, TEAM RUBICON AUS

Encl:    (1) StaffEx Agenda
         (2) Team Rubicon Leadership Conference (TRLC) Agenda
         (3) Summary of events provided by Complainant 1, Manager TR-CAN to Bryan Riddell re: Geoff
             Evans
         (4) Email from Bryan Riddell, CEO TR-CAN to Geoff Evans, CEO TR-AUS
         (5) Email from Geoff Evans, CEO TR-AUS to Bryan Riddell, CEO TR-CAN
         (6) Slack Message from Witness 1, Associate TR-USA to Josh Anderson, Deputy
             Director Talent, TR-USA
         (7) Email from Josh Anderson, Deputy Director Talent, TR-USA to Geoff Evans, CEO TR-AUS
         (8) Email response to Encl. 7 from Geoff Evans, CEO TR-AUS to Josh Anderson, Deputy Director
             Talent TR-USA
         (9) Interview of Complainant 1, Manager TR-CAN
         (10) Interview of Witness 2, Director TR-CAN
         (11) Interview of Witness 3, Director TR-AUS
         (12) Interview of Witness 4, Associate TR-USA
         (13) Interview of Witness 5, Associate TR-USA
         (14) Interview of Witness 6, Partner

         (15) Interview of Geoff Evans, CEO TR-AUS
         (16) Email from Geoff Evans, CEO TR-AUS to Josh Anderson

1.  **Purpose:**  The following document is a compilation of interviews and statements regarding allegations of inappropriate behavior by Geoff Evans, CEO TR-AUS during the 2019 Team Rubicon Leadership Conference. The contents are sensitive, and several interviewees requested anonymity. Please treat the materials accordingly.  The following excerpt from the TR-USA Employee Handbook outlines confidentiality policies:

*"All allegations of sexual harassment will be quickly and discreetly investigated. To the extent possible, your confidentiality and that of any witnesses and the alleged harasser will be protected against unnecessary disclosure. Communications will be made to others only on a limited "need to know" basis. When the investigation is completed, you will be informed of the outcome of the investigation."*

With the exception of executives and personnel that conducted the interviews, names have been redacted in the narrative that follows. The following terminology is utilized:

"Witness": Person interviewed or providing statement that may have seen or heard information regarding events.

"Complainant": Person that has levied allegations or submitted information that indicates he/she may have been wronged.

"████": Person that has been named but is immaterial to investigation.

Titles other than those of executives have been generalized to allow insight into level of personnel within their organizations.  They are "Director", "Manager", and "Associate".

Country associations are maintained (e.g. TR-USA, TR-CAN, TR-UK, TR-AUS)

Due to lack of human capital expertise experienced in investigation along with the fact that it was a TR-USA event, Bryan Riddell requested via Jake Wood that Team Rubicon USA lead the investigation.  I, Art delaCruz, President and COO TR-USA, served as the lead of this investigation. As a former Commanding Officer in the US Navy, I have a background in conducting military investigations as well as formal training in US Department of Defense Sexual Assault Prevention and Response (SAPR).  I did not conduct interviews.  Interviews were conducted by two personnel

from the People Operations team that have experience in human resource investigations, process, and training.  Josh Anderson, Team Rubicon Head of Talent, served as the primary investigator.  He has a human resource and recruiting background that began after his transition from the US Marine Corps in 2007.  Shantal Merchain served as a co-interviewer throughout the process and brings extensive experience as a human resources manager, including at a Fortune 500 company.

2. **Guidance:** The investigation process was initiated on 19 August 2019. Jake Wood (CEO TR-USA) requested for Josh Anderson (Deputy Director Talent TR-USA) to investigate an incident that was reported to Bryan Riddell on 18 August 2019 by Complainant 1, Manager TR-CAN (National Membership Coordinator TR-CAN). Complainant 1, Manager TR-CAN submitted an incident report (Encl. 3), alleging misconduct Geoff Evans (CEO-TRA).

3. **US Definitions and Standards**: For a baseline prior to the interviews, the interview team and I discussed standards and definitions for harassment and sexual harassment, and the threshold of what constitutes unlawful harassment in the United States. These definitions are directly from the Equal Employment Opportunity Commission (EEOC), the federal agency that administers and enforces civil rights laws against workplace discrimination and harassment.

   i. Harassment

   Harassment is defined as unwelcome & offensive conduct that is based on race, color, religion, sex, national origin, age (40 or older), disability or genetic information.

   Offensive conduct may include, but is not limited to, offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance.

   ii. Sexual Harassment

   Sexual Harassment is unlawful harassment based on a person's sex. Sexual harassment includes unwanted verbal (unwelcome sexual advances, requests for sexual favors, etc.), visual or physical conduct of a sexual nature

Harassment does not have to be of a sexual nature, however, and can include offensive remarks about a person's sex. For example, it is illegal to harass a woman by making offensive comments about women in general.

iii. Threshold

Harassment becomes unlawful where:

1) The conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

Or

2) Enduring the offensive conduct becomes a condition of continued employment

Petty slights, annoyances, and isolated incidents (unless extremely serious) will not rise to the level of illegality. To be unlawful, the conduct must create a work environment that meet at least one of the following conditions would be either intimidating, hostile, or offensive to reasonable people.

Although the law doesn't prohibit simple teasing, offhand comments, or isolated incidents that are not very serious, harassment is illegal when it is so frequent or severe that it creates a hostile or offensive work environment. Harassment is also illegal when it results in an adverse employment decision (such as the victim being fired or demoted).

iv. Additional Considerations

· The harasser can be the victim's supervisor, a supervisor in another area, an agent of the employer, a co-worker, or a non-employee.

· The victim does not have to be the person harassed but can be anyone affected by the offensive conduct.

· Both victim and the harasser can be either a woman or a man, and the victim and harasser can be the same sex.

· Unlawful harassment may occur without economic injury to, or discharge of, the victim.

4.  **Team Rubicon Standards:** Additionally, we discussed the standards outlined in the Team Rubicon Employee Handbook regarding TR-USA policies related to harassment definitions, examples of harassment, reporting requirements, investigation process, requirements, and rules against retaliation.  The following is an excerpt from the TR Employee Handbook:

> **Sexual and Other Unlawful Harassment**
>
> TR is committed to providing a work environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive, or disruptive, including sexual harassment. Actions, words, jokes, or comments based on an individual's sex, race, color, national origin, age, religion, disability, sexual orientation, gender identity, pregnancy, military status, or any other legally protected characteristic will not be tolerated.
>
> Harassment is unwelcome verbal, visual or physical conduct creating an intimidating, offensive, or hostile work environment that interferes with work performance. Examples of harassment include verbal (including slurs, jokes, insults, epithets, gestures or teasing), graphic (including offensive posters, symbols, cartoons, drawings, computer displays, or e-mails) or physical conduct (including physically threatening another, blocking someone's way, etc.) that denigrates or shows hostility or aversion towards an individual because of any protected characteristic. Such conduct constitutes harassment when: 1) it has the purpose or effect of creating an intimidating, hostile, or offensive working environment; or 2) it has the purpose or effect of unreasonably interfering with an individual's work performance; or 3) it otherwise adversely affects an individual's employment opportunities.
>
> Sexual harassment is defined as unwanted sexual advances, or visual, verbal, or physical conduct of a sexual nature. This definition includes many forms of offensive behavior and includes gender-based harassment of a person of the same sex as the harasser. The following is a partial list of examples:
>
> • Unwanted sexual advances.
>
> • Offering employment benefits in exchange for sexual favors.
>
> • Making or threatening reprisals after a negative response to sexual advances.
>
> • Visual conduct that includes leering, making sexual gestures, or displaying of sexually suggestive objects or pictures, cartoons or posters.

CONFIDENTIAL

- Verbal conduct that includes making or using derogatory comments, epithets, slurs, or jokes.
- Verbal sexual advances or propositions.
- Verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, or suggestive or obscene letters, notes, or invitations.
- Physical conduct that includes touching, assaulting, or impeding or blocking movements.

Unwelcome sexual advances (either verbal or physical), requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of employment; (2) submission or rejection of the conduct is used as a basis for making employment decisions; or, (3) the conduct has the purpose or effect of interfering with work performance or creating an intimidating, hostile, or offensive work environment.

If you experience or witness sexual or other unlawful harassment in the workplace, you are required to report it immediately to your supervisor or People Operations. If your supervisor is unavailable or you believe it would be inappropriate to contact that person, you should immediately contact any other member of the leadership team or People Operations. You can raise concerns and make reports without fear of reprisal or retaliation.

All allegations of sexual harassment will be quickly and discreetly investigated. To the extent possible, your confidentiality and that of any witnesses and the alleged harasser will be protected against unnecessary disclosure. Communications will be made to others only on a limited "need to know" basis. When the investigation is completed, you will be informed of the outcome of the investigation. If you make a complaint under this policy and have not received a satisfactory response, you should contact People Operations.

Any supervisor or manager who becomes aware of possible sexual or other unlawful harassment must immediately advise People Operations so it can be investigated in a timely and confidential manner. Upon completion of the investigation, if necessary, corrective measures will be taken. These measures may include, but are not limited to: training, counseling, warning, suspension, or immediate dismissal. Anyone, regardless of position or title, found through investigation to have engaged in improper harassment will be subject to discipline up to and including discharge. If the investigation is inconclusive, TR may still provide counseling or take other appropriate steps.

TR prohibits any form of discipline or retaliation for reporting in good faith the incidents of harassment in violation of this policy, pursuing any such claim or cooperating in the investigation of such reports.

5. **Event:** Team Rubicon hosted the 2019 Team Rubicon Staff-ex and the Team Rubicon Leadership Conference (TRLC) in Estes Park, Colorado from 13-14 August and 14-18 August respectively. At peak attendance, nearly five hundred Greyshirts (inclusive of paid staff, volunteer leaders, guest sponsors) were in attendance. Representatives of the Team Rubicon network participated as follows:

    a. Team Rubicon Global – 1
    b. Team Rubicon UK – 3
    c. Team Rubicon Canada – 3
    d. Team Rubicon Australia – 3

The following is an overview of the composition of the StaffEx, and TRLC overall:

CONFIDENTIAL

    a. StaffEx Attendees – 126
        i. 47 Female (37.3% of StaffEx)
        ii. 79 Male (62.7% of StaffEx)
    b. TRLC Attendees – 355
        i. 134 Female (37.7% of TRLC)
        ii. 221 Male (62.3% of TRLC)
    c. Overall Attendees – 481
        i. 181 – Female (37.6% Overall)
        ii. 300 – Male (62.4% Overall)

Encl. 1 shows the agenda for the StaffEx. During the event cultural expectations and behavior at the YMCA were discussed. Beer was available during the welcome aboard gathering and the staff campfire; no hard liquor was available.

Encl. 2 shows the agenda for TRLC. Like the StaffEx, norms and expected behaviors were discussed and beer was available in the evenings during the campfire, dinner, and BBQ. Wine was available during the dinner.

During the entirety of the week, four unexpected incidents occurred and were brought to my attention. On the evening of 14 August 2019, a YMCA employee asked a group of people congregated outside of the Ram's Head Lodge if they could lower the noise level; the issue was immediately resolved and monitored by those present. On the morning of 15 August 2019, I was notified by ▇▇▇▇▇▇▇, Director TR-USA that "Richard had said something stupid last night but has apologized". On the evening of 16 August 2019 / early morning 17 August 2019, a volunteer was transported the local hospital for a potential heart attack; the volunteer was examined, and it was determined to be related to an existing condition. He returned to the YMCA that morning and arrangements were made to fly him home that evening. On 17 August 2019 Jake Wood, CEO TR-USA, was notified by Bryan Riddell, CEO TR-CAN of allegations misbehavior addressed in this document; Jake notified me.

On 22 August 2019, all TRLC attendees were sent a post-TRLC survey via Qualtrix. At completion of the survey, this data will compiled and utilized for after-action reports.

5.  **Narrative:** The incident was alleged to have occurred on the evening Friday,16 August and into the morning of Saturday,17 August.  After the day's formal TRLC agenda had concluded, attendees were congregating in smaller groups throughout the YMCA campus.  Complainant 1, Manager TR-CAN's written statement in Encl. 3 outlines what transpired in detail that evening and early morning.

    Encl. 4-5 include digital correspondence between Bryan Riddell and Geoff Evans regarding the allegations.  Encl. 6-13 include interviews and correspondence of potential witnesses.

    The Enclosures are chronological in order of interview or receipt.  They also include the notes of both Josh Anderson and Shantal Merchain. The team began to interview personnel based on who was present in the Assembly Hall and interviewed additional people based on the first-hand accounts stemming from the initial interviews.

6.  **Conclusions:** All interviews included in this document were conducted by individuals who were independent and neutral parties to the incidents in question. This document's purpose is to provide objective and impartial recollections of the incidents. My hope is that the interviews and statements provided will provide a basis to make a well-informed decision regarding the allegations

and to guide subsequent outcomes. I welcome follow-on questions should they arise.  Please forward any questions or concerns to me at delacruz@teamrubiconusa.org.

Very Respectfully,

A.M. delaCruz

President and COO, Team Rubicon USA

CONFIDENTIAL

**Enclosure 1**

**StaffEx Agenda**

**Enclosure 2**

**TRLC Agenda**

CURRENT 2019 TRLC Agenda

| G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Ask Brent to confirm shuttle start times | |
| **STAFF SYNC** **Thurs - Aug 15** | | **TRLC Day 1** **Fri - Aug 16** | | | **TRLC Day 2** **Sat - Aug 17** | | **Travel Day** **Sun - Aug 18** | |
| | | | | | | | | 700 |
| | | Team Breakfast | | | Team Breakfast | | Team Breakfast (optional) | 715 |
| | | | | | | | | 730 |
| | | | | | | | | 745 |
| | | Morning Stand Up | | | Morning Stand Up | | Closing Remarks | 800 |
| | | | | | | | | 815 |
| | | Welcome & Conference Theme | | | Territory Team Time | | | 830 |
| | | | | | | | NETWORKING | 845 |
| | | | | | | | | 900 |
| | | Digital Transformation | | | Leader Lifecycle: Comms/Dev Intro | | | 915 |
| | | | | | | | | 930 |
| | | Break & Switch | | | Break & Switch | | | 945 |
| | | | | | | | | 1000 |
| | | Leader Lifecycle Intro | | | Session D Culture Council w/ Jake | | | 1015 |
| | | | | | | | | 1030 |
| | | Break & Switch | | | Break & Switch | | | 1045 |
| | | | | | | | | 1100 |
| | | Leader Lifecycle: Field Ops/ReBuild Intro | | | Session E (Ask Me Anythings) | | | 1115 |
| | | | | | | | | 1130 |
| | | Break & Switch | | | Break & Switch | | | 1145 |
| | | | | | | | | 1200 |
| | | Lunch (90 Mins) | | | Lunch (90 Mins) | | | 1215 |
| | | | | | | | | 1230 |
| | | | | | | | | 1245 |
| | | Session A (11 Breakout Options) | | | Session F (Ask Me Anythings) | | | 1300 |
| | | | | | | | | 1315 |
| STAFF SYNC | Travel Window for GREYSHIRTS | | | | | | | 1330 |
| | | Break & Switch | | | Break & Switch | | Travel Window for ALL | 1345 |
| | | Session B (11 Breakout Options) | | | | | | 1400 |
| | | | | | | | | 1415 |
| | | | | | Leader Lifecycle: Functional Onboarding Feedback + Open Functional Time | | | 1430 |
| | | Break & Switch | | | | | | 1445 |
| | | Session C (11 Breakout Options) | | | | | | 1500 |
| | | | | | | | | 1515 |
| | | | | | | | | 1530 |
| | | Break & Switch | | | Break & Switch | | | 1545 |
| | | | | | | | | 1600 |
| | | Territory Time / Booth Visits | | | Territory Team Time | | | 1615 |
| | | | | | | | | 1630 |
| | | Break & Switch | | | Break & Switch | | | 1645 |
| | | | | | | | | 1700 |
| | | | | | | | | 1715 |
| | | | | | | | | 1730 |
| | | | | | | | | 1745 |
| | | | | | | | | 1800 |
| | | | | | | | | 1815 |
| Dinner on Own in Cafeteria; Welcome @ Fire Pit in Evening | | Keynote Speakers & Catered Dinner | | | Close-Out BBQ /Social Time | | | 1830 |
| | | | | | | | | 1845 |
| | | | | | | | | 1900 |
| | | | | | | | | 1915 |
| | | | | | | | | 1930 |
| | | | | | | | | 1945 |

**Enclosure 3**

**Written Statement**

**Source: Complainant 1, Manager TR-CAN**

**Sent to: Bryan Riddell (CEO, TR Canada) on 17 August 2019**

On the evening of 16 October, in the social time after dinner, there were comments made in front of anotherGreyshirt (I cannot remember their name) regarding Geoff's desire to have sex with me and commenting on my physical appearance ("You're a gorgeous girl", "I'd have sex with you"). He has made other jokes or remarks throughout the evening that were inappropriate to myself and other volunteers, and I personally did not know how to react to such comments as they were made by leadership and was unsure know how to respond. Other remarks included "I'd fuck you before I'd ever fuck Jake [Wood]". I observed that this comment in particular regarding sex came after several hours of drinking. Additionally, increased touching, particularly hugging myself and other Greyshirts, also increased throughout the evening.

CONFIDENTIAL

**Enclosure 4**

**Email**

**Source: Bryan Riddell (CEO, TR Canada)**

**Sent to: Geoff Evans (CEO, TR Australia) on 17 August 17 2019**

On 17 Aug 2019, at 10:14 am, Bryan Riddell <riddell@teamrubicon.ca> wrote:

When the team and I jumped in the car this morning, I was happy with the outcome of our visit, and excited for what lies ahead. That was derailed when one of my team members, Complainant 1, Manager TR-CAN, clearly distraught, proceeded to tell me that Geoff had made an inappropriate sexual comment towards her.

Whether you see this as a misunderstanding is irrelevant. Perception is everything.

I'm really disappointed. I should not have to say this but I'm going to: we have impressionable young people in our ranks. We can't be taking advantage of those who look to us as the example. None of us are special; our positions, and the responsibilities that come with them, are. I am no saint, gents, but I tell my people that if we can't lead on the moral and physical plane, we're unfit to lead. We need to be better.

Bry

**Enclosure 5**

**Email**

**Source: Geoff Evans (CEO, TR Australia)**

**Sent to: Bryan Riddell (CEO, TR Canada) on 17 August 2019**

From: Geoff Evans <evans@teamrubiconaus.org>

Subject: Re: Adults Only

Date: August 17, 2019 at 2:48:47 PM EDT

To: Bryan Riddell <riddell@teamrubicon.ca>

Hey Bryan,

The allegations made by Complainant 1, Manager TR-CAN are very serious, and will need to be formally investigated.

I am astounded that I made an inappropriate sexual comment towards her. There was a lot of banter going on, and no one I have spoken to (who was there), can tell me anything untoward happened.

That's not a denial by the way.

I think Complainant 1, Manager TR-CAN is a sweat kid, I am genuinely upset that I offended her. And really can not remember talking to her after dinner.

Given I'll shortly be facing a career ending investigation, can you tell me what I said to her?

And regardless, please pass on my sincerest apologies to her.

Kind Regards

Geoff Evans

**Enclosure 6**

**Slack Message**

**Source: Witness 1, Associate TR-USA**

**Sent to: Josh Anderson (Deputy Director Talent, TR USA) on 20 August 2019**

Related to Complainant 1, Manager TR-CAN and Geoff, I do remember some things being said. Can't recall the exact verbiage. It was inappropriate and sexual I do recall that.

It was very forceful and related to sex.

It was said in the assembly hall

I don't but I do remember he grabbed her arm and leaned super close to her

He was basically saying let's go have sex

But I don't remember the exact verbiage sorry

I even shied away a-bit after it to be honest. She handled it very well and then he (Geoff) was rubbing somegreyshirts arm like 10 min later.  I'm sorry, I don't remember who the greyshirt was. I just remember the instance.

If I can recall anything else I'll send it

CONFIDENTIAL

**Enclosure 7**

**Email**

**Source: Josh Anderson (Deputy Director Talent, TR USA)**

**Sent to:  Geoff Evans (CEO, TR Australia) on 20 August 2019**

Geoff -

I am writing to notify you that TR US People Ops has launched an official investigation into allegations made against you regarding events that occurred at the Team Rubicon Leadership Conference in Estes Park, Colorado, on August 14-18, 2019.  Team Rubicon has an ethical responsibility to treat these allegations with utmost earnestness, and are making this a top priority. We will also ensure that confidentiality is maintained for all parties involved, to the greatest extent possible.

Team Rubicon US People Operations has been designated to conduct the investigation.  We will be reaching out to you directly to schedule an interview as part of this ongoing investigation. Please DO NOT communicate with other TR employees about this matter - to include your country staff, your peers in other countries, or any parties you suspect may have made these claims.  If you have already communicated with any staff members about this matter, we would ask that you please reply to disclose the parties involved and the nature of the exchange.

Thank you for your cooperation.

-Josh

**Enclosure 8**

**Email**

**Source:  Geoff Evans (CEO, TR Australia)**

**Sent to:  Josh Anderson (Deputy Director Talent, TR USA) on 21 August 2019**

Hi Josh,

Thank you for your email.

I spoke to two of my employees, who were attending the conference with me:

█████████:  ████@teamrubiconaus.org  Noting █████ was not present on the night, and I was in shock,  I had a general discussion with her about the night and the allegation.

Witness 3, Director TR-AUS: ████@teamrubiconaus.org    Witness 3, Director TR-AUS was present during the evening in question. I asked him if he was aware of me saying anything offensive to anyone.  I later told him of the allegation, and again asked if he was aware of me offending Complainant 1, Manager TR-CAN.  We had a general discussion about the timeline (what happened) on the night.

I am available at ANY time for an interview.

thank you.

CONFIDENTIAL

**Enclosure 9**

**Verbal Statement**

**Source:  Complainant 1, Manager TR-CAN**

**Provided to:  Josh Anderson (Deputy Director Talent, TR USA) and Shantal Merchain (Manager HR Ops, TR USA)on 21 August 2019**

*Josh's Notes:*

Had two separate negative experiences with two different leaders during the same evening – August 16th, the evening of the catered dinner.

Some of the context will start outside what was in the written report.  Observations started even the night prior.  Geoff was at her table, drinking quite heavily.  Had heard comments about the night before - that he'd over-indulged and had to be "put to bed."  After dinner when everyone was socializing in the Assembly Hall, people were moving back and forth between groups.  Had met Geoff previously in Australia.  Was very huggy, putting hishands on people - including her - then started saying "you're a gorgeous girl, I'd like to have sex with you ... I'd fuck you before I'd fuck Jake Wood."  The touching didn't cross any lines, but the comments were way over the line.  Had had fairly normal conversations up to that point but turned really inappropriate and unprofessional really quickly.  Witness 2, Director TR-CAN had mentioned that he'd also made comments to her. (Did others overhear the comments?)  Witness 1, Associate TR-USA, maybe Witness 3, Director TR-AUS overheard the comments.

No interactions with Geoff up to his untoward comments that night.

**Enclosure 10**

**Verbal Statement**

**Source:  Witness 2, Director TR-CAN**

**Provided to:  Josh Anderson (Deputy Director Talent, TR USA) and Shantal Merchain (Manager HR Ops, TR USA) on 21 August 2019**

*Josh's Notes:*

Witness 2, Director TR-CAN indicated she feels really uncomfortable.  Wouldn't have said anything except that she's now being asked.

Earlier in the evening of August 16, around 10ish, the head of TR AUS, Geoff, asked Witness 2, Director TR-CAN where Complainant 1, Manager TR-CAN was.  Said she was hanging out with Witness 3, Director TR-AUS.  Geoff said, "are they fucking?  I want to make sure he represents TR AUS in the sack."  That was a red flag - I stayed away from Geoff the rest of the night.  Hadn't had much interaction with Geoff before that.

I'd assume he probably just had too much to drink.

*Shantal's notes:*

In the assembly hall after the panel discussion had ended, Geoff asked Witness 2, Director TR-CAN "where's Witness 3, Director TR-AUS?" Witness 2, Director TR-CAN mentioned that he was with Complainant 1, Manager TR-CAN, Geoff responded "Are they fucking? I just want to ensure he reps TR Australia in the sack". Witness 2, Director TR-CAN did not know how to respond to this comment and was caught completely off guard. She said after he made that comment she distanced herself from him Geoff and did not talk to him for the rest of the night or the remainder of TRLC.

**Enclosure 11**

**Verbal Statement**

**Source:  Witness 3, Director TR-AUS**

**Provided to:  Josh Anderson (Deputy Director Talent, TR USA) and Shantal Merchain (Manager HR Ops, TR USA) on 22 August 2019**

*Josh Notes:*

I'd say from about 9/10:00, it went downhill with the drinking with Geoff.

Doesn't remember exactly what Geoff did that was truly inappropriate or offensive.  Was chaperoning making sure that Geoff behaved, had to remind him that he needed to remember where he was.  Knew he was getting a bit belligerent, but doesn't recall specific terms used. Comments on people, what they look like, without thinking it through.  "Aussies can be offensive when they get drunk."  Was also getting pushy/shovey.  Only specific comment he made was to Jake - joking about "wanting to have sex with Jake."  Wouldn't be surprised if he made similar inappropriate comments to others.  Escorted him to his room.  Had a chat with Geoff the next day, asked him what's going on.  Thinks that they were drinking the same way they would at home, but at altitude were getting blackout and doing/saying stupid things.

Complainant 1, Manager TR-CAN was with Witness 3, Director TR-AUS when they put Geoff to bed.

*Shantals notes:*

Witness 3, Director TR-AUS' observations of Geoff:

- Observed Geoff clearly being intoxicated
- Heard Geoff using rash humor. Witness 3, Director TR-AUS couldn't  remember specific comments Geoff made, beyond joking that he wanted to have sex with Jake.
- Witness 3, Director TR-AUS remembers reminding Geoff several times that they were at a global event and reminded him to stay professional, and also told him that some things they find acceptable or humorous  abroad, may not be acceptable in the States, and to remain aware of this when he was communicating with others.

**Enclosure 12**

**Verbal Statement**

**Source:  Witness 4, Associate TR-USA**

**Provided to:  Josh Anderson (Deputy Director Talent, TR USA) and Shantal Merchain (Manager HR Ops, TR USA) on 22 August 2019**

*Josh Notes:*

Geoff was pretty intoxicated on Friday night, and was pontificating to Witness 5, Associate TR-USA about the "appropriate times to use the term 'cunt'."  I don't recall anything else he said to anyone else.  I tried to excuse myself from the conversation as quickly as possible.

*Shantal's notes:*

Witness 4, Associate TR-USA's observations are from Friday night, 8/16.

Witness 4, Associate TR-USA's observations regarding Geoff:

Witness 4, Associate TR-USA overheard Geoff having a conversation with Witness 5, Associate TR-USA about when to use the word 'C***'. When asked if this was a one-way conversation or an interactive conversation (in other words were both parties engaging in this conversation?), Witness 4, Associate TR-USA said it seemed to be a one-way conversation with Geoff doing most of the talking. When Geoff and Witness 5, Associate TR-USA's interaction was over, Witness 5, Associate TR-USA approached Witness 4, Associate TR-USA and said " …Geoff was just telling me when to use the word 'C***' !"

Geoff was "really really really drunk" and was making crude comments throughout the night, but she cannot remember details or specifics of what he said.

**Enclosure 13**

**Verbal Statement**

**Source:  Witness 5, Associate TR-USA**

**Provided to:  Josh Anderson (Deputy Director Talent, TR USA) and Shantal Merchain (Manager HR Ops, TR USA) on 22 August 2019**

*Shantal's Notes:*

Witness 5, Associate TR-USA heard Geoff use the word "C***" in a conversation with a group of people in the assembly hall (she believes this was Friday night 8/16). She said Geoff never directed this word at her and never heard him direct this word atanyone in particular. Rather, he was talking about the word and how its used in a military setting versus a work setting. He said that in a military setting its acceptable to call others a "C***" and that it's so common in the military that it's like calling someone "buddy" and began talking about how interesting it is that the word is so acceptable in military but not acceptable in the U.S. or at work.

Witness 5, Associate TR-USA made a point to explain that she could not clearly understand everything Geoff was saying partly due to his level of intoxication & partly due to his accent. She also wasn't directly involved in the conversation, but was present in the group and within earshot, but only heard pieces of the conversation.

Beyond this conversation Witness 5, Associate TR-USA overheard, she did not observe any other inappropriate behavior in regard to Geoff or anyone else during TRLC

**Enclosure 14**

**Verbal Statement**

**Source: Witness 6, Partner**

**Provided to: Shantal Merchain (Manager HR Ops, TR USA) on 22 August 2019**

*Shantal's Notes:*

Witness 6, Director TR-USA said he didn't observe any inappropriate behavior from Geoff, but made a point to say that he believes Geoff and ████ (one of the woman he came to TRLC with) were clearly in a relationship, based on the "constant PDA between the two", he said this PDA seemed consensual. Witness 6, Director TR-USA said that he did not have much interaction with Geoff and that he seemed 'siloed & distant'.

CONFIDENTIAL

**Enclosure 15**

**Verbal Statement**

**Source:  Geoff Evans (CEO - TRAU)**

**Provided to:  Josh Anderson (Deputy Director Talent, TR USA) and Shantal Merchain (Manager HR Ops, TR USA) on 22 August 2019**

*Josh Notes:*

Geoff started by apologizing that we had to meet under these circumstances.  Asked if he cold be briefed on the accusations.  Josh declined, told him we're only gather independent and objective accounts of events that may have transpired at Conference.  Josh asked that Geoff comply with his own objective account.  Geoff said he runs a lot of investigations and it's difficult to defend yourself against something if you don't know the charges.  Josh indicated this was not a court of law, and he wasn't being asked to defend himself – that the purpose of this call is to gather facts and recollections.  Josh further indicated that Josh was in possession of an email thread between Bryan and Geoff, wherein Bryan briefed Geoff (generally) on the accusations against him.  With that, Geoff recounted the events of the evening:

Came into dinner.  Said hi to Complainant 1, Manager TR-CAN.  She's sitting across the table.  Exchanged commentary about how the conference was going.  Next time interacted with her was outside the Assembly Hall.  Said something to the effect of, it was fantastic having you down to Australia, it would be great to have you down there again.

Nothing was said that night that wasn't par for the course with me.  I have no doubt that I could have said something lewd – the whole conversation all night was inappropriate in some way, with anyone I spoke with.  The conversations I was having were with soldiers who'd returned from war.  I'm not the type of person who hits on girls, and I honestly don't remember specifically anything sexually suggestive.  I'd like to know what specific things I've been accused of saying.

> Josh agreed to share the three quotes:
>
> "You're a gorgeous girl"
> "I'd have sex with you"
> "I'd fuck you before I'd ever fuck Jake [Wood]"

Could I have said that?  Maybe.  Would I have intended it in the way?  No.

I'm fucking stupid.  I honestly have no recollection of saying that.  I'm so disgusted with myself if I did.

I remember a lot of the evening.  I sure as shit don't remember this.  I would come clean if I did remember.  I may have said this, but I didn't mean it in this way.

I am truly sorry and deserving of whatever comes.

The only thing I'd ask is that you talk to other people, get a sense of my headspace.  I'm not a sleezy prick – I didn't intend this to come off this way.  I'm so disappointed in myself.

Geoff thanked Josh and Shantal for doing their jobs.

*Shantal's Notes:*

The conversation opened with all parties agreeing to jump right in to the topic we were there to discuss.

Geoff was the first one to mention Complainant 1, Manager TR-CAN's name and said I may have made lewd sexual comments but they weren't directed toward her.

Geoff mentioned," I'm familiar with how these investigations go because I do them myself for my org…I don't want to mess with your process but I can't defend myself against something if I don't know what it is". Josh then responded that this was not a court of law and we are not asking Geoff to defend himself but rather share his personal experience and perspective, and that our goal was to collect his individual account.

Geoff shared a quick summary of his version of TRLC, and mentioned nothing of note that would be deemed inappropriate. He said he first connected with Complainant 1, Manager TR-CAN during a panel discussion. He said hi to her when he saw her sitting at the same table but didn't talk to her at the table since she was sitting on the other side. He said after the panel he offered to buy her a drink since he was buying everyone else a drink. Outside the assembly hall he said he saw her again and told her "it was fantastic having you at an operation, hope you can make it back down."

Shantal circled back on his previous comment, "I may have made lewd & sexual comments but they weren't directed toward her". Shantal asked Geoff if he remembers the comments he made, even if they weren't directed to anyone in particular? He thought about it and said "I'm probably giving you a gun to shoot me with but a lot of the conversations were inappropriate, they were rough conversations. But they weren't really about sex… more about war"

Josh let Geoff know that he was going to share one of the comments he made during TRLC

Josh first shared the comment "You're a gorgeous girl"

Geoff said, yeah I probably did say that because she is a gorgeous girl, I do think she's gorgeous, but she's a kid."

The Josh shared the second part of the comment "I'd have sex with you. I'd fuck you before I's fuck Jake Wood".

Geoff immediately said "No….No, I didn't say that". Geoff then thought about it, then said "let me sit on it" as it thought for a minute.

Geoff made the following comments (it was mostly Geoff talking through his thought process aloud):

- *" I mean fuck….did I say that??" (said this out loud to himself)*
- *"I mean would I say something like that? Yeah, because I'm a fucking idiot"*
- *"I hope I didn't say that to her, if I did, I didn't mean it the way it reads".*
- *"I'm disgusted with myself"*
- *"No wonder she's upset if that's what I said"*

- *Josh asked "Where you intoxicated to the point that you couldn't remember?" Geoff said "No".*
- *Geoff then continued be saying "What I'm trying to say is….Maybe I said it, but I didn't mean it. I probably said it to a few people that night. But I didn't mean it like that."*
- *"If I said it then I'm truly fucking sorry and I'm deserving of whatever comes my way. Geoff then asked us "Can you write that down?" Geoff then repeated more slowly "I'm truly fucking sorry and I am deserving of whatever comes my way".*
- *"My one ask and what I hope for is that you talk to others that saw me that night to get a better picture of how I was acting that night."*
- *"I'm not a sleezy prick. I think Complainant 1, Manager TR-CAN is a cute kid, but I wouldn't hit on her like that, especially in that setting."*

CONFIDENTIAL

**Enclosure 16**

**Email**

**Source:  Geoff Evans (CEO - TRAU)**

**Sent to:  Josh Anderson (Deputy Director Talent, TR USA) on 22 August 2019**

Hi Josh,

Thanks for your time this afternoon.  Obviously, I have a lot of thoughts running through my head.
Just a couple of things that I may not have said that I want to reiterate.

I would appreciate you interviewing other witnesses to verify the context of the conversation.  As I
said, it is possible that I said that I said those things to her, but if I did it would have been in the
context of something stupid, not sexual and it would have been a two-way, or probably a multi-
way conversation (in context).  The fact that I (allegedly) talked about 'fucking Jake Wood', should
give some indication as to my thought process at the time.

I also draw attention to the fact that Complainant 1, Manager TR-CAN walked me home that
night, to my cabin, and seemed fine when I said goodnight to her.  It makes me wonder how
offended she could have been at the time.

You will find Witness 3, Director TR-AUS a credible witness (for or against).  Other than what I
already sent you, I have deliberately not contacted him to preserve his independence.  Surely there
were others present you could talk to?

As I said, if I knew I had said those things to her I would admit it and try and explain the
circumstances.  I certainly do not recall that conversation.  But, if I am guilty, it is of breaking rule
number 1, not of actually trying to solicit Complainant 1, Manager TR-CAN.

Thank you

Geoff