# EXHIBIT B

*Execution Copy*

**TEAM RUBICON**
**TRADEMARK LICENSE AGREEMENT**

THIS TEAM RUBICON TRADEMARK LICENSE AGREEMENT (this "Agreement"), dated _____, 2015 (the "Effective Date"), is entered into between Team Rubicon Global, Ltd., a Delaware corporation ("TRG"), and Team Rubicon-UK, a _____ under the laws of _____ ("Licensee") (collectively, the "Parties," or individually, a "Party").

WHEREAS, Team Rubicon, Inc. ("TRUSA") is the legal and beneficial owner of certain trademarks listed on Schedule A (the "Licensed Marks," as further defined below), and pursuant to that certain Master Trademark License Agreement, dated _____ October 2015, (the "Master License"), has granted TRG the exclusive right to use the Licensed Marks in relation to a Permitted Purpose throughout the world (excluding the United States), including in the Territory;

WHEREAS, the rights granted to TRG in the Master License include the right to grant licenses in the Territory under substantially the same terms as set out in the Master License; and

WHEREAS, Licensee desires a license to use the Licensed Marks in the Territory and TRG has agreed to grant such a license to Licensee subject to the terms and conditions of this Agreement and the Master License.

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **Definitions.**  Unless the context of a provision herein otherwise requires, words importing the singular shall include the plural and vice-versa.  The words "include," "includes" or "including" shall mean include without limitation, includes without limitation or including without limitation.  For the purposes of this Agreement, the following terms have the meanings ascribed to them as follows:

(a)      "*Authorized Products*" means products and materials bearing and/or distributed using the Licensed Marks to indicate membership in and/or affiliation with a TEAM RUBICON Brand Organization, and/or to advertise and promote such organization's services and/or mission, such products and materials including, but not limited to, certificates, pins, signs, T-shirts, stationery, business cards, posters, brochures and multimedia.

(b)      "*Brand Identity Guidelines*" means those certain guidelines provided by TRG to Licensee, that specify brandmark, typography, graphic elements, color palette and other visual elements of the Licensed Marks, as well as instructions concerning visual communication, to ensure correct and consistent use of the Licensed Marks by the Licensee and all permitted sublicensees.

(c)      "*Brand Owner*" means the legal and beneficial owner of the Licensed Marks, including any related registrations, applications for registration, and all associated goodwill, and

*Execution Copy*

of all right, title and interest in and to the License Marks not expressly granted to TRG under the Master License. As of the Effective Date, the Brand Owner is TRUSA.

(d)    "*Confidential Information*" has the meaning specified in Section 16 below.

(e)    "*Licensed Marks*" means the trademarks, service marks, trade names, trade dress, logos, designs, slogans, names, symbols and other indicia of origin set forth on <u>Schedule A</u> hereto as may be updated by TRG from time to time during the Term, including but not limited to the trademark applications and registrations therefor.

(f)    "*Permitted Purpose*" means for (i) charitable services for, and resource allocation to, organizations concerned with disaster relief, crisis response, emergency response, emergency rescue, and veteran support, and including related outreach, education, advocacy, consulting, and training; (ii) indicating membership in and/or affiliation with a TEAM RUBICON Brand Organization; (iii) advertising and/or promoting such organization's services and mission; and (iv) providing, manufacturing, promoting and distributing Authorized Products.

(g)    "*Person*" means any corporation, partnership, joint venture, company, limited liability company, organization, entity or natural person.

(h)    "*TEAM RUBICON Brand Organization*" means TRUSA, TRG or Licensee.

(i)    "*Term*" has the meaning specified in Section 12 below.

(j)    "*Territory*" means the United Kingdom.

(k)    "*United States*" means the United States of America and its territories and possessions, including the District of Columbia and Puerto Rico.

    **2.    Ownership; Third-Party Beneficiary.** The Parties acknowledge and agree that (a) TRG has the exclusive right to use the Licensed Marks in relation to the Permitted Purpose in the Territory; (b) the Brand Owner is the legal and beneficial owner of the Licensed Marks, including all related registrations, applications for registration, and all associated goodwill; and (c) the Brand Owner shall be a vested intended third-party beneficiary of this Agreement, including, without limitation, with respect to prohibited uses (Section 3), licensed scope of use (Section 4) and the Brand Identity Guidelines and the quality control provisions (Section 5), having the right to enforce the same (including, but not limited to, the right terminate this Agreement for Licensee's breach thereof in accordance with the terms of this Agreement) as fully as if the Brand Owner were TRG. The Parties further acknowledge and agree that any use of the Licensed Marks by Licensee and any accrued goodwill shall inure solely to the benefit of the Brand Owner. Licensee shall not acquire any rights of any nature in or to the Licensed Marks or the goodwill associated therewith as a result of Licensee's use pursuant to the terms of this Agreement or otherwise. All rights not expressly granted to Licensee under this Agreement are reserved to TRG. The Parties further acknowledge and agree that this Agreement shall at all times remain subject to the terms, conditions and limitations of the Master License, the terms of which are hereby incorporated by reference.

2

*Execution Copy*

    **3.**   <u>**Limited Use; No Adoption or Registration of Similar Marks**</u>.   Licensee acknowledges and agrees that, unless expressly permitted under this Agreement, it is prohibited from using the Licensed Marks or any component or translation thereof, or any term confusingly similar to the Licensed Marks. Licensee agrees that it shall not, directly or indirectly, during the Term or thereafter, anywhere in the world: (a) attack the validity of the Licensed Marks, TRG's exclusive rights thereunder, or the Brand Owner's ownership thereof; (b) attack the validity of the exclusive rights granted to TRG in the Master License or attack the validity of the licenses granted to Licensee in this Agreement for the use of the Licensed Marks; (c) adopt or use any of the Licensed Marks or any component or translation thereof, or any term or designation confusingly similar thereto as a trademark, service mark, trade dress, trade name, corporate name, logo, slogan symbol, or domain name of Licensee without TRG's prior express approval; (d) make application to register any of the Licensed Marks or any component or translation thereof, or any term or designation confusingly similar thereto; (e) permit any action or omission in derogation of any of the rights of TRG or the Brand Owner in or to the Licensed Marks; (f) use the Licensed Marks or any confusingly similar marks for other than the Permitted Purpose or in connection with goods other than the Authorized Products; (h) attempt to sublicense the Licensed Marks to any Person other than as expressly provided under this Agreement; (i) otherwise seek to claim or appropriate the Licensed Marks as its own property; (j) use the Licensed Marks, or any TEAM RUBICON Brand Organization's name in any manner that might dilute the distinctiveness of such assets or otherwise disparage any TEAM RUBICON Brand Organization; or (k) use the Licensed Marks in any manner inconsistent with this Agreement.

    **4.**   <u>**License**</u>.

(a)   Subject to the terms of this Agreement, TRG hereby grants Licensee a non-assignable, fully-paid up, royalty-free, license to use the Licensed Marks in the Territory for the Term solely in connection with the Permitted Purpose. [The foregoing license is sole in that, during the Term and subject to Licensee's continued compliance with the terms and conditions of this Agreement, TRG will not authorize any third party to exercise any of the rights granted to Licensee hereunder in the Territory.] Nothing in this Agreement shall prohibit TRG from exercising such rights in the Territory on its own behalf, or exercising such rights worldwide outside of the Territory on its own behalf or through other licensees.

(b)   Only upon TRG's express, prior written approval, and in accordance with any terms and conditions given upon such approval, Licensee may grant a sublicense to a vendor to manufacture, market, distribute and/or sell Authorized Products in the Territory, in each case, solely in furtherance of the Permitted Purpose and solely in accordance with this Section 4(b). Licensee shall enter into a written sublicense agreement with each such approved vendor, the terms and conditions of which shall be approved by TRG in advance and shall be in accordance with this Section 4(b). For each such sublicense agreement: (i) the obligations of the vendor set forth therein shall be substantially identical in scope to the obligations set forth in this Agreement, particularly with respect to brand identity and quality control; (ii) it shall be made expressly subject to the terms, conditions and limitations of this Agreement; (iii) TRG and the Brand Owner shall be expressly made vested third-party beneficiaries with respect to the Brand Identity Guidelines and the quality control provisions thereof, having the right to enforce the same (including, but not limited to, the right terminate the sublicense

3

*Execution Copy*

agreement for vendor's breach thereof) as fully as if they were Licensee; and (iv) Licensee shall remain responsible for vendor's performance under this Agreement and the sublicense agreement and liable to TRG for any breach of this Agreement or any sublicense agreement by the vendor.  Each such sublicense agreement shall automatically expire or terminate upon expiration or termination of this Agreement. Licensee will cooperate with TRG's evaluation of the suitability or performance of any vendor as a sublicensee under this Agreement, including, but not limited to, by providing TRG with all information and material about the vendor and/or the vendor's products/services that TRG may request from time-to-time in connection therewith, and by making such vendor available to meet with TRG upon TRG's request.

(c)     Subject to TRG's express, prior written approval, Licensee, at its sole cost and expense, may register Internet domain names that use Licensed Marks consisting of a Licensed Mark in combination with the applicable geographic region identifier and a top level domain (e.g., "TeamRubiconUnitedKingdom.com"), provided that each such Internet domain name shall be registered in the name of, on behalf of, and for TRG or such other entity as TRG may direct.  Licensee shall provide written notice to TRG on a quarterly basis with a status of all such Internet domain names it has registered, including the date of registration, the identity of the registrar, and upcoming renewal deadlines.

(d)     Licensee may use any Internet domain names registered in accordance with 4(c) above in connection with operating and maintaining any Internet websites offering and promoting Team Rubicon and Authorized Products; provided, that (1) such Internet websites and the goods and services offered using the Licensed Marks are solely for the Permitted Purpose and otherwise comply with this Agreement; (2) the content and look and feel of such Internet websites shall comply with the Brand Identity Guidelines, and (3) such Internet websites do not sell or functionally permit the sale of goods or services that are not for, are not consistent with, or otherwise reflect poorly on Team Rubicon, its mission, or the Permitted Purpose.  The cost and expense for creating and operating any such Internet websites shall be borne exclusively by Licensee.

(e)     Absent TRG's prior written approval, Licensee shall not under any circumstances use or authorize the use of, register, or create, any combined or composite mark or Internet domain name that includes any of the Licensed Marks in combination with the trademarks (or service marks) of another Person.

(f)     All uses of the Licensed Marks by Licensee shall be in accordance with the terms of this Agreement and the Brand Identity Guidelines.

(g)     Licensee shall display the Licensed Marks on all packaging for the Authorized Products and Services and on all other materials on which the Licensed Marks are used in such format as specified in the Brand Identity Guidelines, and shall use the symbols, "M.R.", ® or ™, as appropriate, immediately following the Licensed Marks to provide notice of trademark rights.

*Execution Copy*

(h)     Licensee shall not use the Licensed Marks in any way that would reasonably be expected to injure the value of the Licensed Marks or the goodwill associated therewith. Licensee hereby warrants that it shall not use the Licensed Marks in any manner that may, in TRG's sole judgment, be inconsistent with Team Rubicon's public image or that may in any way disparage or adversely affect Team Rubicon's reputation, nor shall Licensee, or any of its agents or employees, take any actions or conduct the operation of Licensee's business as it relates to the Licensed Marks in any manner which is illegal or may, in TRG's sole judgment, be inconsistent with Team Rubicon's public image or which may disparage Team Rubicon's reputation. For the avoidance of doubt, Licensee shall not use or allow any of its permitted sublicensee's to use the Licensed Marks in any manner which, in TRG's sole judgment, reflects poorly on Team Rubicon, its mission or the Permitted Purpose, including but not limited to in connection with: (1) the production or distribution of adult entertainment; (2) gaming or gambling activities; (3) the production of alcohol or illegal narcotic substances; (4) the production of tobacco or cannabis products; provided, however, that the foregoing restrictions with respect to the production of alcohol and tobacco shall not apply with respect to sponsors who are supporters of Team Rubicon and its mission.

(i)     In the event any of the Licensed Marks fail to reach registration, Licensee shall immediately abide by all instructions or directives provided by TRG with respect to measures that may become necessary as a consequence of the grounds of the rejection.

(j)     The Licensee shall promptly stop using, or as TRG may direct, modify the use of, any Licensed Marks in relation to any part or parts of the Permitted Purpose on receipt of written notice from TRG that such use infringes or is reasonably likely to infringe the intellectual property rights of a third party or another licensee of TRG or impede or impair any pending or planned registration.

**5.    Quality Control.**

(a)     Licensee acknowledges that the Licensed Marks are very valuable and must continue to be associated only with high quality goods and services in order to maintain their value. Licensee agrees that its use (and its sublicensee's use) of the Licensed Marks is subject to the terms and requirements of this Section 5 regarding quality and mark usage, and subject to the Brand Identity Guidelines. Licensee further agrees to cooperate and comply (and to cause its sublicensee's to cooperate and comply) with all quality control measures undertaken by or at the request of TRG in order to preserve and protect the integrity of the Licensed Marks and shall not produce poor quality product or services.

(b)     Licensee (and its sublicensee's) shall maintain quality standards for all of the goods and services offered by it in connection with the Licensed Marks that are substantially equivalent to or stricter than the standards required for such goods and services by TRG. TRG shall have the right, at any time, to modify or supplement the quality standards to be maintained by Licensee by providing written notice thereof to Licensee. TRG shall have the right, as it may deem reasonably necessary, to request and receive from Licensee, at Licensee's expense, a reasonable number of product samples, packaging, advertising and related marketing materials embodying the Licensed Marks.

5

*Execution Copy*

(c)      If TRG determines that Licensee, or any sublicensee of Licensee, is materially not in compliance with this Section 5, then TRG may notify Licensee in writing of such non-compliance. The notice of non-compliance shall set forth in reasonable detail a description of the nature of the non-compliance and any requested action for curing the non-compliance. Upon receipt of the notice of non-compliance, Licensee shall act promptly to correct the issues identified therein. If the non-compliance is not cured to the reasonable satisfaction of TRG within sixty (60) days of the notice of non-compliance, without limiting TRG's rights under Section 13(a) and Section 13(b), Licensee shall cease all sales or distribution of the goods and services at issue and cease offering such goods and services immediately. Licensee hereby acknowledges that damages at law would be inadequate relief in the event of any failure by Licensee or of its Licensees to comply in accordance with this Section 5 and such rights may be enforced in accordance with Section 15 below.

(d)      At the reasonable request of TRG and at the expense of Licensee, Licensee shall permit TRG or its authorized representatives to inspect Licensee's (or its sublicensee's) facilities and provision of services upon reasonable notice and during normal business hours to determine whether Licensee is maintaining the quality standards and is complying with the terms and conditions of this Agreement.

(e)      Licensee shall (and shall ensure that its sublicensee's shall) comply with all applicable laws and regulations and obtain all governmental approvals pertaining to (1) the sale, distribution, provision, and advertising of goods and services in association with the Licensed Marks, including the Authorized Products, (2) the use of the Licensed Marks, and (3) the conduct of Licensee's business in connection with the Licensed Marks. All such requirements shall be treated as quality standards enforced in accordance with this Section 5.

(f)      The Licensee recognizes that it is part of a group of charities and businesses licensed by TRG to use the Licensed Marks for the Permitted Purpose and agrees that it shall at its own expense participate in and promote certain group activities and initiatives including, but not limited to:

      (i)    TRG or group-sponsored promotional activities, such as veteran outreach, promotion of the Permitted Purpose and/or the Team Rubicon mission;

      (ii)   TRG or group-sponsored fundraising activities;

      (iii)  recruitment and promotion of sponsors who are supporters of TRG or the group;

      (iv)  TRG or group-sponsored training and/or team-building activities;

      (v)   Distribution of group internal communications (e.g., newsletters, internal magazines, blogs, etc.) and contribution of content to the same;

      (vi)  TRG or group-sponsored charitable initiatives; and

*Execution Copy*

(vii) TRG or group-sponsored procurement initiatives.

**6.    Royalty Free.** This License shall be provided to the Licensee on a royalty-free basis.

**7.    Records; Audit Rights.**

(a)    Licensee shall keep complete and accurate books and records in a manner sufficient to establish use of the Licensed Trademarks consistent with the terms and conditions of this Agreement.

(b)    Licensee's books and records relating to the verification of the transactions covered by this Agreement shall be open for audit or inspection by TRG or its authorized representatives during Licensee's regular business hours upon three (3) days' notice and shall remain available for a period of three (3) years after the termination of this Agreement.

**8.    Notification of Infringements.**

(a)    Licensee shall notify TRG in writing of any actual, suspected or threatened infringement of the Licensed Marks of which it becomes aware during the Term.  Such notice shall include sufficient detail to enable TRG and/or its authorized representative to pursue the alleged infringement.

(b)    Upon learning of any such potential infringement, TRG or its authorized representative may, but is not obligated to, take whatever action it deems necessary or desirable to protect or enforce its and Licensee's rights to the Licensed Marks, including the filing and prosecution of litigation, opposition or cancellation proceedings, the institution of federal or state proceedings and the right to settle, subject to Licensee's approval, which shall not be unreasonably withheld.  In the event that TRG or its authorized representative takes such action Licensee shall provide, at Licensee's expense, reasonable cooperation to TRG or its authorized representative in the execution of any documents or other similar assistance required for TRG or its authorized representative to take such steps, including joining TRG or its authorized representative as a party in any litigation where reasonably necessary for the conduct thereof.  As between the Parties, TRG shall receive and retain any and all funds recovered in any such action, including without limitation, the settlement thereof.

**9.    Indemnification.**  Licensee agrees to defend, indemnify and hold harmless TRG, and their respective affiliates, and stockholders, directors, officers, employees, agents, successors and assignees and shall pay all losses, damages, settlements, fees, expenses or costs (including reasonable attorneys' fees) incurred by them based upon any claim, demand, suit, or proceeding arising from (a) Licensee's or any of its sublicensee's performance of obligations under this Agreement or any sublicense agreement, (b) Licensee's or any of its sublicensee's breach of any covenant, representation, obligation or warranty under this Agreement or any sublicense agreement, (c) Licensee's or any of its sublicensee's use of the Licensed Marks or (e) the sale of distribution by Licensee or any of its sublicensees of any product or service bearing the Licensed Marks or any mark that is confusingly similar.  TRG shall notify Licensee of any such claim, demand, suit or proceeding, and Licensee, upon written request by TRG, shall promptly defend and continue the defense of such

CPAM: 8301143.1

*Execution Copy*

claim, demand, suit or proceeding at Licensee's expense. TRG agrees to provide reasonable cooperation to Licensee, at Licensee's expense, in the defense or settlement of any such claim, demand, suit or proceeding. Nothing herein shall prevent TRG from defending, if it so desires in its own discretion, against any such claim, demand, suit or proceeding through its own counsel, notwithstanding that the defense thereof may have been undertaken by Licensee. TRG may select its own counsel, whose fees shall be covered by the indemnification of this Section 9, and may, if it so chooses, control the prosecution, defense and settlement of all such claims and actions.

10.    **Disclaimer of Warranty.**    THE MARKS ARE PROVIDED "AS IS" TO LICENSEE AND ANY OF ITS SUBLICENSEES. EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, TRG DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, WITH REGARD TO THE MARKS AND THIS AGREEMENT, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTIES OF NON-INFRINGEMENT OR TITLE OR ANY WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE IN TRADE.

11.    **Limitation of Liability.**    TRG SHALL NOT BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR INCIDENTAL DAMAGES (INCLUDING LOST PROFITS) ARISING FROM ANY CLAIM RELATING TO THIS AGREEMENT OR RESULTING FROM THE USE OF THE MARKS, WHETHER THE CLAIM FOR SUCH RELIEF IS BASED ON WARRANTY, PROPERTY, CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), IN LAW OR IN EQUITY OR OTHERWISE, EVEN IF REPRESENTATIVES OF TRG ARE ADVISED IN ADVANCE OF THE POSSIBILITY OR LIKELIHOOD OF SAME.

12.    **Term.**    The term of this Agreement shall begin on the Effective Date and shall continue for a period of five (5) years thereafter, unless the Agreement is terminated early pursuant to Section 13 (the "Term"). Upon termination of this Agreement or expiration of the Term, Licensee shall cease all use of the Licensed Marks. Notwithstanding the foregoing, the Term of this Agreement is coextensive with the Master License. Accordingly, it shall automatically terminate upon any termination of the Master License.

13.    **Termination and Default.**

(a)    TRG shall have the right to terminate this Agreement immediately, by giving written notice to Licensee, in any of the following situations:

(i)    Licensee, or any of its sublicensee's, materially fails to comply with applicable law in (A) its use of the Licensed Marks; or (B) any aspect of the manufacture, sale, marketing, provision, or distribution of products or services bearing the Licensed Marks or any mark that is confusingly similar; or

(ii)    (A) Licensee's voluntary or involuntary insolvency, (B) Licensee's commission of an action of bankruptcy, (C) adjudication of Licensee's bankruptcy, (D) Licensee's filing of a petition for voluntary or involuntary bankruptcy or similar proceeding, (E) an agreement between Licensee and its creditors generally is entered into providing for extension or composition of debt, (F) a receiver is appointed to administer the assets of Licensee, (G) the assets of Licensee are liquidated, or (H)

8

*Execution Copy*

any distress, execution or attachment is levied on such of its manufacturing or other equipment as is used in the production and distribution of the goods or services offered using the Licensed Marks.

(b)     Without limiting TRG's rights under Section 13(a), if either Party materially breaches any of the terms, conditions or obligations of this Agreement, and such breach remains uncured for a period of sixty (60) days after written notice thereof from the non-breaching Party, then the non-breaching Party may, at its election, declare this Agreement terminated.  For purposes of this Section 13(b), a material breach shall include:

(i)    Licensee (or any of its sublicensees) uses any of the Licensed Marks in a manner that is inconsistent with the terms of this Agreement;

(ii)   Licensee's (or any of its sublicensee's) material failure to comply with its obligations under Section 5;

(iii)  Licensee's (or any of its sublicensee's) material failure to comply with its obligation to use the Licensed Marks in a manner consistent with the Brand Identity Guidelines;

(iv)   Licensee's (or any of its sublicensee's) misconduct which materially and adversely impacts the License Marks or the associated goodwill; and

(v)    Licensee's (or any of its sublicensee's) use of any of the Licensed Marks for any purpose other than the Permitted Purpose.

(c)     TRG may also terminate this Agreement by giving Licensee thirty (30) days' prior written notice in such case where there is a transfer to a bona-fide third-party purchaser, whether direct or indirect, of (i) all or substantially all of the assets used by Licensee in its conduct of its business or (ii) a controlling interest in Licensee, whether by merger or sale or otherwise.

(d)     This Section 13(d) and Sections 1, 2, 3, 7, 9, 10, 11, 12 (the next to the last sentence thereof only), 14, 15, 16, 17, 20, 21, 22, 23, 24, 25, 27, and 29 shall survive termination of this Agreement.

**14.    <u>Rights and Duties Upon Expiration and Termination.</u>**  Upon expiration or termination of this Agreement for whatever reason, all rights granted to Licensee hereunder shall revert to TRG.  Licensee, at Licensee's sole expense, shall immediately undertake the following in the event that this Agreement expires or is terminated:

(i)    cease using the Licensed Marks or any term, phrase or design that is confusingly similar to, or a colorable imitation or translation of the Licensed Marks, or any portion of the Licensed Marks in any manner whatsoever;

(ii)   recall and destroy and/or dispose of all goods in connection with which the Licensed Marks are used, as well all related packaging and marketing collateral,

9

*Execution Copy*

which are on hand or in process as of the date that notice of termination is sent or this Agreement expires, as the case may be;

(iii) promptly destroy, or return to TRG, as directed by TRG, all Authorized Products containing the Licensed Marks; and

(iv) if registration of a domain name utilizing one or more of the Licensed Marks is permitted hereunder, upon the expiration or earlier termination of this Agreement, Licensee shall assign such domain names to TRG or such other entity as TRG may direct and take all steps required by the applicable domain name registrar to complete such assignment within thirty (30) days of such expiration or termination.

     **15.**    **Injunctive Relief.**  Licensee hereby acknowledges and agrees that the obligations of Licensee set forth in this Agreement are unique and special and that the breach thereof by Licensee will cause irreparable harm to TRG. Upon breach of this Agreement by Licensee, TRG shall be entitled to specific performance and injunctive relief in any court of competent jurisdiction without the need to post a bond or provide an undertaking.

     **16.**    **Confidentiality.**

(a)    Subject to Section 16(b) herein, all oral or written information relating to each Party, its pricing, products, planning, marketing strategies, ideas, know-how, customers, suppliers, sales estimates, business plans, client lists, profit margins, media lists, databases, computer code, and any other information of the business or affairs of each Party that is not publicly known, including this Agreement and its subject matter, together with any summaries, declarations, extracts, analysis, compilations, studies, or other documents or records which contain, reflect or are generated from such information (hereinafter referred to as "Confidential Information"), are valuable assets of the Party owning the same. Each Party, its employees and agents will treat all Confidential Information disclosed to it in connection with performing this Agreement as strictly confidential and shall use protections at least equal to those used by the Party to protect its own Confidential Information.

(b)    Confidential Information shall not include information that the Parties agree is not Confidential Information, or information that the recipient Party can demonstrate: (1) was known to the recipient prior to disclosure to it in the course of performing the Agreement; (2) was obtained without any confidentiality obligation by the recipient from a Person other than the other Party provided such Person lawfully obtained and disclosed the information; (3) was independently developed by or on behalf of the recipient without access to the Confidential Information of the other Party; (4) was publicly known prior to receipt by the recipient; or (5) becomes publicly known after receipt by, and without fault of, the recipient.

(c)    Each Party shall: (1) use Confidential Information only as expressly permitted herein for purposes of performing this Agreement; (2) obtain prior express written consent of the other Party before disclosing Confidential Information to any Person other than to its employees, in-house and outside legal counsel, who require the information in

*Execution Copy*

performing this Agreement; (3) not reproduce, or permit to be reproduced, any document in human-readable or any other form containing Confidential Information, except as necessary for performing the Agreement and permitted by this Agreement; and (4) promptly upon the end of the Term or earlier termination of this Agreement return all documents and other materials, regardless of ownership, embodying or which resulted from the use of, any Confidential Information of the other Party.

(d)        Notwithstanding the foregoing, either Party may disclose Confidential Information to the extent required by law, regulation or court order by a court or authority of competent jurisdiction.   In such event, (1) the disclosure shall extend only to information whose disclosure is so required, (2) the Party making such disclosure shall (to the extent permitted by law) promptly and before disclosure notify the other Party of the proposed disclosure, and (3) the Party making such disclosure shall use best efforts to seek from the applicable court or authority confidential treatment of the Confidential Information to be disclosed and an opportunity for the other Party to seek further limitation of the disclosure by petitioning such court or authority.   No information shall be divested of its status as Confidential Information by virtue of disclosure per se pursuant to this Section 16(d).

      **17.**    **Further Assurances.**   Licensee agrees to execute such other documents and take all such actions as TRG may reasonably request to enforce the terms of this Agreement.   At TRG's reasonable request, Licensee shall cooperate with and provide reasonable assistance to TRG and/or the Brand Owner (including execution and delivery of affidavits, declarations, oaths, samples, exhibits, specimens and any other documentation) in order to register and protect the Licensed Marks.

      **18.**    **Required Approvals.**   Licensee shall obtain, at its sole cost and expense, all necessary licenses, permits and approvals of this Agreement required by any government or governmental agency to conduct its business.   Performance of this Agreement shall be subject to Licensee's obtaining all necessary licenses, permits and approvals pursuant to this Section 18 and to the terms of any such licenses, permits and approvals.   Any approvals or consents required by Licensee from TRG pursuant to this Agreement may be withheld or delayed in TRG's sole and absolute discretion.

      **19.**    **Assignment.**

(a)        *TRG Assignment*.   TRG shall have the right to assign this Agreement, whole or in part, and any or all of its rights, obligations and privileges hereunder to any other Person, subject to the terms and conditions of the Master License.

(b)        *Licensee Assignment*.   Licensee hereby acknowledges and agrees that this Agreement and the licenses granted herein are personal to Licensee and the Persons who direct Licensee's affairs and are granted in reliance of such Persons' skills and attributes.   This Agreement and its related rights and obligations, including any license granted herein, may not be sold, assigned, delegated, sublicensed or otherwise transferred or encumbered, in whole or in part, without the prior written consent of TRG.   Any such purported assignment, pledge or transfer by Licensee without such prior written consent from TRG shall be void *ab initio*.   For purposes of this Agreement, the

11

*Execution Copy*

voluntary sale or transfer of any Licensee stock, Licensee assets or ownership interest in or control of Licensee, or a change of control of any entity that is a shareholder of Licensee, shall be deemed an assignment hereunder. Any permitted assignee hereunder shall agree in a writing reasonably satisfactory to TRG to be bound by the terms and conditions of this Agreement, and a copy of such writing shall be promptly delivered to TRG. No assignment by Licensee shall relieve Licensee of its obligations or any liability hereunder.

20. **Language.** All correspondence, notices, reports, and any other communications between the Parties shall be in English, which shall be the language of this Agreement. Any disputes arising hereunder, if legal action is taken, shall be prosecuted and adjudicated in English.

21. **Notices.** Any notice, request, demand, or other communication required or permitted under this Agreement shall be made in writing and shall be deemed given either (a) ten (10) business days after depositing the notice in the postal service, addressed to the Party as set forth below, with proof of mailing; (b) two (2) business days after posting if delivered by internationally recognized courier, with proof of delivery, addressed to the Party as set forth below or (c) on the next business day after such notice has been sent by facsimile or email. Each Party agrees to provide prompt written notification to the other Party of any change of such Party's address. All notices to a Party will be sent to the addresses set forth below or to such other address or Person as such Party may designate by notice to the other Party hereunder:

|  |  |
|---|---|
| If to TRG to: | William McNulty |
| | 300 North Continental Boulevard |
| | Suite 150 |
| | El Segundo, CA  90245 |
| | mcnulty@teamrubiconglobal.org |
| | |
| | |
| If to Licensee to: | Name: _____ |
| | Address: _____ |
| | _____ |
| | _____ |
| | email:_____ |

22. **No Waiver.** Waiver of or failure by a Party to complain of any act, omission or default on the part of the other Party, no matter how long the same may continue or how many times such shall occur, shall not be deemed a waiver of rights, or of any similar future act, omission or default under this Agreement.

23. **Disputes; Governing Law; Jurisdiction.** The interpretation and construction of this agreement, and all matters relating hereto, shall be governed by the laws of the State of New York without regard to the choice of law principles applicable in such state. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof (a "Dispute") shall be settled, insofar as possible, by mutual consultation and consent. If the Parties are unable to reach an amicable resolution to the Dispute within thirty (30) days of their first meeting to resolve it, then the Dispute shall be finally determined by arbitration

CPAM: 8301143.1

*Execution Copy*

administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules, which shall be subject to the following: (a) the number of arbitrators shall be one; (b) the place of arbitration shall be the county and State of New York; and (c) the language of the arbitration shall be in English. The arbitration shall be final and binding on the Parties. Judgment upon any award rendered may be entered in any court, worldwide, having jurisdiction thereof. For the avoidance of doubt, the provisions of this Section 23 include any requests for injunctions or other preliminary measures.

24.   **Interpretation**.   In resolving any dispute or construing any provision in this Agreement, there shall be no presumption made or inference drawn (a) because the attorneys for one of the Parties drafted the Agreement; (b) because of the drafting history of the Agreement; or (c) because of the inclusion of a provision not contained in a prior draft or the deletion of a provision contained in a prior draft.

25.   **Invalidity; Severability**.   If any term, covenant, condition or provision of this Agreement or the application thereof to any Person or circumstance, shall to any extent be held invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to any Person or circumstance, other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each other term, covenant, condition or provision of this Agreement shall be valid and shall be enforced to the fullest extent provided by law.

26.   **Force Majeure**.   Neither Party will incur any liability to the other Party on account of any failure to perform, loss or damage resulting from any delay or failure to perform all or any part of this Agreement if such delay or failure is caused, in whole or in part, by events, occurrences, or causes beyond the reasonable control, and without gross negligence, of the Parties. Such events, occurrences, or causes shall include acts of God, riots, acts of war, acts of terrorism, earthquake, fire and explosions; provided that, the inability to meet financial obligations is expressly excluded from the excusal from performance pursuant to this Section**.**

27.   **Section Headings**.   The section headings in this Agreement have been inserted merely for convenience, are not a part of this Agreement, and shall not affect the rights and obligations of the Parties or the meaning of the language in this Agreement.

28.   **Counterparts**.   This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party, but all of which, taken together, shall constitute one and the same agreement.

29.   **Entire Agreement; Amendments**.   This Agreement sets forth the entire understanding between the Parties relating to the subject matter contained herein, and all prior discussions and writings between the Parties with respect thereto are superseded by this Agreement. The Parties may consider and discuss amendments to this Agreement as they deem appropriate, however, no modifications, amendments, or additions to this Agreement shall be effective or binding unless set forth in a writing signed by both Parties.

**[Remainder of this page intentionally left blank; signature page follows]**

CPAM: 8301143.1

*Execution Copy*

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement, effective as of the Effective Date.


<u>TRG</u>                                           <u>Licensee</u>


TEAM RUBICON GLOBAL, LTD.            TEAM RUBICON-UK



By: _____          By:_____

Name: _____          Name: _____

Title: _____          Title: _____

14

CPAM: 8301143.1

*Execution Copy*

### SCHEDULE A

### LICENSED MARKS

### <u>REGISTERED MARKS</u>

| MARK | COUNTRY | CLASS | APP'N NO. | REG'N NO. | REG'N DATE |
|------|---------|-------|-----------|-----------|------------|
| TEAM RUBICON | European Community | 35, 44, 45 | 011728417 | 011728417 | 11 Oct 2013 |

### <u>COMMON LAW MARKS (WHERE APPLICABLE)</u>

TEAM RUBICON





15

CPAM: 8301143.1