# EXHIBIT E

**Jeff G. Hammel**

Direct Dial: 212.906.1260
Jeff.Hammel@lw.com

53rd at Third
885 Third Avenue
New York, New York 10022-4834
Tel: +1.212.906.1200  Fax: +1.212.751.4864
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Beijing | Moscow |
| Boston | Munich |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | San Diego |
| Frankfurt | San Francisco |
| Hamburg | Seoul |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |
| Milan | |

# LATHAM & WATKINS LLP

May 22, 2020

**VIA EMAIL**

Brigadier General (R.) Ole Asbjørn Fauske
Team Rubicon Norway
Stasjonsvegen 24
2100 Skarnes
Norway

> Re: **Infringement of Team Rubicon's Trademarks And Violation of May 19, 2020 United States District Court Order**

Dear General Fauske:

We write on behalf of Team Rubicon, Inc. ("Team Rubicon") in connection with the lawsuit captioned *Team Rubicon Global, Ltd. v. Team Rubicon, Inc.*, No. 20-cv-2537 (LTS) (KNF), filed by Team Rubicon Global ("TRG") on March 24, 2020, in the Southern District of New York and in particular, with regard to the Court's May 19, 2020 order enjoining use of Team Rubicon's intellectual property.

On May 19, 2020, the Court in the above-captioned action entered an order denying TRG's motion for injunctive relief and granting a preliminary injunction in Team Rubicon's favor (the "Order"). According to the Order, "[TRG] and *all others acting in concert with it* with notice of this action (collectively, the 'Enjoined Parties') are hereby enjoined, pending resolution of this action, from" among other things, the following acts:

- "publishing, using, displaying, distributing or sublicensing Team Rubicon's trademarks, including the TEAM RUBICON mark and the Team Rubicon logo (the 'TR Marks') and any confusingly similar variations thereof,…in connection with the advertising, marketing or other promotion, distribution, offering for sale, or sale of any products or services, including on any social media accounts;"

- "using any false designation of origin, false representation, or any false or misleading description of fact, that can, or is likely to, lead the consuming public or individual members thereof, to believe that any products or services produced, offered, promoted, marketed, advertised, provided, sold or otherwise distributed by the Enjoined Parties is in any manner associated or connected with Team Rubicon, or are licensed, approved, or authorized in any way by Team Rubicon;"

- "representing or suggesting in any fashion to any third party, or performing any act that may give rise to the belief, that the Enjoined Parties, or any of their products or services, are related to, authorized by, or sponsored by Team Rubicon;"

- "operating or authorizing the operation of any website using any domain name incorporating any of the TR Marks or any misspelling or variation of those marks, or any domain name confusingly similar to the TR Marks; [and]

- using any social media or similar accounts or social media websites, and registering any social media accounts, that uses any of the TR Marks, any misspelling or variation of those marks or any other confusingly similar mark."

*See* Dkt. No. 57 at 16. By its terms, the Order enjoining infringing conduct by TRG became effective immediately. A copy of this order is enclosed herein for reference. Team Rubicon previously notified you of this order by email on May 20, 2020.

Given this order, TRG and its sublicensees' continued use of the TR Marks in connection with any TRG or TR-X activity (including maintenance of websites and social media accounts) directly violates the Court's preliminary injunction and constitutes contempt of Court.

Understanding the logistical hurdles TR-Norway may face as a result of the Order, Team Rubicon remains ready and willing to provide a reasonable transition period for TR-Norway to re-brand and operate as a stand-alone, independent organization that is not affiliated with TR or TRG. However, if TR-Norway does not confirm, by no later than Friday, May 29, 2020, that it will agree in principle to this transition period and will cease and desist all use of the TR Marks as the Court ordered, Team Rubicon will notify the Court of TR-Norway's conduct and seek all available remedies at law and equity, including sanctions and fees, stemming from noncompliance.

Nothing contained in this letter constitutes an express or implied waiver of Team Rubicon's rights or remedies, all of which are expressly reserved.

Sincerely,

/s/ Jeff G. Hammel

Jeff G. Hammel
of LATHAM & WATKINS LLP

Enclosures

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

TEAM RUBICON GLOBAL, LTD.,

       Plaintiff and Counter Defendant,

  -v-                                                               No. 20-CV-2537-LTS-KNF

TEAM RUBICON, INC.

       Defendant and Counter Claimant.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
PRELIMINARY INJUNCTION AND DENYING PLAINTIFF'S MOTION

              Plaintiff and Counter Defendant Team Rubicon Global, Ltd. ("Plaintiff" or "TRG"), brings this action against Defendant and Counter Claimant Team Rubicon, Inc. ("Defendant" or "TRI"), asserting claims for declaratory relief, breach of contract, and tortious interference with prospective economic advantage. (Amended Complaint ("Am. Compl."), Docket Entry No. 12.) Defendant TRI has asserted counterclaims for declaratory relief, tortious interference with business relations and prospective economic advantage, trademark infringement, unfair competition, breach of contract, false advertising, and indemnification for attorneys' fees. (Team Rubicon's Counterclaims ("Def. CCs"), Docket Entry No. 28.) Plaintiff and Defendant now cross move pursuant to Federal Rule of Civil Procedure 65, each seeking preliminary injunctive relief. Plaintiff requests a preliminary injunction prohibiting TRI from representing that TRG does not have a valid license to use and sublicense Team Rubicon trademarks outside the United States. (Docket Entry No. 19.) Defendant, on the other hand, seeks to enjoin Plaintiff from using the Team Rubicon trademarks for any purpose and requiring compliance with the terms of the licensing agreement between TRI and TRG. (Docket Entry No.

27.) The Court has subject matter jurisdiction of this action under 28 U.S.C. sections 1331 and 1367.

The Court has considered thoroughly the parties' submissions and, for the following reasons, Defendant's preliminary injunction motion is granted and Plaintiff's preliminary injunction motion is denied. This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rules of Civil Procedure 52(a)(2) and 65. To the extent any statement labeled as a finding of fact is a conclusion of law it shall be deemed a conclusion of law, and vice versa. The Court has concluded that "[a]n evidentiary hearing is not required" because "the relevant facts . . . are not in dispute." Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998).

FINDINGS OF FACT

TRI and TRG are non-profit entities that provide disaster relief services in the United States and abroad, respectively. While they are related, TRI and TRG have separate jurisdictions and responsibilities.[1] TRI was founded in 2010 in the wake of the devastating 7.0 magnitude earthquake in Haiti. (Declaration of Jacob Wood ("Wood Decl."), Docket Entry No. 33, ¶ 2.) TRG was founded thereafter in order to export the Team Rubicon brand and philosophy internationally. (Wood Decl. ¶¶ 7-8.) TRG has exported the Team Rubicon brand by founding sister organizations called "TR-Xs" to carry out disaster relief services in various countries abroad. (Wood Decl. ¶ 8; Affidavit of Rev. Charles F. Kalmbach, PhD. ("Kalmbach

---

[1] TRI and TRG have distinct responsibilities, but they share fundraising channels. (Declaration of Adam Miller ("Miller Decl."), Docket Entry No. 31, ¶¶ 14, 17.) On at least one occasion, a Team Rubicon fundraiser demonstrated confusion as to the entity for which she was fundraising. (Miller Decl. ¶ 18.)

Aff."), Docket Entry No. 22, ¶ 2.)  TRG has successfully partnered with TR-X organizations in the United Kingdom (TR-UK), Canada (TR-CAN), Australia (TR-AUS), and Norway (TR-NOR).  (Kalmbach Aff. ¶ 3.)  TRG and the TR-Xs operate using a "hub-and-spoke" model; they do not have a parent/subsidiary relationship.  (Kalmbach Aff. ¶¶ 2, 6.)

Master Trademark License Agreement

In October 2015, in order to facilitate the international growth of the Team Rubicon mission, TRI licensed its trademarks[2] to TRG through a Master Trademark License Agreement (Wood Decl., Ex. H (the "MTLA").  (Wood Decl. ¶¶ 7-10.)  The MTLA gave TRG the exclusive right to use and sublicense the Team Rubicon trademarks ("TR Marks") outside the United States.  (MTLA at 1, 3-4.)  The TR Marks "have come to represent Team Rubicon's commitment to honor and service" as "one of the most effective and highly regarded non-profits in the country."  (Wood Decl. ¶ 5.)

The MTLA allowed TRG to sublicense the TR Marks to the TR-Xs, provided that "each such sublicense [was] made subject to the terms, conditions and limitations of [the MTLA]," and "provided that the scope of rights and the obligations of each sublicensee set forth in each sublicense agreement [were] no less restrictive than such scope of rights and obligations set forth in [the MTLA]."  (Section 4(b), MTLA at 4.)  The MTLA obligated TRG and the TR-Xs to refrain from using the TR Marks "in any way that would reasonably be expected to injure the value of the [TR Marks] or the goodwill associated therewith or with [TRI]" and prohibited TRG from allowing any TR-X to "use the [TR Marks] in any manner which reflects poorly on

---

[2] TRI owns the rights to two trademarks: Registration No. 5,048,837 for the Team Rubicon logo, and Registration No. 5,048,836 for the standard character mark "TEAM RUBICON."  (Wood Decl. ¶ 3.)

Team Rubicon, its mission or the Permitted Purpose" of the Team Rubicon organization. (Section 4(h), MTLA at 5.)  TRG was also obligated to "cooperate and comply with all quality control measures undertaken by or at the request of [TRI] in order to preserve and protect the integrity of the [TR Marks]."  (Section 5(a), MTLA at 6.)

The MTLA gave TRI the authority to terminate the agreement in the event of a breach.  If TRI determined that TRG or any TR-X was "materially not in compliance" with the quality control provisions of Section 5, TRI could notify TRG of such non-compliance in writing, setting forth "in reasonable detail a description of the nature of the non-compliance and any requested action for curing the non-compliance."  (Section 5(c), MTLA at 6.)  The MTLA required TRG to "act promptly to correct the issues identified" in the written notice.[3]  (Section 5(c), MTLA at 6.)  If TRG failed to cure the non-compliance "to the reasonable satisfaction" of TRI within 60 days of the notice of non-compliance, TRG would be required to "cease all sales or distribution of the goods and services at issue and cease offering such goods and services immediately."  (Section 5(c), MTLA at 6.)

Section 13 sets forth the procedures for terminating the agreement in the event that "either Party materially breaches any of the terms, conditions or obligations of [the MTLA], and such breach remains uncured for a period of sixty (60) days after written notice thereof from the non-breaching Party."  (Section 13(b), MTLA at 9.)  If the breach remains uncured for 60 days, "the non-breaching Party may, at its election, declare [the MTLA] terminated."  (Section 13(b), MTLA at 9.)  Section 13 defines "material breach" to include "[a] material failure to comply with [a party's] obligations under Section 5" (the provisions governing quality control

---

[3]  The MTLA does not require citation to any particular section of the agreement in order to invoke this provision.

for the TR Marks) and "misconduct which materially and adversely impacts the [TR Marks] or the associated goodwill." (Section 13(b)(ii) and (iv), MTLA at 9-10.)

Sexual Harassment Incident

Team Rubicon hosted its annual leadership conference in Estes Park, Colorado from August 15, 2019, to August 18, 2019. (Wood Decl. ¶ 14.) On August 17, 2019, TRI was notified that a volunteer from TR-CAN (a TR-X organization) claimed that she had been sexually harassed by the Chief Executive Officers of TR-UK and TR-AUS (the "CEOs") at the leadership conference. (Wood Decl. ¶ 17.) The volunteer alleged that one or both of the CEOs made "sexual advances, comments of a sexual nature, propositions for sex, and other lewd and unprofessional comments unbecoming of a member of senior leadership within Team Rubicon." (Id.) Two days after receiving the complaint, TRI began investigating the sexual harassment allegations. (Wood Decl. ¶ 20.) TRI's investigation team ultimately determined that the accusations made against the CEOs were credible.[4] (Wood Decl. ¶ 21.)

TRI has proffered statements from organizations that partner with Team Rubicon, indicating that they value trust, integrity and reputation in their partner organizations. (Declaration of Rowena Zimmers ("Zimmers Decl."), Docket Entry No. 41; Declaration of Suzanne M. Bock ("Bock Decl."), Docket Entry No. 42.) Particularly because these organizations interact with their customers during times of crisis, "a failure to address [issues of sexual harassment] in a satisfactory manner could significantly affect [the organization's] decision to continue its partnership with Team Rubicon." (Zimmers Decl. ¶ 7; see also Bock

---

[4]   TRG proffers evidence that the victim was reluctant to make a formal complaint against the CEO of TR-AUS. (Declaration of Melissa DeMeda, Docket Entry No. 44, ¶ 8.) However, because TRG does not contest or proffer any evidence contradicting the accuracy of the victim's allegations, this fact is immaterial to the Court's determination.

Decl. ¶ 5 (stating that "Mercury One would not continue a partnership with an organization that does not have a strict policy in place to address appropriate workplace behavior, including sexual harassment or harassing conduct more generally").)

Letters from TRI

After determining that the sexual harassment accusations against the CEOs were credible, TRI sent a series of letters to TRG invoking the MTLA and requesting responsive action. On September 6, 2019, TRI wrote a letter (the "September letter") to inform TRG that the CEOs' conduct was "inconsistent with, and may disparage, adversely affect, or injure the value or goodwill associated with the TEAM RUBICON brand (including trademarks and logos), and Team Rubicon's public image and reputation." (Supplemental Declaration of William McNulty ("Supp. McNulty Decl."), Docket Entry No. 45, Ex. 5 at 1.) The letter stated that TRI considered the CEOs' conduct to be "prohibited under the [MTLA], and the Team Rubicon Trademark License Agreement between Team Rubicon Global and the aforesaid sublicensees." (Supp. McNulty Decl., Ex. 5 at 1.)

In the September letter, TRI requested that TRG implement certain "quality control measures to preserve and protect the integrity of the TEAM RUBICON brand, and Team Rubicon's public image and reputation," including (i) immediately prohibiting the CEOs from all ongoing and future Team Rubicon activities, (ii) timely terminating the CEOs for cause and in compliance with applicable local law, (iii) forbidding TRG, TR-UK, and TR-AUS from contacting the victim or any witnesses to the sexual harassment incident, and (iv) requiring that TR-UK and TR-AUS retrain their paid staff and regular volunteers on harassment prevention. (Supp. McNulty Decl., Ex. 5 at 1-2.) TRI also requested that TRG produce within three days for audit and inspection various documents and policies concerning TRG's harassment and

whistleblower policies.  (Supp. McNulty Decl., Ex. 5 at 2.)  TRG did not respond to the September letter, providing no indication that it was undertaking any action to remediate the CEOs' misconduct in the manner required by the September letter, and has not proffered any evidence that it implemented all of the requested remedial measures.  (Wood Decl. ¶ 25.)

On October 9, 2019, after receiving no response to the September letter, TRI sent another letter (the "October letter") to TRG.  (Wood Decl. ¶ 26, Ex. J.)  In the October letter, TRI reiterated the gravity of the CEOs' misconduct and stated that TRI was "committed to safeguarding, promoting and maintaining the valuable TEAM RUBICON brand."  (Wood Decl., Ex. J at 1.)  The October letter informed TRG that TRG's "failure to timely and fully resolve this grave misconduct ha[d] and [would] continue to materially and adversely impact the TEAM RUBICON brand and associated goodwill," and that, as a result, the October letter "constitute[d] notice of [TRG's] material breach of the [MTLA]" pursuant to Section 13(b)(iv).  (Wood Decl., Ex. J at 1.)  TRG did not respond to TRI's October letter, again providing no indication that it was taking action to comply with the requirements of the September letter and its quality control obligations under the MTLA, and TRG still has not proffered any evidence that it implemented all of the requested remedial measures.  (Wood Decl. ¶ 27.)

On December 9, 2019, 60 days after TRI sent the October letter and, having received no response from TRG, TRI informed TRG by letter (the "December letter") that it was terminating the MTLA pursuant to Section 13(b)(iv) of the agreement, which provides for termination for uncured "misconduct which materially and adversely impacts the License [sic] Marks or the associated goodwill."  (Wood Decl. ¶ 29, Ex. K.)  The December letter informed TRG that the MTLA was being terminated as a result of TRG's failure to cure the material breaches specified in the October letter (i.e., the failure to implement the remedial measures

requested in the September letter). On December 17, 2019, TRG sent a letter (the "December TRG Response") to TRI claiming that TRG had undertaken certain, but not all, of the remedial measures outlined in TRI's September letter. (Wood Decl. ¶ 29.) TRG did not provide any evidence of actions actually taken. (Id.)

Despite having been informed that the MTLA is terminated, TRG continues to use the TR Marks, including in a way that portrays TRI as a subsidiary organization of TRG. (Miller Decl. ¶¶ 13-18.)

CONCLUSIONS OF LAW

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies." Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985). Indeed, the Supreme Court has characterized injunctive relief as "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008); see also Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (internal quotation marks and citation omitted). A preliminary injunction is "never awarded as of right," and in each case "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter, 555 U.S. at 24 (quoting Amoco Production Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)).

"To obtain a preliminary injunction, the moving party must demonstrate (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of

hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction."  Red Earth LLC v. U.S., 657 F.3d 138, 143 (2d Cir. 2011) (internal quotation marks and citation omitted).

Defendant's Motion

Defendant seeks an order "enjoining TRG from using the TR Marks for any purpose and in connection with any good and/or services" and "requiring compliance with the termination provisions of the MTLA."  (Docket Entry No. 29 at 25.)  Defendant asserts that it is entitled to this relief based on the likelihood of success of its breach of contract and trademark infringement claims.

*Likelihood of Success: Breach of Contract Claim*

Defendant alleges that Plaintiff breached the MTLA "by failing to safeguard, promote, and maintain the quality standards and goodwill associated with Team Rubicon and the TR Marks," and that TRG "continues to breach the MTLA by failing to honor the termination requirements set forth in Section 15 of the MTLA."  (Def. CCs ¶¶ 138-39.)  Plaintiff contends that the TR-Xs, not TRG, failed to safeguard, promote, and maintain the quality standards and goodwill associated with the TR Marks and that TRI's termination of the MTLA on the basis of the TR-Xs' conduct was improper.  (Docket Entry No. 43 at 14.)

To establish a breach of contract, a party must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004).  Here, the parties only dispute the third element: whether TRG breached the MTLA.  Plaintiff does not contest that (i) the CEOs sexually harassed a TR-CAN volunteer, (ii) disclosure of such sexual harassment would adversely affect the value and

goodwill associated with the TR Marks, or that (iii) Plaintiff failed to timely respond to the September and October letters with an indication that it was in compliance with the remedial actions delineated in the September letter.

Plaintiff was obligated under Section 4 of the MTLA to ensure that each sublicense with TR-Xs (like TR-UK and TR-AUS) was (i) "made subject to the terms, conditions and limitations of [the MTLA]," and (ii) was "no less restrictive than such scope of rights and obligations set forth in [the MTLA]." (Section 4(b), MTLA at 4.) Thus, TRG was obligated to ensure that each TR-X followed all of the quality control standards set forth in the MTLA. TRI invoked these obligations in its September 6, 2019, letter by informing TRG that the CEOs' harassing behavior was "inconsistent with, and [could] disparage, adversely affect, injure the value or goodwill associated with the TEAM RUBICON brand (including trademarks and logos), and Team Rubicon's public image and reputation."[5] (Supp. McNulty Decl., Ex. 5 at 1.) This letter "set forth in reasonable detail a description of the nature of the non-compliance" with the quality control standards of the MTLA, and "requested action for curing the non-compliance." (Section 5(c), MTLA at 6.) After receiving no response from TRG, on October 9, 2019, TRI notified TRG that, because TRG "failed to timely and fully resolve [the CEOs'] misconduct," TRG was in non-compliance with the MTLA and, therefore, TRI was invoking Section 13(b)(iv)'s material breach and 60-day cure provisions. (Wood Decl., Ex. J at 1.) TRG did not respond to the October letter. The 60-day cure period passed without any indication that

---

[5] While TRI did not cite any specific provision of the MTLA in its September letter, the MTLA did not require such citation. Section 5(c) simply required TRI to "notify [TRG] in writing of [its sublicensee's] non-compliance" with the quality control standards set forth in Sections 5(a) and (b). TRG was thereupon required to "act promptly to correct the issues identified therein." (Section 5(c), MTLA at 6.) Thereafter, to invoke the termination process, section 13(b) required written notice of a material breach of "any of the terms, conditions or obligations of [the MTLA]."

TRG had cured its non-compliance with its obligations under the MTLA to address the misconduct of its sublicensees in the manner outlined by TRI in the September letter.  Thus, as permitted under the plain language of the MTLA, TRI terminated the agreement pursuant to Section 13(b).  Therefore, TRI has demonstrated that it is likely to succeed on the merits of its claim that TRG breached the MTLA by failing to take the specified remedial measures and continues to breach that agreement by using the TR Marks without permission following the termination of TRG's license.

TRG now asserts, more than eight months after TRI's initial request to implement remedial measures, that it has not "dishonored" certain of TRI's requests.  (Docket Entry No. 43 at 17.)  However, TRG's proffer is insufficient to avoid or cure a breach of the MTLA, as TRG does not dispute that (i) it failed to inform TRI of such compliance during the 60-day cure period, and (ii) it still has not complied with at least three of the requested measures: terminating the CEOs, retraining TR-UK and TR-AUS staff and regular volunteers on harassment prevention, and producing for audit and inspection the various documents and policies concerning TRG's harassment and whistleblower policies.  (Docket Entry No. 43 at 17-18.)  TRG cannot avoid the consequences of its breach by claiming that, because it does not have a parent/subsidiary relationship with the TR-Xs, it could not have taken these remedial measures.  The MTLA obligated TRG to structure its relationship with the TR-Xs in a way that made them subject to the quality control standards set forth in the MTLA.  TRG does not dispute the applicability of these provisions.  That TRG may have failed to establish its sublicense agreement in a way that allowed it to enforce those provisions cannot serve as a basis to avoid liability under the MTLA, which clearly required TRG to ensure that its sublicense agreements were "no less restrictive than such scope of rights and obligations set forth in [the MTLA]."

(Section 4(b), MTLA at 4.)  Further, TRG provides no evidence that it ever attempted to have TR-UK and TR-AUS terminate their CEOs or retrain their employees, or that it produced its harassment and whistleblower policies for inspection.

Defendant has thus proffered uncontroverted evidence demonstrating that Plaintiff materially breached the MTLA in a manner that affects TRI's public image and reputation and that, as a result, Defendant properly terminated the MTLA in accordance with the plain language of the agreement.  Defendant has established a likelihood of success on the merits of its breach of contract claim.

*Likelihood of Success: Trademark Infringement*

Defendant alleges that Plaintiff no longer has permission to use the TR Marks because Defendant validly terminated the MTLA and, therefore, Plaintiff's continued use of the TR Marks constitutes trademark infringement.  (Def. CCs ¶ 100-01.)  Plaintiff asserts that, because the MTLA was not properly terminated, Plaintiff retains a valid license to use the TR Marks.  (Docket Entry No. 43 at 20.)

To establish a claim of trademark infringement, TRI must establish that TRG "(1) without permission, copied, reproduced, or imitated the plaintiff's (2) registered trademark in commerce (3) as part of the sale or distribution of goods or services (4) and that such use is likely to cause confusion between the two marks." Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 742 (2d Cir. 1998).

TRG does not dispute that the TR Marks were used in commerce as part of the sale or distribution of goods or services.  Because TRI is likely to succeed in demonstrating that the MTLA has been validly terminated, TRI is likely be able to succeed in demonstrating that TRG has been using the TR Marks without permission.  Further, likelihood of confusion is

presumed "[w]hen an ex-licensee continues to use a mark after its license expires." Really Good Stuff, LLC v. BAP Inv'rs, L.C., No. 19 Civ. 2218 (LLS), 2019 WL 5460784, at *7 (S.D.N.Y. Oct. 17, 2019). That is because "consumers have already associated the formerly licensed infringer with the trademark owner." L & L Wings, Inc. v. Marco-Destin, Inc., 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009). Even without this presumption, however, TRI has established a likelihood of confusion based on the factors set forth in Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 493 (2d Cir. 1961).[6] Defendant has proffered uncontroverted evidence that the TR Marks are distinct and recognizable as being associated with one of the most successful disaster relief organizations in the country. TRG and TRI offer the same products and services, and compete for the same donations. Defendant has also proffered evidence to show that use of the TR Marks led to actual confusion on the part of at least one fundraiser—she believed that she was soliciting donations for TRI, but she was actually soliciting donations for TRG. Indeed, the likelihood of actual confusion is particularly high here, where TRG and TRI offer the same goods and services and operate using a nearly identical name. Further, TRG has disseminated communications and advertisements insinuating that TRI is a subsidiary of TRG. This evidence is sufficient to show that the imitative mark was adopted during the relevant period in bad faith. For these reasons, Defendant has demonstrated a likelihood of success on the merits of its trademark infringement claim.

---

[6] The eight Polaroid factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market. Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009).

*Irreparable Harm*

Defendant has demonstrated that it will suffer irreparable harm in the absence of an injunction. The MTLA provides that irreparable harm is presumed in the event of a material breach. (Section 16, MTLA at 11.) See Heisman Trophy Tr. v. Smack Apparel Co., 637 F. Supp. 2d 146, 159 (S.D.N.Y. 2009) (finding irreparable harm where operative agreement stipulated that breach "would result in continuing and irreparable harm"). Defendant has also established irreparable harm because "[i]n cases of trademark infringement, a showing of likelihood of confusion establishes irreparable harm." Id.; Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 42 (2d Cir. 1986). TRI has proffered evidence of at least one instance where confusion concerning the TR Marks resulted in fundraising efforts erroneously directed towards TRG instead of TRI. TRI has also demonstrated that, in the absence of corrective measures to address the CEOs' misconduct, certain partner organizations would likely discontinue their relationship with TRI. Without an injunction, such confusion is likely to continue to cause TRI to lose donations and valuable partnerships.

*Public Interest*

The public has an interest in strict enforcement of contract provisions and trademark laws. See Microsoft Corp. v. Atek 3000 Computer Inc., No. 06 Civ. 6403 (SLT) (SMG), 2008 WL 2884761, at *6 (E.D.N.Y. July 23, 2008) ("the public interest lies in the enforcement of the principles recognized by Congress in creating the Acts, especially the prevention of consumer confusion"). This interest is particularly acute here, where the likelihood of confusion created by misuse of the TR Marks could negatively affect Defendant's disaster relief efforts, which directly benefit the public. Further, "the public interest is especially

served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion." <u>Church of Scientology Int'l</u>, 794 F.2d at 44.

<u>Plaintiff's Motion</u>

In light of the clear likelihood of success on the merits of Defendant's breach of contract and trademark infringement claims, Plaintiff is incapable of demonstrating a likelihood of success on the merits of its claims, which stem from the same contract and trademarks that underlie Defendant's claims.  Therefore, Plaintiff cannot satisfy the standard for preliminary injunctive relief and TRG's motion for a preliminary injunction must be denied.

<u>CONCLUSION AND TERMS OF PRELIMINARY INJUNCTION</u>

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is denied and Defendant's motion for preliminary injunction is granted.  Plaintiff and all others acting in concert with it with notice of this injunction (collectively, the "Enjoined Parties") are hereby enjoined, pending resolution of this action, from (i) publishing, using, displaying, distributing or sublicensing Team Rubicon's trademarks, including the TEAM RUBICON mark and the Team Rubicon logo (the "TR Marks") and any confusingly similar variations thereof, in, on, or with any products or services, or in connection with the advertising, marketing or other promotion, distribution, offering for sale, or sale of any products or services, including on any social media accounts; (ii) using any false designation of origin, false representation, or any false or misleading description of fact, that can, or is likely to, lead the consuming public or individual members thereof, to believe that any products or services produced, offered, promoted, marketed, advertised, provided, sold or otherwise distributed by the Enjoined Parties is in any manner associated or connected with Team Rubicon, or are licensed, approved, or authorized in any way by Team Rubicon; (iii) representing or suggesting in any fashion to any third party, or

performing any act that may give rise to the belief, that the Enjoined Parties, or any of their products or services, are related to, authorized by, or sponsored by Team Rubicon; (iv) registering any domain name that contains the TR Marks or any misspelling or variation of those marks, or any domain name confusingly similar to those marks; (v) operating or authorizing the operation of any website using any domain name incorporating any of the TR Marks or any misspelling or variation of those marks, or any domain name confusingly similar to the TR Marks; (vi) using any social media or similar accounts or social media websites, and registering any social media accounts, that uses any of the TR Marks, any misspelling or variation of those marks or any other confusingly similar mark; (vii) unfairly competing with Team Rubicon in any manner whatsoever, or engaging in any unfair, fraudulent, or deceptive business practices that relate in any way to the production, distribution, marketing and/or sale of products and services bearing the TR Marks or any other mark likely to cause confusion with the TR Marks, including any misspelling or variation of those marks or any other confusingly similar mark; and (viii) assisting, aiding or abetting any other person or entity in engaging in or performing any such activities.

      This Memorandum Opinion and Order resolves Docket Entry Nos. 19 and 27. This case remains referred to Magistrate Judge Fox for general pretrial management.

      SO ORDERED.

Dated: New York, New York
      May 19, 2020

                                                          /s/ Laura Taylor Swain
                                                          LAURA TAYLOR SWAIN
                                                          United States District Judge