# EXHIBIT G

**From:** George, Sara <sara.george@sidley.com>
**Date:** Thursday, May 28, 2020, 6:25 AM
**To:** Hammel, Jeff (NY) <Jeff.Hammel@lw.com>
**Subject:** TRG v TRUSA

Dear Mr Hammel

I am responding to the letter sent to General Sir Nick Parker enclosing the injunction you obtained from Judge Laura Taylor Swain

We note that the judge has subsequently ordered an expedited hearing of an application to stay the injunction and that the parties are directed to meet and confer promptly to use their best efforts to reach a negotiated resolution of the issues of security and stay pending an application to the Court of Appeals for a further stay pending appeal, and that they are required to file a status report by 1 June 2020 as to whether they have reached agreement on either or both of those issues. We trust that you will take the opportunity to reflect on the serious harm you have done by seeking an injunction against a British charity operating frontline services upon which this country depends in a state of emergency and that you will either support the application for a stay or apply to vary the terms of the injunction so as to ensure that there is no disruption for the duration of the United Kingdom's response to the Covid 19 pandemic.

Although not a party to the dispute, it is the beneficiaries of the British charity who are the parties seriously and immediately detrimentally affected by the injunction.

Such an injunction can only be enforced in England and Wales by the High Court of England and the Court is likely to be deeply troubled by any such attempt to enforce the injunction because of the obvious public health implications of bodies being left uncollected, the supply of PPE to those whose lives depend on its provision in a time of serious national shortage being disrupted, shielded individuals being left to starve and doctors and nurses who are treating Covid 19 victims entering the community to obtain essential food and supplies because you have shut down the hospital supermarkets which the British charity has been supplying.

Every vehicle, every item of protective clothing, every communication network, every resource at the charity's disposal was purchased with donor funds and is likely to have on it somewhere one of the marks to which the injunction applies. There is absolutely no harm, no damage and no possible loss of reputation to TRUSA by the provision of emergency services.

Conversely, the level of public opprobrium to which both Jake Woods and Latham & Watkins will be subject by the British public and the British press were it to become publicly known that they had procured an injunction which prevents a British charity from collecting the dead, feeding the shielded and supplying PPE would far outweigh any harm to the reputation of TRUSA from a single incident of unproven sexual harassment.

One of the hospitals where a free supermarket for doctors and nurses provided by the Charity currently operates will close as a result of the injunction you have procured. It is immediately adjacent to the London Offices of News International which houses the European desk of many US titles including the Wall Street Journal.

An example of the extraordinarily harmful impact of the injunction you have obtained on just one hospital in the United Kingdom is the position of Peterborough Hospital. The charity is preventing the hospital mortuary from being overwhelmed and is running a decontamination unit for used PPE. According to the terms of the injunction you have obtained those services must immediately terminate. If hospitals cannot remove the remains of the deceased they cannot free up beds for the living. PPE is in such short supply that used PPE (items which are not designed for reuse) is being decontaminated for reuse by doctors and nurses. It is the only protection from infection that they have.

We also note that you appear to have procured the injunction on the basis of a fundamental misrepresentation of fact.

On Friday 18 November 2019 at 2pm an extraordinary board meeting was called at the offices of Sidley Austin LLP in London to receive the formal report of the disciplinary panel and to discuss it's recommendations in the light of the concerns raised therein regarding the future relationship with TRG and TRUSA. The Board had been advised by the panel that there were conduct and reputational risks to the Charity caused by the leadership of TRUSA.

The Board meeting was attended by telephone by Dr Stephen Hunt who was a trustee ex officio of TRG. The Board was asked to consider three options:

1. Closing the Charity

2. Withdrawing from all licensing arrangements and continuing to operate the Charity on an independent basis

3. Seeking to remain part of the TR network

The Board decided by 9 votes and 1 abstention that it would withdraw from all licensing arrangements and operate independently.

The charity intended to change its name and to operate in accordance with British laws and consistent with British values. A working group was set up to facilitate the rebranding exercise and the legally qualified trustee was deputised to seek an amicable agreement with TRUSA and TRG on the terms of the separation and did so immediately thereafter.

No sanction, threat, control or directive should have been applied to the charity as of 18 October 2019 under a license from which the trustees had chosen to withdraw.

It is difficult to see any basis upon which TRG could have committed any *"misconduct"* by not requiring the dismissal of Richard Sharp after 18 October 2019 as (i) they did not employ him and (ii) the Board of TRUK had made a binding decision to give up the licence and operate independently and so could not be bound by any decisions of TRG.

Moreover, both TRG and TRUSA knew that TRUK had reached a decision to rebrand and operate independently. TRG because it had a member of its Board at the meeting on 18 October 2019.

TRUSA because there were many contacts between the respective Board Members of the Board of TRUSA and TRUK and because TRUSA authorised their external counsel John Pitts of Kirkland and Ellis to enter into negotiations with TRUK to separate the two organisations. Mr Pitts would not have acted without specific instructions from his client and as a diligent professional no doubt reported back and took further instructions after every contact with former TRUK. It was anticipated that the full separation would have been achieved by 30 January 2020.

We are unable to fathom how it can have been that the version of the facts advanced on behalf of TRUSA should have omitted to include the fact that TRUSA knew that TRUK had decided to give up the license and operate independently. Had you been in any doubt it would have been a simple matter to either ask Mr Pitts or to request the information from the Secretary to the Board of TRUK. No such request was ever received.

We trust that you will act with all proper expedition to remedy the misapprehension of fact caused by the omission.

There is now a narrow window of opportunity for all parties to the dispute to exercise restraint and judgement. We trust that the opportunity will not be missed.

**SARA GEORGE**

**SIDLEY AUSTIN LLP**
70 St Mary Axe
London  EC3A 8BE
+44 20 7360 3741
sara.george@sidley.com
www.sidley.com

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.
Sidley Austin LLP is a Delaware limited liability partnership. A list of names of partners in the Partnership is available at 70 St Mary Axe, London, EC3A 8BE.
Authorised and Regulated by the Solicitors Regulation Authority under number 79075.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the U.S. Internal Revenue Service. These U.S. Treasury regulations set forth the rules governing practice before the U.S. Internal Revenue Service.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*